**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TEXAS PELLETS, INC.,[1] | ) | Case No. 16-90126 |
| | ) | |
| Debtor. | ) | (Request for Joint Administration Pending) |
| | ) | |

**DECLARATION OF BRYAN DAVIS IN SUPPORT OF CHAPTER 11 PETITIONS
AND FIRST DAY PLEADINGS**

Bryan Davis, being duly sworn, deposes and says:

1.　　On April 30, 2016 (the "Petition Date"), Texas Pellets, Inc. ("TPI") and German

Pellets Texas, LLC ("GPTX", and together with TPI, the "Debtors"), as debtors and debtors in

possession in the above-captioned cases, each commenced a case under chapter 11 of title 11 of

the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") with the United

States Bankruptcy Court for the Eastern District of Texas (the "Court").

2.　　I am the Plant Manager for the Facility (defined below) of the Debtors located in

Woodville and Port Arthur, Texas.  In this role, I have become thoroughly familiar with the day-

to-day operations and the business and financial affairs of the Debtors.

3.　　The Debtors continue to operate their businesses and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1109 of the Bankruptcy Code.

4.　　I submit this Declaration (the "Declaration") to assist the Court and the other

parties in interest in understanding the circumstances that compelled the commencement of these

chapter 11 cases and in support of the first day motions and applications filed in these cases (the

"First Day Motions").  Except as otherwise indicated, all facts set forth in this Declaration are

---

[1] The last four digits of the Debtor's Federal Tax Identification Number of **Texas Pellets, Inc**. is 3478.  The Debtor's principal place of business and service address is 164 County Road 1040, Woodville, Texas 75979.

1

based upon my personal knowledge, information provided to me by certain of the Debtors' employees, my review of relevant documents, or my opinion based upon my experience, knowledge, and information concerning the operations and financial affairs of the Debtors.  If I were called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration.

5.      This Declaration is divided into two sections.  Section I provides a brief description of the Debtors' current organizational structure and operations, their current financial condition and the events giving rise to these cases.  Section II sets forth those facts that are most germane to this Court's determination of the Debtors' various motions for first day relief and is intended to supplement any other declarations or affidavits submitted in direct support of such motions.

**I.**
**BACKGROUND AND EVENTS LEADING TO THE COMMENCEMENT**
**OF THE CHAPTER 11 CASES**

**A.      Corporate Structure**

6.      TPI and GPTX are members of the "German Pellets" family of companies, which is a family of related companies centered in Wismar, Germany, operating in the wood pellets industry.  TPI and GPTX have separate ownership, but their operations are closely coordinated, and their interests are extensively interdependent.

**B.      Overview of Business Operations.**

**1.      Overview**

7.      TPI is the owner and developer of a solid waste disposal and wood biomass pellet manufacturing facility located in Woodville, Tyler County, Texas (the "Manufacturing Facility"), and a five-silo pellet storage facility located at Port Arthur, Texas (the "Storage Facility"; and together with the Manufacturing Facility, the "Facility").   The Facility

2

manufactures and handles industrial wood pellets, which are used, among other things, as fuel in power plants, primarily in Europe.

8.     GPTX is the operator of the Facility and leases the Facility, pursuant to that certain Facilities License Agreement, dated July 25, 2012 (the "Operator License"), by and between TPI and GPTX.  Under the Operator License, GPTX received a license to operate the Facility to manufacture and sell wood biomass pellets as part of one operational project (the "Project").

9.     TPI is a party to that certain Ground Lease by and between Port of Port Arthur Navigation District of Jefferson County, Texas, as lessor, and TPI as lessee, dated February 28, 2012 (as amended and supplemented from time to time, the "Ground Lease"), pursuant to which TPI leases certain real and personal property located at Port Arthur as a wood pellet warehouse, storage, and loading facility. The Ground Lease is for an initial 20-year term and granted to TPI a right of first refusal to purchase the property subject to the lease.

10.     TPI (as assignee of GPTX) is a party to that certain Agreement for the Sale and Purchase of Biomass FOB Loading Port, dated as of March 29, 2012, by and between Drax Power Limited ("Drax") and GPTX (as amended and supplemented from time to time, the "Drax Contract").  Under the Drax Contract, Drax has agreed to purchase a set amount of pellets per year with an option to increase or decrease its pellet purchase amount up to a certain percentage of the original purchase amount.  The receipts from the Drax Contract are deposited into the Revenue Fund held under the Indenture, which are used, among other things, to fund the debt service obligations on the Bonds (ad defined herein) under the Indenture.

C.     **Prepetition Capital Structure**

3

11.     TPI is indebted under certain Bonds, as defined and described below. TPI is obligated in an amount of approximately $184,675,000 in principal to the Bond Trustee (defined below) for the benefit of the beneficial holders of the Bonds authorized and issued by the Issuer for the benefit of the Debtors.

12.     UMB Bank, National Association, is the successor trustee (the "Bond Trustee") with respect to the Sanger Texas Industrial Development Corporation Industrial Development Revenue Bonds (Texas Pellets Project), Series 2012B and 2012C issued under that certain Indenture of Trust, dated as of August 1, 2012 (as amended and supplemented from time to time, the "Indenture"), between the Sanger Texas Industrial Development Corporation (the "Issuer") and Wells Fargo Bank, N.A. as original trustee.

13.     The Issuer issued its (i) $157,250,000 Sanger Texas Industrial Development Corporation Industrial Development Revenue Bonds (Texas Pellets Project), Series 2012B (the "Series 2012B Bonds"); and (ii) $29,285,000 Sanger Texas Industrial Development Corporation Industrial Development Revenue Bonds (Texas Pellets Project), Series 2012C (the "Series 2012C Bonds"; and together with the Series 2012B Bonds, the "Bonds"), pursuant to the Indenture.

14.     The proceeds from the sale of the Bonds were loaned to TPI pursuant to that certain Loan Agreement, dated as of August 1, 2012 (as amended and supplemented from time to time, the "Loan Agreement"), between the Issuer and TPI, and were used by the Debtors primarily to, among other things: (i) finance the acquisition, design, development, and construction of the Facility; (ii) refund the previously issued 2012A Bonds; and (iii) pay certain expenses incurred in connection with the issuance of the Bonds.  The rights of the Issuer under the Loan Agreement were assigned to the Bond Trustee under the terms of the Indenture.

15.     The Debtors granted the Bond Trustee a first priority security interest in and lien on the following:

i.      The Pledged Revenues and the Note (each as defined in and pursuant to the Indenture), each as granted under the Indenture;

ii.     all of TPI's right, title and interest in and to its personal property and other assets, whether currently owned or subsequently acquired by or arising in favor of TPI, pursuant to that certain Security Agreement, dated July 25, 2012 (as amended and supplemented from time to time, the "TPI Security Agreement");

iii.    all of GPTX's right, title and interest in and to its personal property and other assets, whether currently owned or subsequently acquired by or arising in favor of GPTX, pursuant to that certain Security Agreement, dated July 25, 2012 (as amended and supplemented from time to time, the "GPTX Security Agreement");

iv.     all of GPTX's right, title and interest in and to those agreements entered into in connection with the Project, pursuant to that certain Consent, Subordination and Attornment Agreement, dated July 25, 2012 (as amended and supplemented from time to time, the "Consent to Assignment");

v.      all of TPI's right, title and interest in and to the Drax Contract, pursuant to that certain Novation, Assignment, Assumption, Consent and Subordination Agreement Drax Power Limited, dated July 25, 2015 (as amended and supplemented from time to time, the "Drax Consent");

vi.     all of TPI's right, title and interest in its real property, pursuant to that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture

Filing, as of July 25, 2012 (as amended and supplemented from time to time, the "Woodville Deed of Trust");

vii.    all of TPI's right, title and interest in the real property subject to the Leasehold Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated July 25, 2012 (as amended and supplemented from time to time, the "Port Arthur Deed of Trust"); and

viii.    any other document or agreement delivered as security for, or in respect to, the Bonds or the Debtors' obligations under any of such documents ("Other Security Documents").

The Indenture, Loan Agreement, Operator License, Ground Lease, Drax Contract, TPI Security Agreement, GPTX Security Agreement, Consent to Assignment, Drax Consent, Woodville Deed of Trust, Port Arthur Deed of Trust, and Other Security Documents, are collectively referred to in thisDeclaration as the "Bond Documents."

16.    Under the grants of security interest in and liens on the Debtors' assets under the Bond Documents, including but not limited to the agreements above, the Bond Trustee holds first priority valid, binding, enforceable and perfected mortgages, pledges, liens and security interests (the "Prepetition Liens") in substantially all of the Debtors' real and personal property as security for its obligations associated with the Bonds (together with the other collateral described in the Bond Documents, the "Prepetition Collateral"), subject only to the Postpetition Liens (as defined herein); Permitted Liens (as defined herein); and the Carve-Out (as defined herein).

D.    **Events Leading To A Chapter 11 Filing**

17.    Prior to the Petition Date, the Facility has operated as a pellet mill for approximately three years.  While the Debtors' operations have continually improved since the

inception of operations, the Debtors have faced certain operational difficulties, adverse weather events, and other difficulties as the Debtors have ramped up operations.

18.     Prior to the Petition Date, the Debtors experienced an acute liquidity crisis by which they required sufficient funds in order to operate in the three weeks leading up to filing the within Chapter 11 Case.  The Debtors approached the Bond Trustee on behalf of the holders of the Bonds and requested an emergency loan sufficient to fund the acute liquidity needs of the Debtors in the three weeks prior to the Petition Date.  The Bond Trustee agreed to provide an emergency loan in the aggregate amount of $1,507,275 to bridge the Debtors into an orderly commencement of the Chapter 11 Case (the "Bridge Loan").

19.     The Bridge Loan is fully secured by valid, perfected liens on assets of the Debtors and are entitled to priority in repayment ahead of all other obligations under the Bond Documents.

20.     The Debtors admit, acknowledge and agree that due to the nature of the Bridge Loan, the parties thereto agreed that the Bridge Loan would be paid in full upon the closing of the DIP Loan Facility pursuant to the terms of the Budget (as defined herein).

21.     In addition, the Debtors experienced limited damage to the Facility from one or more tornados on Wednesday, April 27, 2016, which damaged a conveyor system and two of the pellet silos.  The Debtors have made appropriate claims under their insurance policies, and are assessing the damage from the storm.  The Debtors will be working to address the damage using the proceeds from the DIP Loan (defined below) and insurance proceeds.

## II.
## FIRST DAY PLEADINGS

22.     Concurrently with the filing of this Declarations, the Debtors will be filing a number of first day motions.  The Debtors anticipate that the Court will conduct a hearing soon

after the commencement of the Debtors' chapter 11 cases (the "<u>First Day Hearing</u>"), at which time the Court will hear the First Day Motions.  For those motions being heard at the First Day Hearing, the relief requested therein is necessary and appropriate under the circumstances as the Debtors will suffer irreparable harm if any of the relief requested is not granted.

23.    Generally, the First Day Motions have been designed to meet the goals of: (a) continuing the Debtors' operations in chapter 11 with as little disruption and loss of productivity as possible; (b) maintaining the confidence and support of the Debtors' suppliers, employees, and certain other key constituencies; and (c) establishing procedures for the smooth and efficient administration of these cases.  I have reviewed each of the First Day Motions, including the exhibits thereto, and I believe that the relief sought in each of the First Day Motions is tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to achieve a successful reorganization.  I also believe that the matters addressed in the First Day Motions are of a genuinely emergent nature, and that the relief requested in the First Day Motions is required to preserve the assets of the Debtors' estates and to maintain the Debtors' ongoing business operations.  Moreover, I believe, as further described below, that the failure to immediately address the issues set forth in the First Day Motions will have extremely adverse effects on the Debtors, their estates, and their creditors.

**A.      Emergency Motion for Entry of an Order Authorizing Joint Administration of Related Chapter 11 Cases ("<u>Joint Administration Motion</u>")**

24.    Both Debtors have cases pending before the Court. The Debtors are "affiliates" as that term is defined in section 101(2) of the Bankruptcy Code because GPTX operates the wood-pellets manufacturing facility on TPI's behalf, and their operations are closely related. Joint

administration of the Debtors' Bankruptcy Cases is warranted and will ease the administrative burden for the Court and the parties involved with these Bankruptcy Cases.

25.     The Debtors anticipate that numerous notices, applications, motions, hearings, and orders in these cases will affect both Debtors. With two debtors before the Court, each with its own case docket, the failure to administer these Bankruptcy Cases jointly would result in the filing of duplicative pleadings for each issue that arises in these cases, and the service of these duplicative pleadings on numerous overlapping service lists. Joint administration of these Bankruptcy Cases will eliminate these cumbersome filings and reduce the waste and burden on judicial resources associated with the administration of these cases. Specifically, services rendered by professionals for each debtor will be difficult to separate, justifying consolidated applications for compensation with specific apportionment among the Debtors to occur as set forth in the undersigned counsel's forthcoming application for retention. The Debtors expect that such apportionment will, in general, be approximately equal, with half of all fees and expenses apportioned to TPI's Bankruptcy Case and the remaining half of such fees and expenses apportioned to GPTX's Bankruptcy Case. Joint administration will also reduce the burden on the United States Trustee in supervising these Bankruptcy Cases.

**B.      Motion For Interim And Final Orders (1) Authorizing Debtors in Possession to Obtain Post-Petition Financing; (2) Authorizing Debtors in Possession to Use Cash Collateral; (3) Providing Adequate Protection; and (4) Granting Liens, Security Interests and Superpriority Claims ("DIP Loan Motion")**

26.     The Debtors file the DIP Loan Motion for approval of an interim and final order to approve a debtor in possession financing facility extended by the Bond Trustee, as well as for agreed use of cash collateral pursuant to the agreed Budget (as defined below).  The debtor in possession financing facility and use of cash collateral will allow the Debtors to cover their

necessary operating expenses and ensure continued normal business operations of their wood pellet mill facility, to preserve and enhance the value of the Debtors' assets.

27.    By this Motion, the Debtors request authority to enter into the DIP Facility on an interim basis (and subject to the Final Hearing, on a final basis), by which the Bond Trustee, as DIP lender, will provide a postpetition loan to the Debtors up to in an interim amount of $3,434,000 and additional amounts which may be agreed upon by the Debtors and the Bond Trustee (each, a "<u>DIP Loan</u>"; and collectively, the "<u>DIP Loans</u>"), <u>provided</u>, <u>however</u>, that the Debtors shall use the proceeds of the DIP Loans solely in compliance with the budget attached to the DIP Loan Motion as **Exhibit A thereto** and incorporated herein by reference (the "<u>Budget</u>").

28.    In addition to the request to enter into the DIP Loan, the Debtors have requested the use of the cash collateral (as defined in section 363(a) of the Bankruptcy Code) constituting proceeds of accounts and revenues from operations of the Facilities of the Bond Trustee in connection with the Chapter 11 Case (the "<u>Cash Collateral</u>").  The Bond Trustee does not consent to the use of its Cash Collateral, except upon the express terms of the Interim Order and Final Order.   Without the use of Cash Collateral, it would disrupt the Debtors as a going concern, the value of the underlying assets would significantly decline, and would not be in the best interest of the Debtors, their estate, or their creditors.

29.    The Debtors expressly acknowledge that at the expiration of the Interim Order, the Bond Trustee, in its sole and absolute discretion and subject to entry of the Final Order, may continue to advance funds under the DIP Facility, up to a maximum amount as established and agreed to between the parties.  The Debtors further expressly acknowledge that there is no obligation by the Bond Trustee to continue funding upon expiration of the Interim Order.

30.     The Debtors have determined that they are unable to obtain secured credit from sources other than the Bond Trustee that would be allowable under sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code for the purposes set forth in the Interim Order. Further, the Bond Trustee would not consent to any priming liens except as set forth in the Interim Order, asserting that the Debtors could not have provided adequate protection for any such proposed financing.

31.     18.     The Bond Trustee has agreed to provide the requested DIP Loan under the DIP Facility and use of Cash Collateral in accordance with the terms contained in the Interim Order, including in the amounts, categories and times set forth in the Budget, which shall be used on an interim basis for: (i) operational expenses of the Debtors and the Facility; (ii) repayment of the Bridge Loan in full; and (iii) other costs and expenses of administration of the Chapter 11 Case.

32.     Further, the Debtors seek authority under this Motion to enter into additional DIP Loans in amounts which may be agreed upon between the Debtors and the Bond Trustee and submitted in advance of the Final Hearing on the Motion.

33.     Without the DIP Loan and use of Cash Collateral, the Debtors will be unable to pay its necessary preservation and maintenance costs, payroll and other operating expenses, and obtain goods and services needed to preserve the Facility in a manner that will avoid irreparable harm to the Debtors' estates.  At this time, the Debtors' ability to finance the preservation and maintenance of their assets and the availability of sufficient liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations as provided herein are vital to the preservation of the Facility and maintenance of the going concern value of the Debtors' estates.

34.     The Bond Trustee has indicated its willingness to provide the DIP Loans and allow the use of Cash Collateral, subject to the terms and conditions set forth in the Interim Order.  The Bond Trustee's lending of the DIP Loans is conditioned upon the grant of a lien that (a) will prime and remain senior to the Prepetition Liens; and (b) will otherwise constitute a first priority lien in all other Postpetition Collateral, subject only to (i) valid, binding, enforceable and perfected liens, having priority over the liens of the Bond Trustee as of the Petition Date that are set forth on Schedule 1 to the Interim Order, and (ii) the Carve-Out.

35.     The terms of the DIP Loan and use of Cash Collateral have been negotiated in good faith and at arm's length among the Debtors and the Bond Trustee.  The terms of the DIP Loan are at least as favorable to the Debtors as those available from alternative sources, under all of the circumstances.  Given the current market conditions and under the particular circumstances of the Chapter 11 Case, there are no other sources of funding.  Given the exigencies of the case, the Debtors believe the DIP Facility is the best and only option.  In connection with its consent to this Interim Order, the Debtors acknowledge and agree that the Bond Trustee exercised its rights and powers and used the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs and the Bond Trustee acted consistent with its duties and responsibilities under, and entry of the Interim Order does not violate, the terms of any agreement relating to the Bonds.

36.     The terms for the proposed DIP Facility and use of Cash Collateral are set forth in the Interim Order and the principal terms are summarized as follows:

| | |
|---|---|
| Borrowers: | Texas Pellets, Inc. and German Pellets Texas, LLC |
| Lender: | UMB Bank, National Association, as successor trustee with respect to the Sanger Texas Industrial Development Corporation Industrial Development Revenue Bonds (Texas Pellets Project), Series 2012B and 2012C issued under that certain Indenture of Trust, dated as of August 1, 2012 |
| DIP Facility: | A credit facility, with an interim amount disbursed up to $3,434,000. All DIP Loans shall be subject to the Budget. |
| Use of Proceeds: | DIP Loan proceeds shall be used on an interim basis exclusively for (i) the necessary operation and maintenance costs associated with the Project in the amounts and categories and time set forth in the Budget; (ii) other costs and expenses of administration of the Chapter 11 Case as set forth in the Budget. |
| Use of Cash Collateral: | The Debtors' use of Cash Collateral shall be solely as set forth in the Budget and as otherwise provided in this Interim Order for: (i) the necessary operation and maintenance costs associated with the Project in the amounts and categories and time set forth in the Budget; (ii) repayment of the Bridge Loan in full; and (iii) other costs and expenses of administration of the Chapter 11 Case as set forth in the Budget. Use of Cash Collateral other than as set forth in this Interim Order, including in accordance with the Budget, shall be strictly prohibited. |
| Interest and Fees: | The DIP Loans under the Interim Order shall not accrue under the Interim Order. Under the Final Order, however, the DIP Loans will accrue interest at a rate equal to [TBD]% per annum based upon the principal amount of necessary bonds issued to fund the DIP Loans, in the aggregate, under the Final Order. Upon the occurrence of an Event of Default, the DIP Loans shall accrue interest at a default rate of interest equal to 2% over the Applicable Rate and such interest will be payable on demand. |
| Maturity Date: | The earliest to occur of the following: (i) the occurrence of an Event of Default; and (ii) May 31, 2016. |

| <u>Security and Priority to Bond Trustee for DIP Loans:</u> | Postpetition Liens granted pursuant to Bankruptcy Code sections 364(c)(2), (c)(3) and (d) in the Postpetition Collateral, consisting of all currently owned or hereafter acquired property and assets of the Debtors of any kind or nature, excluding Avoidance Actions (pending Final Order). |
|---|---|
| | A Superpriority Claim pursuant to Bankruptcy Code section 364(c)(1), having priority over all other unpaid administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code (subject only to Carve-Out). |
| | The Postpetition Liens and Superpriority Claim granted to the Bond Trustee are subject only to the Carve-Out. |
| <u>Adequate Protection to Bond Trustee for Prepetition Liens and Bond Claim:</u> | The Bond Trustee will receive: (a) Rollover Liens, (b) Supplemental Liens, (c) Prepetition Superpriority Claim, (d) Financial Reports, and (e) covenant to comply with certain terms of the Bond Documents (subject only to Carve-Out). |
| | In addition, the Bond Trustee, for the benefit of holders of the Bonds, shall be entitled to interest payments at the non-default contract rate (provided, however, that the Bond Trustee reserves the right to assert interest at the default rate in connection with any claims asserted in the Chapter 11 Case), which shall be accrued in accordance with the Bond Documents and payable pursuant to the Budget (the "<u>Adequate Protection Payments</u>") |
| <u>Carve Out:</u> | (a) $100,000 for the sole benefit of the estate professionals (to the extent of any unpaid amounts set forth in the Budget at the time of a Termination Event, and  subject to approval by the Court), and (b) the payment of fees pursuant to 28 U.S.C. § 1930. |

14

| Milestones: | | |
|---|---|---|
| | (i) | On or before May 8, 2016, the Debtors shall file a motion with the Bankruptcy Court seeking the retention of an independent Chief Restructuring Officer (the "<u>CRO</u>") acceptable to the Bond Trustee, upon such terms and conditions of retention acceptable to Debtors and the Bond Trustee.  Such terms and conditions shall provide that the CRO shall, among other things, and subject to his business judgment and fiduciary responsibilities and with the assistance of the Debtors' executive officers, assume a lead management position in guiding the Debtors through their reorganization efforts and the evaluation, development, negotiation and implementation of such restructuring efforts, provide advisory services, management of the Project and Debtors' business, facilitate, assist in the development and implementation of an affiliation or sale, if any, of substantially all assets under the Bankruptcy Code; |
| | (ii) | The Bankruptcy Court shall have entered an order no later than May 15, 2016, in form and substance satisfactory to the Bond Trustee authorizing the Debtors' retention of the CRO; |
| | (iii) | On or before July 11, 2016, the Debtors shall file a motion with the Bankruptcy Court seeking the retention  (the "<u>IB Motion</u>") of an investment banker (the "<u>IB</u>") acceptable to the Bond Trustee, upon such terms and conditions of retention acceptable to the Debtors and Bond Trustee to solicit offers relating to the affiliation or acquisition of the Project through a section 363 sale or as a plan sponsor under a plan of reorganization; <u>provided</u>, <u>however</u>, that the obligation to file the IB Motion shall be suspended to the extent the Bond Trustee receives a term sheet in form and substance acceptable to the Bond Trustee in its sole and absolute discretion that provides for the refinancing/restructuring of the Bonds and the process for consummation of such refinancing/restructuring within a time period acceptable to the Bond Trustee; |
| | (iv) | Subject to the proviso in subsection (iii) above, the Bankruptcy Court shall have entered an order no later than August 1, 2016, in form and substance satisfactory to the Bond Trustee approving the IB Motion; |

15

| | |
|---|---|
| | (v)   On Tuesday of each week (or such other day as may be agreed upon by the parties) the Debtors, CRO and IB (if/when approved) shall make available representatives reasonably acceptable to the Bond Trustee for a telephone conference call with the Bond Trustee, holders of the Bonds, and their respective agents, advisors and/or representatives to discuss the cash flows, operations, the marketing, affiliation or acquisition process of the Project, and such other matters as are relevant or are reasonably requested by the Bond Trustee; and |
| | (vi)   On or before fourteen days after approval of the IB Motion, the Debtors and the Bond Trustee shall have agreed to a marketing and sale process with specific further milestone dates acceptable to the Bond Trustee. |
| 506(c) Waiver | Except to the extent of the Carve-Out, subject to entry of the Final Order no expenses of administration of the Chapter 11 Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Postpetition Collateral, the Prepetition Collateral or collateral subject to Rollover Liens and Supplemental Liens, pursuant to section 506(c) or 552(b) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the Bond Trustee and no such consent shall be implied from any other action, inaction, or acquiescence by the Bond Trustee. |

37.     The Debtors have determined that they are unable to obtain financing in another manner, or on any terms superior to those in the Interim Order.  The Debtors submit that obtaining the Interim Order is necessary to fund their postpetition operating expenses for preservation and maintenance and allows the Debtors to successfully pursue a reorganization or disposition of their assets as a going concern.

38.     The Debtors request the Court enter the Interim Order as soon as practicable to allow the Debtors access to the funds necessary to cover operational expenses; and that the Court schedule a Final Hearing on the matter with notice to creditors. Without the DIP Loan, the Debtors will be unable to pay their necessary payroll and other operating expenses, and obtain

goods and services needed to preserve and operate the Facility in a manner that will avoid irreparable harm to the Debtors' estates.

39.     The terms of the DIP Loan have been negotiated in good faith and at arm's length among the Debtors and the Bond Trustee.  The terms of the DIP Loan are more favorable to the Debtors than those available (if any) from alternative sources, under all of the circumstances. Given the current market conditions and under the particular circumstances of the Chapter 11 Case, there are no other sources of funding.  Given the exigencies of the case, the Debtors believe the DIP Loan is the best and only option.

40.     Pursuant to this Motion and the Final Hearing under this Motion, the Debtors will further request entry of a Final Order concerning potential additional financing (beyond the 30-day period under the Interim Order) under an amended and extended Budget, details of which are currently being discussed.  To the extent agreed upon, the amended longer term form of Budget will be filed and presented to the Court and parties in interest as soon as possible.

41.      It is essential to the Debtors' successful reorganization and the going concern value of their businesses that they have sufficient funds to operate in the ordinary course, and at a level that is on par with their prepetition performance. Absent the use of Cash Collateral (in conjunction with the DIP Facility), the Debtors will not have sufficient working capital to (a) make payments to employees, vendors, or suppliers, (b) satisfy ordinary operating costs, and (c) fund the administrative costs of these chapter 11 cases.  Accordingly, the Debtors submit that the use of Cash Collateral under the terms set forth herein and in the Interim and Final Order, is in the best interests of the Debtors' estates and should be approved.

**C.**    **Emergency Motion For Entry Of An Order (I) Authorizing The Debtors To Continue Prepetition Insurance Coverage Policies And Practices; (II) Continuing Bond Coverage, And (III) Directing Banks To Honor All Payments Related Thereto ("<u>Insurance Motion</u>")**

42.    In connection with the operation of their businesses, the Debtors currently maintain numerous insurance policies and programs providing coverage for, among other things, the following: General Liability, Worker's Compensation; Homeowner, Builder's Risk, Pollution, Wind and Hail, Boiler and Machinery, Inland Marine, Auto Liability, and certain excess liability coverages (collectively, the "<u>Insurance Programs</u>").  The Debtors' Insurance Programs are maintained with several different insurance carriers (the "<u>Insurance Carriers</u>") and include, but are not limited to, those Insurance Programs identified on <u>Exhibit A</u> attached to the Insurance Motion.

43.    The Insurance Programs are essential to the preservation of the value of the Debtors' businesses, property, and assets.  In many cases, insurance coverage such as that provided by the Insurance Programs is required by the diverse regulations, laws, and contracts that govern the Debtors' commercial activities.

44.    The annual premiums for the Debtors' current Insurance Programs total approximately $2,323,913.00.   As of the Petition Date, the Debtors owe $1,179,900.00 for their Property coverage and $8,174.20 for Boiler & Machinery coverage.  A Boiler & Machinery payment of $8,174.20 will become due later in May 2016, and Debtors also anticipate a payment for Inland Marine coverage will be due in a few weeks in the amount of $5,107.00.   Debtors have budgeted for the outstanding insurance payments in connection with their debtor-in-possession financing, which is the subject of a separate motion.

45.    Pursuant to certain of its liability and property Insurance Programs, the Debtors are required to pay various deductibles (collectively, the "<u>Insurance Deductibles</u>").  Under the

majority of the liability and property Insurance Programs, the Insurance Carrier pays claims directly to the claimant and then seeks reimbursement from the Debtors for the Insurance Deductible; in certain instances, the Debtors will pay the deductible amount directly to the claimant.

46.     The Debtors employ an insurance broker, Wells Fargo Insurance Services USA (the "Broker"), to assist with the procurement and negotiation of the Insurance Programs.  The Broker earns commissions for its services (the "Broker Commission").  While the Debtors believe that payment of the Broker Commission post-petition would simply be a payment in the ordinary course of business for post-petition services, out of an abundance of caution, the Debtors seek authority for the Broker Commission to be paid (including any outstanding as of the Petition Date) in the ordinary course of business.

47.     In the ordinary course of business, the Debtors procure bonds (collectively, the "Bonds"), including without limitation, bonds to satisfy Louisiana Private Works Act liens, for the benefit of third-party beneficiaries.  Debtors may be required to purchase the Bonds in connection with services performed by the Debtors or as required by state and local law.  The Bonds are thus vital for the maintenance of the Debtors' businesses.  As of the Petition Date, the Debtors believe that they have paid all premiums due and owing on the Bonds.  However, the Debtors seek permission to renew the Bonds or, as necessary, procure new Bonds postpetition in the ordinary course of their business, and pay premiums related thereto.

**D.      Emergency Motion For Entry Of An Order Under 11 U.S.C. §§105, 363, 364, 1107 And 1108 Authorizing Maintenance Of Existing Bank Accounts, Continued Use Of Existing Business Forms And For Related Relief ("Bank Account Motion")**

48.     The Office of the United States Trustee for the Eastern District of Texas (the "UST") has established certain operating guidelines for debtors in possession in chapter 11 cases.

These guidelines require debtors in possession to, among other things, (a) close existing bank accounts and open new accounts, (b) obtain checks for all debtor-in-possession accounts that bear the designation "Debtors in Possession" and the bankruptcy case number, and (c) deposit funds only in authorized financial institutions. These requirements, designed to provide a clear line of demarcation between prepetition and postpetition claims and payments, help prevent the inadvertent payment of a prepetition claim by preventing banks from honoring checks drawn before the bankruptcy filing.

49.     Prior to the Petition Date, each of the Debtors, in the ordinary course of business, maintained active accounts at Citizen State Bank (the "Bank").  Those accounts are identified on Exhibit A to the Bank Account Motion (collectively, the "Accounts").

50.     The Debtors seek a waiver of the UST's requirement that the Accounts be closed and new postpetition accounts be opened. If enforced in these cases, the requirement would cause undue disruption to the Debtors' cash flow and business operations. In order to continue their operations and preserve the value of their businesses, the Debtors need to be able to continue to issue checks to vendors, service providers, employees and others. Additionally, changing from the current Accounts would cause the Debtors to incur additional expense and could cause delays in payments for which the Debtors could incur penalties and interest.

51.     A waiver of the account closing requirement is necessary here. Subject to a prohibition against honoring prepetition checks without specific authorization from this Court, the Debtors request that the Accounts be deemed debtor-in-possession accounts and that the Debtors be authorized to maintain and continue the use of these Accounts in the same manner and with the same Banks, account numbers, styles, and document forms as those employed during the prepetition period.

52.     To minimize expense to their estates, the Debtors also request authority to continue to use all correspondence and business forms (including, but not limited to, letterhead, purchase orders, invoices, etc.), as well as checks and bookkeeping records existing immediately before the Petition Date, without reference to their status as debtors-in-possession.

53.     The Debtors purchase their checks in bulk. Changing checks, correspondence and business forms would be unnecessarily burdensome to the estates, as well as expensive and disruptive to the Debtors' business operations. These additional costs will reduce the resources available in the Debtors' estates to satisfy the claims of creditors and other parties-in-interest. Similarly, opening a new set of books and records as of the Petition Date would create unnecessary administrative burdens and expense. For these reasons, the Debtors request authority to continue to use their existing records as well as their checks and business forms without placing the label "Debtor in Possession" on such checks or forms.

**E.      Motion For Entry Of Interim And Final Orders (I) Authorizing Payment Of Wages And Employee Benefits; And (II) Directing Financial Institutions To Honor And Process Checks And Transfers Related To Such Obligations ("Wages Motion")**

54.     In the ordinary course of their business, the Debtors incur payroll and various other obligations and provide other benefits to its employees for the performance of services.  As of the Petition Date, Debtors employed approximately 98 employees, including both full time and part time employees, with some employees salaried and others paid on an hourly basis (collectively, the "Employees").

55.     The Debtors have costs and obligations with respect to the Employees relating to the period prior to the Petition Date.  Certain of these costs and obligations are outstanding and due and payable, while others will become due and payable in the ordinary course of the Debtors' business after the Petition Date.

56.     Finally, the Debtors request authorization to modify the Automatic Stay to permit employees with valid workers' compensation claims to pursue those claims under the Workers' Compensation Program (as defined herein).

57.     Prior to the Petition Date and in the ordinary course of business, the Debtors typically paid obligations relating to wages, salary and compensation for the Employees (collectively, the "Wage Obligations") through direct deposits into Employees' accounts on a bi-weekly basis (paid every other Friday).[2]   The Debtors' current estimated monthly gross payroll (including tax and other withholding) is approximately $350,000.00.   Following the Debtors' customary payroll schedule, the next payroll is due to be paid on May 6, 2016.   The Debtors will pay such postpetition Wage Obligations.

58.     The Debtors issued paychecks to Employees on April 22, 2016.   However, the Debtors believe that not all such paychecks have been cashed yet, and seek permission to direct the Bank (as defined herein) to honor such paychecks.

59.     The Debtors seek to be authorized, but not required, to pay any outstanding Wage Obligations due and owing up to $350,000, and to pay all Wage Obligations that arise post-petition in the ordinary course of business.

60.     The Employees and management incur various expenses (collectively, the "Reimbursable Expenses") in the discharge of their ordinary duties.   Specifically, the Debtors reimburse for a variety of business expenses, including without limitation, travel expenses and general expenses incurred for the Debtors' benefit.   Because these expenses are incurred as part of their official duties and in furtherance of the Debtors' business, the Employees and managers

---

[2] Employees are paid in arrears, for work performed in the previous week[s].

are reimbursed in full after submission of appropriate documentations to the Debtors' accounting department and with appropriate approvals.  Expenses are reimbursed on a rolling basis.

61.     Reimbursable Expenses are paid by the Employees or managers using cash or personal credit cards and the costs of these Reimbursable Expenses are reimbursed once it is determined that the charges are for legitimate reimbursable business expenses.

62.     Although it is difficult for the Debtors to determine the amount of Reimbursable Expenses outstanding at any particular time, the Debtors estimate that no amounts in Reimbursable Expenses remain outstanding as of the Petition Date.

63.     The Reimbursable Expenses were all incurred as business expenses on the Debtors' behalf and with the understanding that they would be reimbursed. Accordingly, to avoid financial harm to Employees who incurred Reimbursable Expenses, the Debtors request authority, to be exercised in their sole discretion, to (a) continue reimbursing the Reimbursable Expenses in accordance with prepetition practices, and (b) pay all Reimbursable Expenses due and owing (including those that accrued prepetition), or that may become due and owing, to Employees and managers.

64.     The Debtors are required by law to withhold from the Wage Obligations amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes (collectively, the "Withholding Taxes") and to remit the same to the appropriate taxing authorities (collectively, the "Taxing Authorities").  In addition, the Debtors are required to make matching payments from their own funds on account of social security and Medicare taxes and to pay, based on a percentage of gross payroll and subject to state-imposed limits, additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (collectively, the "Employer Payroll Taxes" and, together with the Withholding Taxes,

the "Payroll Taxes").  The Debtors request the authority to pay these Payroll Taxes in the ordinary course of business.

65.     The Debtors remit most of the Payroll Taxes to the Taxing Authorities on a quarterly basis. As of the Petition Date, the Debtors were current on its Payroll Taxes obligations due for past quarters but are accruing additional amounts due for next quarter.   The Debtors seek authority to pay these prepetition, outstanding Payroll Taxes in the ordinary course of business.

66.     Payroll Processing Fee.  Payments to the Employees are handled on a centralized basis and with the assistance of a third party payroll processor, ADP. A day before payday, the Debtors' payroll account are funded with enough money to cover payroll for the pay period. ADP calculates the payroll obligations, handles direct deposits, prints the checks for Employees who elect to receive paychecks, sends the checks to the Debtors for distribution to Employees, and pays payroll taxes and other applicable deductions required by law. ADP charges a nominal fee of approximately $500.00 - $600.00 per month for this service. The Debtors estimate that they owe ADP approximately this amount for accrued prepetition amounts, and the Debtors seek authorization to pay this nominal amount to ADP.

67.     In the ordinary course of business, the Debtors have established various benefit plans and policies for their Employees, which can be divided into the following categories (collectively, the "Employee Benefits"): (1) medical, dental, vision, and short term disability (collectively, the "Health and Welfare Plans"); and (2) allows two weeks paid vacation.

68.     The Debtors deduct specified amounts from the Employees' wages in connection with certain of the Employee Benefits, such as health, vision, and dental insurance.

69.     The Debtors offer a Basic Healthcare Package to all of its full-time Employees. The Basic Healthcare Package is administered by insurance vendors: (i) Blue Cross Blue Shield

of Texas for group health; (ii) Guardian for vision and dental ("collectively, the "Benefits Insurers").

70.     Within the Basic Healthcare Package, the Debtors' medical coverage is provided through fully-insured medical plans (the "Medical Plans") administered by Blue Cross Blue Shield of Texas for the Debtors' full time employees.  The Debtors pay approximately $55,000.00 to Blue Cross Blue Shield on a monthly basis for coverage under the Medical Plans. As of the Petition Date, the Debtors estimate that they are current with Blue Cross Blue Shield. Payments for subsequent months will become due each month after the Petition Date.

71.     Guardian administers the Debtors' fully-insured dental and vision plans ("Guardian Plans").  The Debtors pay $3,500.00 on a monthly basis for coverage under the Guardian Plans.  As of the Petition Date, the Debtors estimate that they owe Guardian approximately $3,294.32, in accrued and unpaid prepetition amounts on account of the Guardian Plans, for April 2016.  Payments for subsequent months will become due each month after the Petition Date.

72.     The Debtors maintain group life insurance and short-term disability administered by Principal for certain of their full-time Employees ("Principal Plans").  The Debtors pay approximately $1,200.00 on a monthly basis for coverage under the Principal Plans.  As of the Petition Date, the Debtors estimate that they owe Principal approximately $1,094.24 in accrued and unpaid prepetition amounts on account of the Principal Plans for April 2016.  Payments for subsequent months will become due each month after the Petition Date.

73.     Full-time Employees are eligible, in certain circumstances, to receive their full wages for, among other things, vacation time ("PTO").  The Employees earn their annual PTO days based on their length of service.  Generally, this amount is not a current cash payment

25

obligation as to Employees and as such, most Employees will receive their vacation time as paid time off in the ordinary course of business (and not as a cash payment). The Debtors seek approval to pay such amounts in the ordinary course of business.

74. The Debtors also administer other PTO programs for holidays and bereavement. The Debtors are not aware of any accrued and unpaid obligations relating to these programs, which allow Employees to take paid days away from work, but do not entitle the Employees to any payments for earned and unused PTO.

75. The Debtors are required to maintain for its Employees workers' compensation coverage for claims arising from or related to their employment with the Debtor (the "Workers' Compensation Program"). The Debtors currently maintain their Workers' Compensation Program with Texas Mutual Insurance Company (the "Workers' Compensation Insurer") as insurer.

76. Pursuant to the Workers' Compensation Program, the Debtors pay to the Workers' Compensation Insurer premiums that are calculated using the Debtors' payroll and historic loss rates (the "Workers' Compensation Premiums"). The Debtors project that, as of the Petition Date, the Debtors have accrued approximately $44,081.05 in prepetition amounts due as Workers' Compensation Premiums, and seek authority to, in their discretion, pay such Workers' Compensation Premiums. Further, the Debtors seek to be authorized, but not be required to continue to pay the Workers' Compensation Premiums that accrue subsequent to the Petition Date in the ordinary course of business.

**F.    Initial Emergency Motion for an Extension of Time for Filing Schedules and Statements of Financial Affairs Pursuant to Fed. R. Bankr. P. 1007(c) and Local Rule 1007(b) filed by GPTX**

**And**

**Initial Emergency Motion for an Extension of Time for Filing Schedules and Statements of Financial Affairs Pursuant to Fed. R. Bankr. P. 1007(c) and Local Rule 1007(b) filed by TPI**

**("Schedules Motions")**

77.     The Debtors seek an initial extension of time through **May 31, 2016** within which to file its Schedules and Statements of Financial Affairs (the "Schedules and Statements") as required by Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules" or "FRBP"). This represents a short, two-week extension from the original filing deadline of May 16, 2016.

78.     To properly complete the Schedules and Statements in the Bankruptcy Cases, the Debtors must prepare, among other items, lists of assets, lists of payments made to creditors, lists of payments made to insiders, and lists of both executory contracts/unexpired leases and the counterparties to those contracts/leases.  Obtaining this information requires the Debtors to collect, review, and assemble considerable amounts of data—much of which is located in Germany rather than in the United States. Several of the Debtors' key personnel are also based in Germany. Because of the foreign location of both this information and the Debtors' key employees, the Debtors need more time to complete the Schedules and Statements than would debtors whose books, records and representatives are located entirely in the United States. Furthermore, certain of the Debtors' German affiliates are in administration proceedings in Germany, which further complicates the Debtors' efforts to gather and process the considerable information necessary to complete the Schedules and Statements by the original May 16, 2016 deadline.

**G.** **Emergency Motion for an Order Pursuant to Sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 6004 Authorizing the Debtors to Pay Prepetition Claims of Critical Vendor Mid South Fire Solutions, LLC ("Critical Vendor Motion")**

79.     Prior to the Petition Date, GPTX had hired Mid South Fire Solutions, LLC ("Mid South") to perform certain work related to the fire-suppression system at the Debtors' wood-pellet manufacturing plant located near Woodville, Texas (the "Manufacturing Facility"), which is owned by TPI and operated by GPTX.

80.     As of the Petition Date, Mid South had provided, in part, certain materials, equipment and services to the Debtors at the Manufacturing Facility in connection with the installation of this fire-suppression system. However, the Debtors had not paid Mid South in full for these prepetition materials, equipment and services. Mid South was therefore owed as of the Petition Date a total of $130,701.47.

81.     The Debtors have determined that the continued services and materials to be provided in the future by Mid South are critical to the Manufacturing Facility's continued operations.  In particular, continued and ongoing maintenance and work on the fire suppression system is critically important.  The Debtors expect to continue using Mid South for future work, but they do not have an overarching master service or similar agreement with Mid South that the Debtors can assume under Bankruptcy Code § 365. Mid South has indicated that, unless its prepetition claim is paid in full, it will not provide any future services to the Debtors. For these reasons, the Debtors have concluded that they should treat Mid South as a "critical vendor" and request authority from this Court to do so. The Debtors' Bondholders have agreed, in connection with the proposed debtor-in-possession financing that the Debtors seek to have approved in these Bankruptcy Cases, to include in the proposed debtor-in-possession budget the amounts necessary to satisfy Mid South's prepetition claims under the terms set forth in this Motion.

28

82. Specifically, Mid South and GPTX have agreed that GPTX will pay up to one hundred percent (100%) of the prepetition amount owed to Mid South ($130,701.47). GPTX will first make a down payment of seventy-five percent (75%) of this amount and then pay Mid South the remaining twenty-five percent (25%) (including the release of any retainage) upon GPTX's acceptance of Mid South's completed work. In exchange for this treatment as a critical vendor and the payment of one hundred percent (100%) of Mid South's prepetition claim, Mid South will continue to do business with the Debtors post-petition under identical terms and conditions. The Debtors have concluded that this business arrangement with Mid South is necessary to protect both the Debtors' property and the interests of their creditors and estates.

83. In the Critical Vendor Motion, the Debtors request entry of an order authorizing the Debtors to pay Mid South $130,701.47 and release a retainage totaling $47,718.98 to Mid South so that Mid South will continue to provide services related to the fire-suppression system and be bound to continue providing and/or supplying new and/or additional work to the Debtors post-petition under similar terms and conditions.

**H.      Emergency Motion Pursuant To Sections 105(A) And 363(B) Of The Bankruptcy Code For Interim And Final Orders Authorizing The Debtors To Enter Into Management Services Agreement With German Pellets Gmbh ("Management Services Agreement Motion")**

84. In order to move towards formulation and confirmation of a plan of reorganization, the Debtors need to make sure that their business operations are stabilized.

85.     Before the Petition Date, management services for the Debtors were provided by approximately 25 personnel ("Management Personnel") of German Pellets GmbH, another company within the "German Pellets" family of companies.  Information technology, accounting and logistics support to the Debtors has also traditionally been provided through German Pellets GmbH.  All management functions for the Debtors have been provided by the Management Personnel.

86.     It is critically important that the Debtors continue to receive management services and support from the Management Personnel.  The Debtors simply would not be able to function and continue normal business operations without continued services of the Management Personnel and the logistical and support functions provided through German Pellets GmbH.

87.     Because German Pellets GmbH is in its own insolvency proceedings under German law, it is necessary for the Debtors to remit the costs to cover the critical Management Personnel and other services provided by German Pellets GmbH.

88.     This Motion requests entry, of first, an interim order providing for four weeks of initial approval and funding for the Management Personnel.  Debtors plan to continue to discuss terms for a longer term agreement and final order regarding management during the interim period and in advance of a final hearing on this Motion.

89.     A copy of the Management and Operational Support Services Agreement ("Management Agreement") is attached to the Management Services Agreement Motion as Exhibit A.  The Management Agreement provides that the Management Personnel will provide a variety of management services ranging from management, to bookkeeping.  The scope of services is generally set out in Exhibit A to the Management Agreement.

90.     The cost of management services under the Management Agreement for the four-week interim period under the Interim Order requested under this Motion is $180,000.  This cost is necessary to provide for employment of approximately 25 personnel, office space, and expenses and other overhead.  Debtors submit that such cost is reasonable given the scope of services provided.

91.     The Management Personnel covered by the Management Agreement include all of the critical managers for the Debtor's business facilities (defined as the Manufacturing Facility and Storage Facility under the Davis Declaration).  Under the Debtors' previous business practices, none of the critical managers are employees of the Debtors.

92.     The Bond Trustee has reviewed the Management Agreement and agrees with the interim relief requested.  The Debtors, in consultation with the Bond Trustee will discuss the structure for a longer term management agreement (including scope and pricing) in advance of the Final Hearing on this matter.

93.     **Immediate entry of the interim relief requested is necessary to prevent irreparable injury to the Debtors.**  Because German Pellets GmbH is itself in insolvency proceedings, if the Management Agreement is not entered into on an immediate basis, German Pellets GmbH may not be able to retain the critical Management Personnel.   Simply put, if the Management Agreement is not entered into on an immediate basis, the Debtors will lose all of their Management Personnel, which would be disastrous to the Debtors' business and to the value of the Debtors' assets.

94.     It should be noted that German Pellets GmbH is the indirect corporate parent of German Pellets Texas, LLC, and is therefore an insider and affiliate of Debtor German Pellets Texas, LLC.  Nevertheless, the Debtors submit that the management arrangement and costs are

reasonable.    Payment of the costs under the Management Agreement is necessary to keep the critical managers and support services in place.    During the interim four week period, the Debtors will be discussing a longer term arrangement and will present terms for such arrangement at the final hearing on this matter.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


Executed on May 2, 2016

By:*/s/ Bryan Davis*
Name: Bryan Davis
Title: Plant Manager, German Pellets Texas, LLC