## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## LUFKIN DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| TEXAS PELLETS, INC., *et al.*,[1] | § | Case No. 16-90126 |
| | § | |
| Debtors. | § | (Jointly Administered) |

### GERMAN PELLETS HOLDING USA, INC.'S MOTION FOR
### ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM
### UNDER 11 U.S.C. § 503(b)(1)(A), (b)(3)(D), and (b)(4)

**Your rights may be affected by the relief sought in this pleading. You should read this pleading carefully and discuss it with your attorney, if you have one in this bankruptcy case. If you oppose the relief sought by this pleading, you <u>must</u> file a written objection, explaining the factual and/or legal basis for opposing the relief.**

**No hearing will be conducted on this Motion unless a written objection is filed with the Clerk of the United States Bankruptcy Court and served upon the party filing this pleading *WITHIN TWENTY-ONE (21) DAYS FROM THE DATE OF SERVICE* shown in the certificate of service unless the Court shortens or extends the time for filing such objection. If no objection is timely served and filed, this pleading shall be deemed to be unopposed, and the Court may enter an order granting the relief sought. If an objection is filed and served in a timely manner, the Court will thereafter set a hearing with appropriate notice. If you fail to appear at the hearing, your objection may be stricken. The Court reserves the right to set a hearing on any matter.**

German Pellets Holding USA, Inc. ("GP Holding"), the sole member and manager of the

Debtor German Pellets Texas, LLC ("GPTX"), submits this motion (the "Motion") pursuant to

11 U.S.C. § 503(b)(1)(A), (b)(3)(D), and (b)(4) for allowance and payment of an administrative

expense claim. In support of this Motion, GP Holding respectfully represents as follows:

---

[1] The jointly-administered Chapter 11 Debtors, along with the last four digits of each such Debtor's federal tax identification number, are Texas Pellets, Inc. (3478) and German Pellets Texas, LLC (9084). The location of the Debtors' corporate headquarters and service address for the jointly-administered Debtors is: 164 CR 1040, Woodville, TX 75979.

## I.   PRELIMINARY STATEMENT

1.      As further discussed in detail herein, GP Holding has played a material role in these Chapter 11 bankruptcy cases by providing necessary corporate governance and adding value to the process.

2.      By this Motion, GP Holding requests allowance and payment of its administrative expense claim in the aggregate amount of $356,277.97 ("Administrative Expense Claim") (a) pursuant to 11 U.S.C. §§ 503(b)(3)(D) and (b)(4) for GP Holding's legal fees in the amount of $278,277.97 incurred (i) preserving proper corporate governance of Debtor GPTX and (ii) defending against certain litigation claims brought by third parties against the Debtors and GP Holding, and (b) pursuant to 11 U.S.C. § 503(b)(1)(A) for $78,000 of previously unpaid officer compensation owed to GP Holding.

3.      For the reasons set forth in this Motion, GP Holding's legal fees are actual and necessary expenses in making a substantial contribution in these Chapter 11 bankruptcy cases, and the unpaid compensation is an actual and necessary expense of preserving the Debtors' estate.

4.      Additionally, under the circumstances set forth *infra* related to the attempts to divest GP Holding of its proper role as managing member of GPTX, GP Holding also requests that if this Court awards GP Holding its legal fees as an administrative expense, it is appropriate and equitable for the Court to reduce any final fees that may be awarded to Locke Lord and RPA Advisors, in their roles as Debtors' counsel and CRO, respectively, on a pro rata basis in amounts not to exceed $278,277.97 in the aggregate.

## II.    CONFERENCE WITH AND PRIOR REQUESTS TO THE PARTIES

5.      Before filing this Motion, GP Holding conferred with Debtors' counsel, counsel for the official committee of unsecured creditors (the "Committee"), and counsel for UMB Bank, N.A. (the "DIP Lender" or "Bond Trustee") requesting their consent to reimbursement of the Administrative Expense Claim.  GP Holding's discussions with the parties began with a formal request in July 2018 for certain of the amounts requested in this Motion.  GP Holding requested a portion[2] of the final amount it now seeks in further correspondence sent in November 2018, and followed such request with formal correspondence with supporting documentation in December 2018.  Despite reaching out to counsel for the Committee, the DIP Lender, and the Debtors, no agreement has been reached regarding the relief requested as of the filing of this Motion.

6.      The correspondence sent to the parties referenced GP Holding's right to reimbursement pursuant to the GPTX Limited Liability Company Agreement, made effective as of June 22, 2011 (the "Operating Agreement," attached hereto as **Exhibit A**).  Specifically, pursuant to Section 6.1 of the GPTX Operating Agreement, GP Holding is entitled to seek reimbursement of its "fees, costs and expenses incurred in connection with any claim, action or demand against [GP Holding] or [GPTX] that arise out of or in any way related to [GPTX], its properties, business or affairs."   The fees of HuntonAK that GP Holding incurred in connection with preserving proper corporate governance and the Personal Injury Lawsuits are expressly covered by Section 6.1.  GP Holding continues to rely on this provision of the GPTX Operating Agreement as a basis for reimbursement of the amounts requested in this Motion, but because the parties did not consent to the reimbursement without the need for Court intervention, GP Holding files this Motion for allowance and payment of its Administrative Expense Claim.

---

[2] At the time of the prior correspondence with the parties, the amount requested did not include HuntonAK's invoices for November and December 2018.

## III. JURISDICTION AND VENUE

7.      This Court has jurisdiction to consider this Motion pursuant to 11 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), and (O).

8.      Venue of this case and this Motion is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## IV. FACTUAL AND PROCEDURAL BACKGROUND

### A. Bankruptcy Cases

9.      On April 30, 2016 (the "Petition Date"), Texas Pellets, Inc. ("TPI") and GPTX (TPI and GPTX together, the "Debtors") each filed voluntary petitions for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Texas (the "Court") commencing these jointly-administered Chapter 11 bankruptcy cases (the "Bankruptcy Cases").

10.     GP Holding is the sole managing member of the Debtor GPTX.  Norman Dittmar is GP Holding's CFO, Secretary and sole director (the "CFO"), and Frank Ledermueller is GP Holding's CEO and President (the "CEO", and together with the CFO, the "Officers").

11.     On January 30, 2019, the Debtors filed a *First Amended Joint Chapter 11 Plan* [Docket No. 1025] (the "Plan"), *Motion for Entry of Orders: (I) Approving Amended and Superseding Bidding Procedures and Potentially Awarding Certain Protections and (II) Authorizing (A) the Sale of Substantially All of the Debtors' Assets, and (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* [Docket No. 1028] (the "Sale Motion"), and a *Motion for Order Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan* [Docket No. 1027] (the "Plan Scheduling Motion"). The Plan, Sale Motion, and Plan Scheduling Motion propose a (i) bidding and auction process;

(ii) sale of substantially all the Debtors' assets; and (iii) liquidating Chapter 11 plan for distribution of the sale proceeds and other assets of the Debtors, to maximize the value of the estates and bring the main portion of these Bankruptcy Cases to a conclusion.

12.    As the Court is well aware, difficult circumstances have plagued these Bankruptcy Cases and the casualty losses sustained by these estates caused numerous hurdles for the Debtors.  Without the corporate governance of GP Holding, made possible through the efforts of the Officers and GP Holding's counsel, these Bankruptcy Cases would have continued directionless to the detriment of the estates and all stakeholders. The progress made in these Bankruptcy Cases, as evidenced by the filing of the Plan and Sale Motion, would not have been realized without GP Holding's and its counsel's continuing efforts.

**B. German Pellets Invoice for Officer Compensation**

13.    In or about March 2018, German Pellets, GmbH ("German Pellets"), GP Holding's ultimate parent, sent GP Holding an invoice dated March 22, 2018 ("German Pellets Invoice," attached hereto as **Exhibit B**).  The German Pellets Invoice is in the amount of $78,000 for reimbursement of officer compensation for the twelve-week period from October 16, 2017 through January 7, 2018 at a rate of $6,500/week.

14.    In December 2017, before receiving the German Pellets Invoice, GP Holding engaged in discussions with the Crisis Manager (now CRO) to reach an agreement regarding the Officers' compensation going forward, including payment of the $78,000 not yet invoiced by German Pellets to GP Holding.  The parties were unable to reach an agreement.

15.    On February 9, 2018, German Pellets filed its *Motion for Allowance and Payment of Administrative Expense Claim under 11 U.S.C. § 503(b)(1)* [Docket No. 724] (the "German Pellets Motion") requesting allowance and payment of $206,804.22 as an administrative expense

claim for post-petition services provided to the Debtors and for reimbursement of expenses.  As set forth in the German Pellets Motion, German Pellets provided services under the Management Operational Support Services Agreement ("MSA"), as approved by the Court under various orders, with the last order entered on October 24, 2016 [Docket No. 234].  The German Pellets Invoice was not sent to GP Holding at the time of the German Pellets Motion and was not included in the amounts requested therein.

16.     On March 2, 2018, the Debtors filed an objection to the German Pellets Motion [Docket No. 746].  Subsequently, German Pellets and the Debtors reached an agreement, and on May 29, 2018, the Court entered an *Agreed Order Granting German Pellets, GmbH's Motion for Allowance and Payment of Administrative Claim under 11 U.S.C. § 503(b)(1)* [Docket No. 838] ("German Pellets Administrative Claim Order") awarding German Pellets an administrative expense claim in the agreed, reduced amount of $158,955.86.

17.     As the Debtors were negotiating and resolving the German Pellets administrative claim, the Debtors and GP Holding were also resolving issues related to the Officers' compensation going forward.  On February 27, 2018, the Debtors filed the *Motion for Entry of Order Authorizing Payment of Compensation to German Pellets Holdings, USA, Inc. for Management Services* (the "Management Services Motion") [Docket No. 742], seeking authority to pay $6,500/week to GP Holding for management services provided by the Officers.  The Debtors sought to pay the agreed compensation in the ordinary course of business under Section 363 of the Bankruptcy Code.

18.     On April 24, 2018, the Court issued the *Order Authorizing Payment of Compensation to German Pellets Holding USA, Inc. for Management Services* (the

6

"Management Services Order") [Docket No. 782], authorizing the Debtors to pay the Officers' compensation in the amount of $6,500/week.

19.     The German Pellets Invoice seeks reimbursement for twelve weeks of the Officers' compensation at the same rate of $6,500/week allowed under the Management Services Order.

### C. Legal Fees Incurred by GP Holding

20.     In or about late October 2017, GP Holding retained the undersigned counsel at Hunton Andrews Kurth LLP ("HuntonAK")[3] for (i) preserving corporate governance in these Bankruptcy Cases, and (ii) defending GP Holding in two lawsuits defined below as the Personal Injury Lawsuits. GP Holding's total legal fees for these two categories of matters are $278,277.97, as shown in the supporting HuntonAK invoices (redacted where appropriate) for periods including October 2017 through December 2018, attached hereto as **Exhibit C** (the "HuntonAK Invoices").[4]

### (i) Preserving Corporate Governance

21.     During these Bankruptcy Cases, Debtors' counsel, the Crisis Manager, and the CRO repeatedly excluded the Officers from important decisions and discussions and made attempts to divest GP Holding and the Officers of corporate governance rights, roles, and responsibilities. The history of the repeated attempts dating back to May 2017 is set forth in the CRO Objection (defined below) filed at Docket No. 661. To defend against these attempts and to preserve corporate governance for the benefit of these Bankruptcy Cases, GP Holding retained its own counsel and necessarily incurred legal fees.

---

[3] At the time and up until the merger effective as of April 1, 2018, the undersigned counsel's name was Andrews Kurth Kenyon LLP.

[4] $250,625.28 total fees, less $9,335 incurred in connection with the GP Holding's claim in *In re Louisiana Pellets, Inc., et al.*, Case No. 16-80162, Bankr. W.D. La., for which GP Holding is not seeking reimbursement.

### a)        CRO Retention and Division of Responsibilities and Roles

22.    The first attempt that prompted GP Holding to retain its own counsel came in late

2017.  On October 27, 2017, the Debtors filed the *Motion to Modify Retention of RPA Advisors,*

*LLC and to Appoint Chip Cummins as Chief Restructuring Officer of the Debtors Pursuant to*

*Bankruptcy Code §§ 363(b), and 328 and Rules 2014, 6003, and 6004 of the Federal Rules of*

*Bankruptcy Procedure* (the "CRO Motion") [Docket No. 620].  In the CRO Motion, the Crisis

Manager and Debtors' counsel moved the Court for entry of an order replacing the existing CRO

with Chip Cummins of RPA Advisors, who was then serving in a limited capacity as the

Debtors' crisis manager, despite GP Holding's explicit request not to file such motion before GP

Holding agreed to RPA Advisors' engagement letter.

23.    On December 1, 2017, GP Holding filed its Objection to the *Motion to Modify*

*Retention of RPA Advisors, LLC and to Appoint Chip Cummins as Chief Restructuring Office of*

*the Debtors Pursuant to Bankruptcy Code §§ 363(b), and 328 and Rules 2014, 6003, and 6004*

*of the Federal Rules of Bankruptcy Procedure* (the "CRO Objection")[5] [Docket No. 661].  As

GP Holding asserted in the CRO Objection, the CRO Motion was an attempted *coup d'état* by

the DIP Lender to exclude the Officers and GP Holding as the managing member, and

completely control the Debtors and these Bankruptcy Cases through the new CRO with an

expanded role.  Before filing the CRO Objection, GP Holding made clear that it was not in the

best interests of the Debtors' estates to exclude management who want to help reduce

professional fees and find a conclusion to these Bankruptcy Cases.  To that end, GP Holding

proposed a seemingly unremarkable allocation of responsibilities among the Officers and the

CRO.  Despite such proposal, the Crisis Manager, Debtors' counsel, and the DIP Lender at that

---

[5] As previously mentioned, the CRO Objection details a history of the Debtors, CRO, and the DIP Lenders efforts to
    exclude GP Holding and the Officers from these Bankruptcy Cases.

time were unwilling to agree on the new CRO role that also recognized management's proper role and complied with corporate governance requirements. Such unreasonable positions compelled GP Holding to file the CRO Objection.

24. Eventually, GP Holding, with assistance from its counsel, achieved a resolution to the CRO issue. The end result was a heavily-negotiated addendum (the "Addendum") later attached to the Court's January 10, 2018 order [Docket No. 700] (the "CRO Order") appointing Chip Cummins of RPA Advisors as CRO. The Addendum outlined the division of labor and responsibilities of the CRO and the Officers going forward and provided a framework for the Officers to continue to provide valuable services and institutional knowledge necessary for facilitating a resolution to the Bankruptcy Cases for the benefit of all stakeholders.

### b) DIP Budget Amendment

25. By way of another example, in late 2018, GP Holding had to again fight to preserve proper corporate governance when the CRO and the DIP Lender, unbeknownst to GP Holding, removed the agreed-upon Officers' compensation as an indirect means of ousting the Officers. On October 29, 2018, GP Holding filed a limited objection [Docket No. 957] (the "DIP Objection") to the *Agreed Motion to Modify the Twelfth Amendment to Final Order (1) Authorizing Debtors in Possession to Obtain Postpetition Financing; (2) Authorizing Debtors in Possession to Use Cash Collateral; (3) Providing Adequate Protection; and (4) Granting Liens, Security Interests and Superpriority Claims* [Docket No. 945] (the "DIP Motion").

26. The DIP Motion represented to the Court that no parties contested the further amended DIP financing budget ("DIP Budget") when in fact the CRO, Debtors' counsel, and the DIP Lender knew that GP Holding would oppose the surreptitious removal of the Officers' compensation from the DIP Budget. The removal of the compensation was made without the

Officers' prior knowledge or agreement and GP Holding only discovered the removal of the Officers' compensation from the DIP Budget upon the filing of the DIP Motion.

27.    This contested issue was discussed on the record at the November 1, 2018 hearing on the DIP Motion.  Again, had the parties consulted with GP Holding regarding the DIP Budget and not taken such unreasonable positions on proper corporate governance, GP Holding could have avoided legal fees and expenses for the DIP Objection and the hearing on the DIP Motion for which it now seeks reimbursement.

### (ii) Defending Against Personal Injury Lawsuits

28.    GP Holding also incurred legal fees in connection with the following two lawsuits brought by certain personal injury plaintiffs against the Debtors and GP Holding:

> Cause No. A-200862, *Bobbie Langston Cuevas, Ind. & ANF Tristan Cuevas & ANF Jesus Antonio Cuevas, Kristin Taylor Cuevas, Rafael Cuevas & Maria Cuevas, All Individually & On Behalf of Jesus Mario Cuevas, Deceased*, in the 58th Judicial District Court of Jefferson County, Texas; which was subsequently removed to the United States District Court for the Eastern District of Texas (Beaumont Division) and thereafter styled *Cuevas, Ind., et al v. German Pellets Texas, LLC, et al.*, in the Civ. Act. No. 1:17-cv-00501-MAC (the "Cuevas Case"); and

> Cause No. D-201493, *Yhana Abdullah, et al. v. German Pellets Texas LLC, et al.*, in the 136th Judicial District Court of Jefferson County, Texas (the "Abdullah Case" and together with the Cuevas Case, the "Personal Injury Lawsuits").

29.    GP Holding needed separate counsel in the Personal Injury Lawsuits when Locke Lord informed GP Holding that it represented only the Debtors. As shown in the HuntonAK Invoices, GP Holding's counsel prepared responsive pleadings, performed legal research, propounded and responded to discovery requests, attended a court hearing, prepared for mediation, addressed issues with insurance coverage counsel, and negotiated with the parties' counsel to reach a resolution in each of the Personal Injury Lawsuits.  For the reasons set forth

below, GP Holding seeks reimbursement of legal fees incurred in connection with the Personal Injury Lawsuits.

## V.    BASIS FOR RELIEF REQUESTED

30.    Section 503(b) of the Bankruptcy Code provides a non-exhaustive list of the categories of expenses entitled to administrative priority status.  *See* 11 U.S.C. § 503(b).  Here, GP Holding seeks reimbursement under multiple subsections of Section 503(b).  First, GP Holding seeks reimbursement under Section 503(b)(1)(A) for the Officers' compensation incurred as an actual and necessary cost and expense of preserving the estates.  Second, GP Holding seeks reimbursement under Section 503(b)(3)(D) and (b)(4) for the actual and necessary legal fees and expenses incurred in making a substantial contribution to the Debtors' estates. Each of these requests is discussed in turn.

### A. The Officer Compensation is an actual and necessary cost and expense of preserving the Debtors' estates and is therefore reimbursable as an administrative expense under 11 U.S.C. § 503(b)(1)(A).

31.    Under Section 503(b)(1)(A) of the Bankruptcy Code, an administrative expense shall be awarded for "the actual, necessary costs and expenses of preserving the estate."  11 U.S.C. § 503(b)(1)(A).  "An 'actual and necessary' cost or expense is one which conferred a benefit upon the bankruptcy estate."  *See In re Canton Jubilee, Inc.*, 253 B.R. 770, 775 (Bankr. E.D. Tex. 2000) (citing *Tex. v. Lowe (In re H.L.S. Energy Co., Inc.)*, 151 F.3d 434, 437 (5th Cir. 1998)).  "The 'benefit' requirement . . . is merely a way of testing whether a particular expense was truly 'necessary' to the estate:  If it was no 'benefit,' it cannot have been 'necessary.'"  *Id.*

32.    As this Court explained in a memorandum opinion regarding another party's administrative expense application in these Bankruptcy Cases, "[n]otwithstanding such a test, courts recognize that, because the benefit requirement is 'simply a gloss on the underlying

11

concept of what is necessary,' it is not restricted to goods or services that lead to a direct economic enhancement of the estate." *In re Texas Pellets, Inc.*, No. 16-90126, 2007 WL 6508974, at *2 (Bankr. E.D. Tex. Dec. 19, 2017) (citing *H.L.S. Energy*, 151 F.3d at 438 (finding a benefit to the bankruptcy estate by fulfilling its duty under state law to plug its unproductive oil and gas wells)). Further, "[a]lthough the estate receives a benefit that often can be measured by the actual cost of necessary goods or services supplied, ***the estate also receives other less readily calculable benefits, such as the ability to continue to conduct business as usual***." *Id.* (emphasis added) (quoting *Toma Steel Supply, Inc. v. GHR Energy Corp. (In re TransAmerican Natural Gas Corp.)*, 978 F.2d 1409, 1420 (5th Cir. 1992)).

33.    GP Holding, as the applicant, bears the burden to prove that its cost or expense was actual and necessary. *See In re Canton Jubilee, Inc.*, 253 B.R. 770, 775 (Bankr. E.D. Tex. 2000). To establish a *prima facie* case under Section 503(b)(1), GP Holding must show that (1) the claim arises from a transaction with the Debtors, and (2) the goods or services supplied enhanced the ability of the Debtors' business to function as a going concern.

34.    Here, GP Holding's claim for $78,000 arises from services the Officers provided post-petition in these Bankruptcy Cases. Such services provided "less readily calculable benefits," but the services were the only means for GPTX to comply with corporate governance and "conduct business as usual." If GP Holding had not fought for its right to continue to provide the agreed-upon services, GPTX would not be able to obtain necessary approvals pursuant to applicable corporate governance, thus paralyzing these Bankruptcy Cases. *See, e.g.*, *In re New Orleans Paddlewheels, Inc.*, 350 B.R. 667, 691 (Bankr. E.D. La. 2006) (citing *In re Johns–Manville Corp.*, 801 F.2d 60, 64 (2d Cir. 1986) ("The general rules of corporate governance remain the purview of state law in a bankruptcy proceeding. Absent a specific grant

12

of authority, the board of directors remains the authority to propose a plan of reorganization to creditors and court alike for approval.")).

35.     GP Holding performed its management duties consistent with corporate governance, the MSA, and the heavily-negotiated Addendum to the CRO Order as agreed to by the Debtors, the Crisis Manager, and the DIP Lender and as approved by the Court.  In addition to fulfilling its corporate governance role, GP Holding and its Officers provided valuable knowledge of the industry and these Debtors' operations and finances, including among other things, insurance, financial statements, analysis of professional fees, facilities and personnel.

36.     The same reasons for seeking authority to pay the Officers' compensation as detailed in the Management Services Motion are still applicable.  In the Management Services Motion, the Debtors assert the following:

> In the Debtors' business judgment, the Compensation is appropriate to procure the continued services of Mr. Ledermueller and Mr. Dittmar. In addition, the Debtors submit that the payment is in the ***best interests of the creditors and the Debtors*** to (among other things) support the Port Arthur rebuild, ***support and enhance*** the strategic process, and ***support the Debtors in enhancing*** insurance claims and to recover under other estate causes of action.

Management Services Motion, at ¶ 3 (emphasis added).  The circumstances surrounding the payment of the Officers' compensation have not changed and the undeniable support and enhancement provided by the Officers continues to this day.

37.     Additionally, the $78,000 requested for the Officers' compensation during the post-petition period from October 16, 2017 through January 7, 2018 is the same type of expense for services under the MSA found to be reimbursable as an administrative expense when requested by German Pellets in the German Pellets Motion.  *See* German Pellets Administrative Claim Order [Docket No. 838].  That the expense is now being requested by GP Holding, and

not German Pellets, does not change its character and should not change its treatment as an administrative expense claim.

38.    Therefore, for the same reasons that the parties agreed to and the Court approved the Officers' compensation and the administrative expense claim for German Pellets, the $78,000 should be allowed and payable as an administrative expense claim.

39.    Moreover, given that the parties already agreed to such amounts and given that the budgets in these Bankruptcy Cases contemplate the Officers' compensation, for the Debtors, the CRO, and the DIP Lender to take a contrary position now would be disingenuous and arbitrary.

40.    For these reasons, GP Holding requests reimbursement of $78,000 as payment for the post-petition compensation which is an actual, necessary cost of preserving the estate under Section 503(b)(1)(A).

**B. The legal fees incurred by GP Holding were actual and necessary costs and expenses in making a substantial contribution in these Bankruptcy Cases and therefore are reimbursable as an administrative expense under 11 U.S.C. §§ 503(b)(3)(D) and (b)(4).**

41.    GP Holding, as an equity holder, seeks reimbursement for attorneys' fees and expenses incurred in making a substantial contribution in these Bankruptcy Cases.

42.    Under Section 503(b)(3)(D), a court shall allow, as an administrative expense, "the actual, necessary expenses . . . incurred by . . . an equity security holder . . . in making a substantial contribution in a case under Chapter 9 or 11." 11 U.S.C. § 503(b)(3)(D). In turn, under Section 503(b)(4), a court shall allow, as an administrative expense:

the reasonable compensation for professional services rendered by an attorney . . .
of an entity whose expense is allowable under subparagraph . . . (D) . . . of
paragraph (3) of this subsection, based on the time, the nature, the extent, and the
value of such services, and the costs of comparable services other than in a case

14

under this title, and reimbursement for actual, necessary expenses incurred by such attorney.

11 U.S.C. § 503(b)(4).

43.     The Bankruptcy Code does not define "substantial contribution," and the parameters of a substantial contribution are determined on a case-by-case basis. *See Canton Jubilee*, 253 B.R. at 777 (citing *Matter of DP Partners Ltd. P'ship*, 106 F. 3d 667, 673 (5th Cir. 1997)). The Fifth Circuit has held that substantial contribution is a contribution that is "considerable in amount, value or worth" and that "services which make a substantial contribution are those which foster and enhance, rather than retard or interrupt the process of reorganization." *DP Partners*, 106 F.3d at 672–73; *see Canton Jubilee*, 253 B.R. at 775 (citing *DP Partners*, 106 F.3d at 672–73).

44.     "[N]othing in the Bankruptcy Code requires a self-deprecating, altruistic intent as a prerequisite to recovery of fees and expenses under section 503." *DP Partners*, 106 F.3d at 673. That being said, "the applicant must still demonstrate that the contribution it made to the case was 'considerable in amount, value or worth' and that the fees or expenses it incurred have a causal connection to its contribution and were reasonable when compared to the scope and breadth of the benefit which its contribution brought to the case." *Canton Jubilee*, 253 B.R. at 775 (citing *DP Partners*, 106 F.3d at 673).

### (i) Substantial Contribution by GP Holding

45.     GP Holding conferred direct benefits directly to the estates in a variety of ways. Although difficult to ascribe specific dollar values to GP Holding's contributions, GP Holding's counsel's fees are measurable and enabled GP Holding to contribute considerable value to these Bankruptcy Cases.

46.    For example, GP Holding and its counsel provided valuable assistance in defending against significant claims brought by third parties against the estates and GP Holding in the Personal Injury Lawsuits.  Specifically, the Cuevas Case was ultimately settled for amounts to be paid from insurance proceeds, and the litigants waived all claims against the Debtors' estates and GP Holding.  Because the global settlement reached in the Cuevas Case allowed for finality and resolution of a claim against the estates in excess of $1,000,000, the legal fees of GP Holding's counsel on the Cuevas Case are reimbursable as actual and necessary costs of preserving the estates.  In the Abdullah Case, the litigants nonsuited GP Holding without prejudice.  Given that GP Holding is entitled to defense costs related to such claims pursuant to the Operating Agreement, an expeditious and efficient resolution to GP Holding's involvement in the Abdullah Case saves the estates money.  Therefore, the legal fees of GP Holding's counsel on the Abdullah Case are reimbursable as actual and necessary costs of preserving the estates

47.    Additionally, as set forth previously, GP Holding took actions, with the assistance of its counsel, necessary to preserve proper corporate governance.  Perhaps it is par for the course in these Bankruptcy Cases to expect the unexpected, but the challenges to corporate governance and attempts by the DIP Lender to run these Bankruptcy Cases as the "lender-in-possession" are quite remarkable and extraordinary.  The unfortunate consequence is that GP Holding was forced to engage its own counsel to defend its rightful place as managing member.  Proper corporate governance is necessary for the required approvals of the Debtors' actions and decisions in these Bankruptcy Cases, and without such approvals, the Debtors could not have proposed a sale or plan without a trustee.  GP Holding's and its counsel's efforts were instrumental in maintaining proper corporate governance and avoiding the need for a trustee and

related delays.  The progress made in these Bankruptcy Cases could not have been realized without such efforts.

48.     In assessing whether an applicant provided a substantial contribution, the Fifth Circuit has stated that bankruptcy courts "should weigh the cost of the claimed fees and expenses against the benefits conferred upon the estate which flow directly from those actions." *DP Partners*, 106 F.3d at 673.  GP Holding submits that for all the aforementioned reasons, its active participation and efforts of its counsel enhanced the process and conferred direct and demonstrable benefits at critical stages of these Bankruptcy Cases.

### (ii) Reasonableness of Fees

49.     The factors to determine the reasonableness of compensation are set forth in *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974) and *In re First Colonial Corp. of Am.*, 544 F.2d 1291 (5th Cir. 1977), *cert. denied*, 431 U.S. 904 (1977) (quoting and applying the *Johnson* factors).  Each of the twelve *Johnson* factors is discussed below, and on balance, the factors support a finding that the fees requested are reasonable.

### a)        Time and Labor Required

50.     During these Bankruptcy Cases, HuntonAK expended time providing services that constituted a substantial contribution as detailed in this Motion.  The HuntonAK Invoices attached to this Motion detail all of the work performed and provide the date the services were rendered, the individual performing such services, a description of the services, and the time expended.

### b)        Novelty and Difficulty of Questions Presented

51.     These Bankruptcy Cases involve a number of challenging issues, including: (i) unique facts and circumstances in light of the casualty losses sustained by these estates, (ii) the

resulting delay to the timeline for confirmation, and (iii) the repeated challenges to corporate governance and unreasonable positions taken by the DIP Lender, the CRO, and Debtors' counsel.

### c)    Skill Required to Perform the Legal Services Properly

52.    HuntonAK attorneys with varying levels of experience and seniority were used effectively and efficiently to provide services on bankruptcy-specific issues as well as the related litigation disputes outside of bankruptcy court for the Personal Injury Lawsuits.

53.    HuntonAK restricted the number of lawyers involved in these cases to (a) maximize familiarity with the subject matter and avoid waste or duplicate efforts; (b) employ special expertise in a given field of law when necessary to do the best job possible with the least amount of effort; and (c) assign the performance of all tasks to the least-senior lawyer capable of performing it consistent with sound legal representation and supervision.  Moreover, HuntonAK took care to avoid duplication of effort and to deploy lawyers whose expertise is of the requisite level to perform the services.

### d)    Preclusion of Other Employment by the Attorneys Involved

54.    HuntonAK's representation in these Bankruptcy Cases did not preclude it from accepting other employment.

### e)    Customary Fees

55.    HuntonAK's hourly rates compare favorably with average rates for similar legal services from other national law firms and also with the rates of other professionals in these Bankruptcy Cases.  HuntonAK submits that the fees are the same as (or lower than) they would have been in a non-bankruptcy matter of similar size and complexity.

### f)        Fixed or Contingent Fee

56.      HuntonAK's fees are neither fixed nor contingent, but reimbursement to GP Holding from the Debtors' estates is subject to the Court's ruling on this Motion and the estates' ability to pay the Administrative Expense Claim.

### g)        Time Limitations Imposed by Client or Other Circumstances

57.      During this engagement, HuntonAK allocated its resources and utilized its professionals as necessary to provide services competently, efficiently and without duplication of time.  In certain instances, these Bankruptcy Cases involved requests for expedited relief from the Court (e.g., requests for approval of amendments to the DIP Budget), and under those circumstances, HuntonAK performed services to assist GP Holding in an expeditious manner to avoid unnecessary disruption to the process whenever possible.

58.      Additionally, given the repeated attempts by the DIP Lender, CRO, and Debtors' counsel to frustrate and upset normal corporate governance without warning, significant time limitations were imposed on GP Holding and its counsel to thwart such attempts.  For example, GP Holding and HuntonAK had to react quickly after the Debtors filed pleadings (e.g., the CRO Motion and the DIP Motion) without the knowledge or authorization of GP Holding.

### h)        Results Achieved

59.      As detailed more fully above, HuntonAK's services in preserving proper corporate governance and settling the Personal Injury Lawsuits resulted in substantial and demonstrable benefits ultimately being conferred on the Debtors' estates and all stakeholders.

### i)        The Experience, Reputation and Ability of the Attorneys

60.      HuntonAK's attorneys have regularly appeared in significant representations, including many bankruptcy cases throughout Texas and the United States, and are highly

experienced and regarded in the practice of bankruptcy law. Additionally, the professionals handling the Personal Injury Lawsuits are also highly experienced and regarded in commercial and personal injury litigation matters.

**j)      The Undesirability of the Case**

61.     Though these Bankruptcy Cases presented difficult circumstances and were contentious at times, the Bankruptcy Cases were not undesirable.

**k)      The Nature and Length of the Professional Relationship with the Client**

62.     HuntonAK's engagement as counsel to GP Holding is a new engagement. In other unrelated bankruptcy cases, HuntonAK has served as counsel to equity holders and non-debtor parent companies of various debtors.

**l)      Awards in Similar Cases**

63.     Based on HuntonAK's experience throughout the country, HuntonAK's fees are in line with fees allowed in proceedings of similar scope for the services rendered and results obtained. Moreover, GP Holding seeks to recover $278,277.97 in legal fees—a paltry percentage of the amount of fees and expenses expended by the estates' professionals.

64.     In sum, the balance of the *Johnson* factors favors a finding that HuntonAK's legal fees are reasonable.

65.     Pursuant to 11 U.S.C. §§ 503(b)(3)(D) and (b)(4), GP Holding requests that the Court allow as an administrative expense GP Holding's legal fees in the amount of $278,277.97 incurred in making a substantial contribution in these Bankruptcy Cases.

66.     To the extent that the Court awards GP Holding its legal fees as an administrative expense, under the circumstances presented in this Motion, GP Holding asserts that it is

appropriate and equitable to reduce the fees awarded to Locke Lord LLP, as Debtors' counsel, and RPA Advisors, as CRO, on a pro rata basis by the same amount awarded to GP Holding.

## VI.    CONCLUSION

Accordingly, GP Holding respectfully requests that the Court enter an order, substantially in the form attached hereto (i) allowing GP Holding's Administrative Expense Claim in the amount of $356,277.97, (ii) directing the Debtors to pay GP Holding's Administrative Expense Claim within seven (7) business days from the date of entry of such order, and (iii) granting such other and further relief as the Court deems just and proper.

*[Remainder of Page Intentionally Left Blank]*

Dated: February 21, 2019

Respectfully submitted,

HUNTON ANDREWS KURTH LLP

/s/ Timothy A. ("Tad") Davidson II
Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Ashley L. Harper (Texas Bar No. 24065272)
600 Travis Street, Suite 4200
Houston, Texas  77002
Telephone:     (713) 220-4200
Facsimile:      (713) 220-4285
Email:           taddavidson@HuntonAK.com
                      ashleyharper@HuntonAK.com

*Counsel for German Pellets Holding USA, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 21, 2019, a true and correct copy of the foregoing pleading was served (i) via the Court's CM/ECF Notification System on the parties registered to receive electronic notices as permitted by Appendix 5005 III(E) to the Local Rules of the U.S. Bankruptcy Court for the Eastern District of Texas, and (ii) via U.S. first-class mail, postage prepaid on the Limited Service List attached hereto as **Exhibit D**.

/s/ Timothy A. ("Tad") Davidson II
Timothy A. ("Tad") Davidson II