# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### (LUFKIN DIVISION)

| | | |
|---|---|---|
| In re: | ) | |
| | ) | **JOINTLY ADMINISTERED** |
| TEXAS PELLETS, INC.[1] | ) | under Case No. 16-90126 |
| | ) | |
| Debtors. | ) | Chapter 11 |
| | ) | |

**FIRST AMENDED DISCLOSURE STATEMENT IN
SUPPORT OF FIRST AMENDED JOINT CHAPTER 11 PLAN
(SOLICITATION VERSION)[2]**

**THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") IS SUBMITTED TO ALL HOLDERS OF CLAIMS AND INTERESTS OF THE DEBTORS ENTITLED TO VOTE ON THE CHAPTER 11 PLAN SUBMITTED BY THE DEBTORS, HEREIN DESCRIBED AND CONTAINS INFORMATION THAT MAY AFFECT YOUR DECISION TO VOTE TO ACCEPT OR REJECT THE PLAN. THIS DISCLOSURE STATEMENT IS INTENDED TO PROVIDE ADEQUATE INFORMATION AS REQUIRED BY THE BANKRUPTCY CODE CONCERNING THE PLAN. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO READ THE ENTIRE DISCLOSURE STATEMENT AND PLAN WITH CARE.**

**SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN HEREIN DESCRIBED IS BEING SOUGHT FROM HOLDERS OF CLAIMS AND INTERESTS WHOSE CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS ARE IMPAIRED UNDER THE PLAN. HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN ARE URGED BY THE DEBTORS TO VOTE IN FAVOR OF THE PLAN. WHEN YOU VOTE, PLEASE RETURN THE COMPLETED BALLOT INCLUDED WITH THIS DISCLOSURE STATEMENT IN THE ACCOMPANYING ENVELOPE ADDRESSED TO Locke Lord LLP, c/o C. Davin Boldissar, 601 Poydras St., Suite 2660, New Orleans, Louisiana 70130 SO AS TO BE RECEIVED NOT LATER THAN MARCH 25, 2019 AT 4:00 P.M.**

**A HEARING ON CONFIRMATION OF THE FIRST AMENDED JOINT CHAPTER 11 PLAN IS SET FOR MARCH 27, 2019, AT 10:00 AM IN THE FIRST FLOOR COURTROOM OF THE UNITED STATES BANKRUPTCY COURT, JACK BROOKS FEDERAL BUILDING, 300 WILLOW STREET, IN BEAUMONT, TEXAS.**

---

[1] The jointly-administered Chapter 11 Debtors, along with the last four digits of each such Debtor's federal tax identification number, are Texas Pellets, Inc. (3478) and German Pellets Texas, LLC (9084). The corporate headquarters and service address for the jointly-administered is: 164 CR 1040, Woodville, TX 75979.

[2] This is the version sent to creditors and parties in interest on February 22, 2019.

**Locke Lord LLP**

C. Davin Boldissar (La. #29094)
*(admitted pro hac vice)*
Bradley C. Knapp (Tex. #24060101)
Locke Lord LLP
601 Poydras Street, Suite 2660
New Orleans, Louisiana 70130-6036
Telephone: (504) 558-5100
Fax: (504) 681-5211
dboldissar@lockelord.com
bknapp@lockelord.com
-and-

W. Steven Bryant
Texas Bar. No. 24027413
Federal I.D. No.  32913
Locke Lord LLP
2800 JP Morgan Chase Tower
600 Travis Street
Houston, Texas 77002
Telephone: (713) 226-1489
Fax: (713) 229-2536
sbryant@lockelord.com


**COUNSEL FOR TEXAS PELLETS, INC. AND
GERMAN PELLETS TEXAS, LLC**

# ARTICLE I
## DEFINITIONS

The following terms (which appear in this Disclosure Statement and the attached Plan as capitalized terms) have the following meanings:

**1.1**   "**Administrative Claim**" means a Claim for costs and expenses of administration of the Reorganization Case under section 503(b) of the Bankruptcy Code entitled to priority pursuant to section 507(a)(1) of the Bankruptcy Code; provided, however, the term "Administrative Claim" shall not include "Professional Fee Claims."

**1.2**   "**Administrative Claims Bar Date**" means the earlier of: (i) any bar date or deadline set by the Bankruptcy Court for some or all Administrative Claims in the Reorganization Case; or (ii) for all other Administrative Claims, the date that is thirty (30) calendar days after the Effective Date, all as set forth in Section 6.1.4 of the Plan.

**1.3**   "**Allowed**" means, with respect to Claims and Interests, except as otherwise allowed or provided for in the Plan or a Final Order of the Bankruptcy Court, a Claim or Interest, proof of which was timely and properly Filed or, if no Proof of Claim or proof of interest was Filed, which has been or hereafter is listed by the Debtors on their Schedules as liquidated in amount and not disputed or contingent, and, in either case, as to which:

   (a)   no objection to the allowance thereof has been interposed on or before the later of: (i) the one hundred and twentieth (120th) day after the Effective Date, or (ii) such other applicable period for objection as may be fixed or extended by the Bankruptcy Court, or

   (b)   any objection thereto has been determined by a Final Order to the extent such objection is determined in favor of the respective holder.

Unless otherwise specified herein or by order of the Bankruptcy Court, an "Allowed Claim" shall not include any interest, fees, costs or other charges on such Claim accruing after the Petition Date.

**1.4**   "**Asset Purchase Agreement**" means the Asset Purchase Agreement as defined under the Sale Order and as executed between the Debtors and Purchaser.

**1.5**   "**Assumed Executory Contracts**" has the meaning set forth in Section 8.2 of the Plan.

**1.6**   "**Assumed Unexpired Leases**" has the meaning set forth in Section 8.2 of the Plan.

**1.7**   "**Auction**" shall have the meaning as set forth under the Bidding Procedures Order.

**1.8**   "**Available Cash**" means the Liquidating Trust's Cash on hand on any particular date less (i) amounts reserved on account of Disputed Claims; (ii) amounts reasonably required

by the Liquidating Trustee to retain professionals post-confirmation; and (iii) amounts reasonably required by the Liquidating Trustee to administer the Liquidating Trust and to complete the transactions and other actions required under the Plan and Liquidating Trust Agreement, including the prosecution of claims and causes of action.

**1.9** **"Avoidance Action Proceeds"** means, as of the Effective Date, the funds and proceeds held by the Debtors, realized from settlements, judgments, and other payments and proceeds of the Avoidance Actions, net of and not including the total amount of court costs and attorneys' fees incurred by the Debtors to prosecute Avoidance Actions. The Debtors and the UCC acknowledge that the Liens of the Bond Trustee encumber such amounts; however, the Bond Trustee has consented to the Avoidance Action Proceeds being transferred to the Liquidating Trustee free and clear of such Liens.

**1.10** "**Avoidance Actions**" means all of the Debtors' and the Estates' rights and claims under sections 541 through 553 of the Bankruptcy Code, inclusive, or under any similar or related state or federal statute or case or common law, whether or not an action is initiated on or before the Effective Date, and including without limitation the Causes of Action set forth on Schedule 1.10.

**1.11** "**Ballot**" means the form to be distributed with the Disclosure Statement to each holder of an Impaired Claim or Interest on which the holder is to indicate acceptance or rejection of the Plan.

**1.12** "**Balloting Deadline**" means the date and time, as set by an Order of the Bankruptcy Court and set forth in the Disclosure Statement or on the Ballot, by which all Ballots must be received at the address set forth used for voting on the Plan, as such date may be extended by an order.

**1.13** "**Bankruptcy Code**" means Title 11 of the United States Code, or the Bankruptcy Reform Act of 1978, as amended.

**1.14** "**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of Texas, or, in the event such court ceases to exercise jurisdiction over the Reorganization Case, such court or adjunct thereof that exercises jurisdiction over the Reorganization Case in lieu of the United States Bankruptcy Court for the Eastern District of Texas.

**1.15** "**Bankruptcy Rules**" means collectively, the (a) Federal Rules of Bankruptcy Procedure, (b) Federal Rules of Civil Procedure and, (c) Local Rules of the Bankruptcy Court, as applicable from time to time in the Reorganization Case or proceedings therein, as the case may be.

**1.16** "**Bidding Procedures Order**" means that certain order entered by the Bankruptcy Court in the Reorganization Case, entered on February 21, 2019 [Docket #1048], pursuant to the Debtors' *Motion for Entry of Orders: (I) Approving Amended and Superseding Bidding Procedures and Potentially Awarding Certain Protections and (II) Authorizing (A) the Sale of Substantially All of the Debtors' Assets, and (B) the Assumption and Assignment of*

*Certain Executory Contracts and Unexpired Leases* as may be supplemented and/or amended through further Order of the Bankruptcy Court.

  **1.17**  "**Bond Documents**" means the Indenture; the TPI Security Agreement dated July 25, 2012; the GPTX Security Agreement dated July 25, 2012, the Loan Agreement dated August 1, 2012, the Consent, Subordination, and Attornment Agreement, dated July 25, 2012, the Novation, Assignment, Assumption, Consent and Subordination Agreement Drax Power Limited, dated July 25, 2015, the Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing as of July 25, 2012, the Leasehold Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated July 25, 2012, and any other document or agreement delivered as security for, or in respect to, the Bonds or Debtors' obligations under any such documents.

  **1.18**  "**Bond Trustee**" means UMB Bank, National Association, as the successor trustee with respect to the Sanger Texas Industrial Development Corporation Industrial Development Revenue Bonds (Texas Pellets Project), Series 2012B and 2012C, issued under the Indenture.

  **1.19**  "**Bond Trustee Collateral**" means all property securing the Bond Trustee Secured Claim.

  **1.20**  "**Bond Trustee Secured Claim**" means the Claim filed by the Bond Trustee as claim number 13 in the Reorganization Case in the amount of $189,510,697.22 and as treated in Section 5.1 hereof. For the avoidance of doubt, the Deficiency Claim held by the Bond Trustee shall not be part of the Bond Trustee Secured Claim, and instead is treated as an Unsecured Claim pursuant to the provisions herein.

  **1.21**  "**Bonds**" means the Sanger Texas Industrial Development Corporation Industrial Development Revenue Bonds (Texas Pellets Project), Series 2012B and 2012C, issued under the Indenture.

  **1.22**  "**Business Day**" means any day other than a Saturday, Sunday, holiday in Tyler, Texas or pursuant to Bankruptcy Rule 9006.

  **1.23**  "**Cash**" means legal tender of the United States of America and equivalents thereof.

  **1.24**  "**Causes of Action**" means, without limitation, any and all claims, actions, causes of action, liabilities, obligations, rights, suits, accounts, debts, sums of money, damages, judgments, claims and demands, actions, defenses, offsets, powers (including all police, regulatory, and enforcement powers and actions that may be taken), privileges, licenses, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whatsoever, whether known or unknown, suspected or unsuspected, whether arising prior to, on or after the Petition Date, in contract, negligence, or tort, in law, equity or otherwise, whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured and whether asserted or assertable. For avoidance of doubt, Causes of Action include, but are in no way limited to (a) damages, (b) the recovery of monies, (c) Lien avoidance, subordination, surcharge,

recharacterization, rights of setoff, counterclaim or recoupment, and claims on contracts or for breaches of duties imposed by law, (d) injunctive, equitable, or other relief, (e) claims pursuant to Section 362 of the Bankruptcy Code, (f) such claims and defenses as fraud, mistake, duress, and usury, (g) Avoidance Actions, and (h) all Causes of Action that may be directly or derivatively asserted on behalf of the Debtors, their Estates, or the Reorganized Debtors.

1.25    "**Claim**" has the meaning set forth in section 101(5) of the Bankruptcy Code.

1.26    "**Class**" means a category of holders of Claims or Interests classified together pursuant to section 1123(a)(11) of the Bankruptcy Code.

1.27    "**Closing**" means the closing of the Sale.

1.28    "**Confirmation Date**" means the date on which the Confirmation Order is entered on the docket of the Bankruptcy Court.

1.29    "**Confirmation Hearing**" means the hearing held pursuant to section 1128(a) of the Bankruptcy Code at which the Bankruptcy Court considers confirmation of the Plan, including any continuances thereof.

1.30    "**Confirmation Order**" means the order of the Bankruptcy Court entered following the Confirmation Hearing that confirms the Plan.

1.31    "**CRO**" means Chip Cummins of RPA Advisors, LLC, serving as Chief Restructuring Officer pursuant to the Order entered in the Reorganization Case on January 10, 2018 [Docket #700].

1.32    "**Cure Payments**" means any payments as may be required to be made to counterparties to Assumed Executory Contracts and/or Assumed Unexpired Leases under Section 8.4 of the Plan.

1.33    "**D&O Action**" means (i) all of the Debtors' and the Estates' rights and claims as asserted in the action filed and asserted by the Debtors as encaptioned *Texas Pellets, Inc., et al. v. German Pellets GmbH, et al*., Case No. 2:18-cv-00178-JRG-RSP (United States District Court, Eastern District of Texas); and (ii) all of the Debtors' and the Estates' rights and claims as may be asserted against any Insurance Policy (including any runoff or tail policy, but not including any property or casualty Insurance Policy) that has been issued at any time to and provides coverage to any of the Debtors for current or former directors', officers', managers', and/or members' liability for actions or inactions taken by such individuals in such capacities.

1.34    "**Debtors**" mean Texas Pellets, Inc., and German Pellets Texas, LLC.

1.35    "**Deficiency Claim**" means that portion of a Claim secured by a Lien on property in which the Debtors' estates have an interest that is determined, pursuant to section 506(a) of the Bankruptcy Code or through agreement, to exceed the value of the claimant's interest in such property.

**1.36** **"DIP and Cash Collateral Order"** means the Final Order (1) Authorizing Debtors in Possession to Obtain Postpetition Financing; (2) Authorizing Debtors in Possession to Use Cash Collateral; (3) Providing Adequate Protection; and (4) Granting Liens, Security Interests and Superpriority Claims [Docket No. 121] dated June 14, 2016 entered in the Reorganization Case, as amended through the orders entered in the Reorganization Case on January 26, 2017 [Docket #313]; March 31, 2017 [Docket #398] ; April 19, 2017 [Docket #418]; May 5, 2017 [Docket #437]; May 18, 2017 [Docket #448]; June 15, 2017 [Docket #477]; July 7, 2017 [Docket #489]; September 15, 2017 [Docket #560]; October 13, 2017 [Docket #599]; November 15, 2017 [Docket #649]; December 29, 2017 [Docket #692]; September 22, 2018 [Docket #908] as modified by the order entered on October 22, 2018 [Docket #945]; and November 28, 2018 [Docket #982].

**1.37** **"DIP Lender"** means UMB Bank, National Association, as Trustee, in its capacity as lender under the DIP Loans.

**1.38** "**DIP Lender Collateral**" means all real, personal, tangible and intangible assets of any kind or character of the Debtors and the Estates as more fully set forth in the DIP and Cash Collateral Order.

**1.39** **"DIP Loans"** means, as amended, the debtor-in-possession loans extended by the DIP Lender to the Debtors, and as further defined under the DIP and Cash Collateral Order.

**1.40** **"Disallowed"** means, as to a Claim or Interest, (a) a Claim or Interest, or any portion thereof, that has been disallowed by a Final Order or a settlement, (b) a Claim or Interest or any portion thereof that is Scheduled at zero or as contingent, disputed, or unliquidated and, as to which, no Proof of Claim has been properly filed by the Proof of Claim Bar Date, or (c) a Claim or Interest or any portion thereof that is not Scheduled and, as to which, no proof of claim has been properly filed by the Proof of Claim Bar Date.

**1.41** **"Disclosure Statement"** means the Debtors' First Amended Disclosure Statement in Support of the First Amended Joint Chapter 11 Plan, filed with the Bankruptcy Court on February 22, 2019, and as may be further modified, amended, and/or supplemented.

**1.42** **"Disclosure Statement Objection Deadline"** means the deadline set by the Bankruptcy Court, or under applicable rules, for parties in interest to file objections to the Disclosure Statement.

**1.43** **"Disputed,"** as to a Claim or Interest, means any Claim or Interest that is not an Allowed Claim, a Disallowed Claim, an Allowed Interest or a Disallowed Interest, as the case may be. In the event that any part of a Claim or Interest is disputed, such Claim or Interest in its entirety shall be deemed to constitute a Disputed Claim or Disputed Interest for purposes of distribution under this Plan unless a Final Order has been entered providing otherwise. Without limiting any of the foregoing, a Claim or Interest that is the subject of a pending objection, motion, complaint, counterclaim, setoff, Avoidance Action, litigation claim or other defense, or any other proceeding seeking to disallow, subordinate or estimate such Claim, shall be deemed to constitute a Disputed Claim or Disputed Interest, as the case may be.

**1.44** **"Distribution Record Date"** means the record date for determining the entitlement of holders of Claims to receive distributions under this Plan on account of Allowed Claims. The Distribution Record Date shall be five (5) Business Days before the Confirmation Hearing.

**1.45** **"Distribution Reserve"** means the reserve account as defined under the Sale Order, consisting of funds reserved from the Sale Proceeds, as required under the Sale Order, and utilized and disbursed under the terms of this Plan and the Sale Order.

**1.46** **"Distribution Reserve Balance"** means the balance of the Distribution Reserve after all required payments from the Distribution Reserve are made under this Plan and the Sale Order, and all Disputed Claims subject to payment from the Distribution Reserve are resolved by Final Order.

**1.47** **"Docket"** means the official docket maintained by the Bankruptcy Court in the Reorganization Case.

**1.48** **"Docket #_"** means and refers to the specific filing as numbered in the Docket of the Reorganization Case under Case No. 16-90126, unless the text and context states that such Docket is from Case No. 16-90127 of the Reorganization Case.

**1.49** **"Effective Date"** has the meaning ascribed to it in Section 9.1 of the Plan.

**1.50** **"Entity"** means a Person, estate, trust, governmental unit, and U.S. Trustee, within the meaning of Bankruptcy Code section 101(15).

**1.51** **"Estate"** means the estate created in the Reorganization Case under section 541 of the Bankruptcy Code.

**1.52** **"Excluded Assets"** means all assets of the Debtors that are not sold and transferred to the Purchaser pursuant to the Sale Order, including without limitation the Retained Causes of Action.

**1.53** **"Executory Contract"** means a contract to which one or more of the Debtors is a party, that is subject to assumption or rejection under sections 365 and/or 1123 of the Bankruptcy Code.

**1.54** **"File" or "Filed"** means filed with the Bankruptcy Court in the Reorganization Case, as reflected on the official docket of the Bankruptcy Court for the Reorganization Case.

**1.55** **"Final Order"** means an order or judgment of the Bankruptcy Court or other applicable court as to which the time to appeal, petition for certiorari, or move for new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, retry, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Debtors or, in the event that an appeal, writ of certiorari, or new trial or reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other applicable court shall have been affirmed by the highest court to

which such order or judgment was appealed, or certiorari has been denied, or from which new trial, reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for new trial, reargument or rehearing shall have expired, with no further appeal, petition for certiorari or motion for new trial, reargument or rehearing pending; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule of the Bankruptcy Rules, may be filed with respect to such order or judgment shall not render such order or judgment not to be a Final Order.

      **1.56**    **"GP Holding"** means German Pellets Holding USA, Inc.

      **1.57**    **"GPTX"** means Debtor German Pellets Texas, LLC.

      **1.58**    **"Impaired"** means a Claim or Interest or a Class of Claims or a Class of Interests that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

      **1.59**    **"Indenture"** means the Indenture of Trust, dated as of August 1, 2012 (as amended and supplemented from time to time), between the Sanger Texas Industrial Development Corporation and Wells Fargo Bank, N.A, as original trustee, as predecessor to the Bond Trustee.

      **1.60**    **"Insurance Policies"** means any insurance policies, insurance settlement agreements, coverage-in-place agreements, or other agreements relating to the provision of insurance entered into by or issued to or for the benefit of any of the Debtors or their predecessors

      **1.61**    **"Insured Claim"** means an Allowed Claim or portion of an Allowed Claim that is insured under the Liability Policies, but only to the extent of such coverage.

      **1.62**    **"Interest"** means the holder of any current or former holder of an "equity security" (as defined in Section 101(16) of the Bankruptcy Code).

      **1.63**    **"Interim Distribution Date"** has the meaning as set forth in the Liquidating Trust Agreement, and shall be the date or dates that interim distributions are made on account of Class 3 Claims under the Liquidating Trust Agreement.

      **1.64**    **"Investment Banker"** means Configure Partners, LLC.

      **1.65**    **"Liability Policies"** shall mean one or more of the specific Insurance Policies identified on Schedule 1.65, but shall <u>not</u> include any other Insurance Policies.

      **1.66**    **"Lien"** has the meaning set forth in section 101(37) of the Bankruptcy Code.

      **1.67**    **"Liquidating Trust"** means the entity created pursuant to Section 9.10 of this Plan to which all holders of Unsecured Claims shall look for satisfaction of their Claims unless otherwise specifically set forth to the contrary in this Plan.

**1.68** **"Liquidating Trust Agreement"** means the trust agreement entered into in accordance with the Plan pursuant to which the Liquidating Trust will be established and administered, in the form included within the Plan Supplement.

**1.69** **"Liquidating Trust Committee"** shall mean those individuals set forth in the Plan Supplement.

**1.70** **"Liquidating Trustee"** means the person designated to serve as the Liquidating Trustee under the Liquidating Trust Agreement and pursuant to the terms of this Plan, or any successor Liquidating Trustee appointed pursuant to the terms of this Plan or such other person as appointed by the Bankruptcy Court.

**1.71** **"Litigation Rights"** means the Causes of Action that the Debtors or the Estates may hold against any Person or Entity (except to the extent expressly released under the Plan), including, without limitation, Avoidance Actions, the D&O Action, Ship Loader Insurance Claims, and/or Silo Burn Insurance Claims.

**1.72** **"Manufacturing Facility"** means the Debtors' wood pellet manufacturing facility located in Woodville, Texas.

**1.73** **"NAPCO"** means North American Procurement Company.

**1.74** **"NAPCO 503(b)(9) Claim"** means all Causes of Action brought and asserted by NAPCO against the Debtors under Section 503(b)(9) of the Bankruptcy Code, which are pending before the Bankruptcy Court.

**1.75** **"NAPCO Avoidance Claim"** means the Causes of Action brought and asserted by the Debtors against NAPCO, which are pending in Adversary No. 16-9003 before the Bankruptcy Court.

**1.76** **"Person"** means and includes a natural person, individual, partnership, corporation (as defined in section 101(a) of the Bankruptcy Code), or organization including, without limitation, corporations, limited partnerships, limited liability companies, general partnerships, joint ventures, joint stock companies, trusts, land trusts, business trusts, unincorporated organizations or associations, any ad hoc committee, or other organizations, irrespective of whether they are legal entities, governmental bodies (or any agency, instrumentality or political subdivision thereof), or any other form of legal entities; provided, however, the term "Person" does not include governmental units, except that a governmental unit that (a) acquires an asset from a Person (i) as a result of the operation of a loan guarantee agreement or (ii) as receiver or liquidating agent of a Person; (b) is a guarantor of a pension benefit payable by or on behalf of the Debtor or an Affiliate of the Debtor; or (c) is the legal or beneficial owner of an asset of (i) an employee pension benefit plan that is a governmental plan, as defined in section 414(d) of the Internal Revenue Code of 1986 or (ii) an eligible deferred compensation plan, as defined in section 457(b) of the Internal Revenue Code of 1986, shall be considered for purposes of section 1102 of the Bankruptcy Code to be a Person with respect to such asset or such benefit.

**1.77** **"Petition Date"** means April 30, 2016.

**1.78    "Plan"** means the Debtors' First Amended Joint Chapter 11 Plan, filed with the Bankruptcy Court on February 22, 2019, and as may be further modified, amended, and/or supplemented.

**1.79    "Plan Rate"** means the rate of interest, if any, that will be paid on Claims but only to the extent that this Plan specifies that interest will be paid on such Claims. For all non-tax claims, the Plan Rate shall be 5% simple interest. The Plan Rate for tax claims shall be the applicable non-bankruptcy statutory rate determined as of the calendar month in which the Confirmation Order is entered. Interest shall be calculated from the Petition Date to each Payment Date. Notwithstanding the foregoing, the interest rate for amounts advanced to the Debtors by the DIP Lender shall be the interest rate set forth in the documents relating to the DIP Loans.

**1.80    "Plan Scheduling Order"** means the means that certain order entered by the Bankruptcy Court in the Reorganization Case, entered on February 13, 2019 [Docket #1040], pursuant to the Debtors' *Motion for Order Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan* [Docket #1027], and entitled *Order Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan*, as may be supplemented and/or amended through further Order of the Bankruptcy Court.

**1.81    "Plan Supplement"** means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed by the Debtors no later than seven (7) days before the objection deadline for filing objections to the Plan, or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules comprised of, among other documents, the following: (a) the form of the Liquidating Trust Agreement; (b) the identification of the Liquidating Trustee and the members of the Liquidating Trust Committee; (c) the Schedule of Assumed Executory Contracts and Unexpired Leases; and (d) the Schedule of Rejected Executory Contracts and Unexpired Leases.  Any reference to the Plan Supplement in the Plan shall include each of the documents identified above as (a) through (d), as applicable. The documents that comprise the Plan Supplement shall be: (x) subject to any consent or consultation rights provided hereunder and thereunder, including as provided in the definitions of the relevant documents; and (y) in form and substance reasonably acceptable to the Debtors, the Bond Trustee and UCC.

**1.82    "Port"** means Port of Port Arthur Navigation District of Jefferson County, Texas.

**1.83    "Priority Tax Claim"** means any Claim due as of the Petition Date computed on an accrual basis entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code, but only to the extent it is entitled to priority under such subsection.

**1.84    "Professional Fee Claim Bar Date"** means the date that is thirty (30) days after the Effective Date, as further defined in Section 6.1.5.

**1.85** **"Professional Fee Claims"** means, without limitation, a Claim seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code.

**1.86** **"Proof of Claim"** means a proof of Claim Filed against either of the Debtors in the Reorganization Case.

**1.87** **"Proof of Claim Bar Date"** means September 22, 2016, except for (i) Governmental Units (as defined in the Bankruptcy Code) for which the Proof of Claim Bar Date means October 27, 2016; and (ii) Administrative Claims Bar Date; and (iii) Professional Fee Claim Bar Date.

**1.88** **"Purchased Assets"** has the same meaning as set forth in the Asset Purchase Agreement and Sale Order.

**1.89** **"Purchaser"** means the "Purchaser" as defined under the Sale Order.

**1.90** **"Rejected Executory Contracts"** has the meaning set forth in Section 8.2 of the Plan.

**1.91** **"Rejected Unexpired Leases"** has the meaning set forth in Section 8.2 of the Plan.

**1.92** **"Rejection Damages Bar Date"** means the date that is thirty (30) days after the Effective Date, as set forth in Section 8.2 hereof.

**1.93** **"Released Claims"** means those Claims released and discharged under Sections 9.21 through 9.25, inclusive, below.

**1.94** **"Released Parties"** means: (i) the Debtors' and Reorganized Debtors' respective financial advisors, attorneys, investment bankers, experts, consultants, and accountants whose retention has been approved by the Bankruptcy Court; (ii) the Bond Trustee, its successors and assigns, and each of their respective divisions, affiliates, and their former, present and future officers, directors, servants, shareholders, members, affiliates, managers, partners, employees, agents, representatives, professionals, consultants, financial advisors, attorneys and accountants; (iii) the DIP Lender, its successors and assigns, and each of their respective divisions, affiliates, and their former, present and future officers, directors, servants, shareholders, members, affiliates, managers, partners, employees, agents, representatives, professionals, consultants, financial advisors, attorneys and accountants; (iv) the UCC, its members, and its respective financial advisors, attorneys and accountants whose retention has been approved by the Bankruptcy Court; and (v) the CRO, RPA Advisors, and their respective financial advisors, attorneys and accountants whose retention has been approved by the Bankruptcy Court. Notwithstanding the foregoing or anything contained in this Plan, no provision of this Plan shall release the Debtors, the Debtors' parents, members, shareholders, affiliates, officers, directors, or any of the Debtors' accountants, bankers, financial advisors, or professionals (other than Locke Lord LLP) retained by the Debtors or their affiliates before the Petition Date.

1.95    **"Reorganization Case"** means these jointly administered bankruptcy cases under chapter 11 of the Bankruptcy Code.

1.96    **"Reorganized Debtors"** means Texas Pellets, Inc., and German Pellets Texas, LLC., following the Effective Date.

1.97    **"Reserved Distributions"** has the meaning set forth in Section 9.7 of the Plan.

1.98    **"Retained Causes of Action"** means any and all claims and Causes of Action of the Debtors and/or Reorganized Debtors, including without limitation the Causes of Action set forth on Schedule 1.98; but except for and not including: (i) the Ship Loader Insurance Claims and Silo Burn Insurance Claims; (ii) any claims and Causes of Action that constitute Purchased Assets; and (iii) any and all claims or Causes of Action expressly released or discharged in this Plan.

1.99    **"Sale"** means the sale of the Purchased Assets to the Purchaser under the Sale Order.

1.100   **"Sale Order"** means that certain order entered by the Bankruptcy Court in the Reorganization Case, pursuant to the *Motion for Entry of Orders: (I) Approving Amended and Superseding Bidding Procedures and Potentially Awarding Certain Protections and (II) Authorizing (A) the Sale of Substantially All of the Debtors' Assets, and (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* [Docket #1028], approving and authorizing the Debtors to enter into the Sale.

1.101   **"Sale Proceeds"** means the funds tendered by Purchaser as the "Closing Cash Payment" as defined under the Asset Purchase Agreement and Sale Order.

1.102   **"Schedule of Assumed Executory Contracts and Unexpired Leases"** means the schedule of Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan (with proposed cure amounts), as the same may be amended, modified, or supplemented from time to time.

1.103   **"Schedule of Rejected Executory Contracts and Unexpired Leases"** means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time.

1.104   **"Scheduled"** means the claims set forth, stated or listed on the Schedules.

1.105   **"Schedules"** means the Schedules of Assets and Liabilities and List of Equity Security Holders Filed by the Debtors under the Bankruptcy Rules, as the same have been or may be amended from time to time before the Effective Date.

1.106   **"Secured Ad Valorem Tax Claim"** means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code, including any related Secured Claim for penalties, and is further secured by a valid statutory Lien against any property in which the Debtors' estates have an interest.

**1.107** **"Secured Claim"** means a claim by a creditor possessing a valid and perfected Lien, including Secured Ad Valorem Tax Claims the Bond Trustee Secured Claim and the claim held by the DIP Lender; provided that any Deficiency Claim held by a holder of a Secured Claim shall not be a Secured Claim, and instead is treated as an Unsecured Claim pursuant to the provisions herein.

**1.108** **"Ship Loader Fire"** means the fire and casualty event experienced by the Debtors commencing on or about February 27, 2017, which destroyed the Debtors' ship loader equipment, and caused other damage at the Storage Facility.

**1.109** **"Ship Loader Insurance Claims"** means all claims, Causes of Action, and rights of recovery of the Debtors or Reorganized Debtors relating to or arising from the Ship Loader Fire, under and in connection with Insurance Policies, but not including any claims, Causes of Action, and rights of recovery under the Liability Policies. Without limitation, the Ship Loader Insurance Claims include the claims, Causes of Action, and rights of recovery identified on Schedule 1.109.

**1.110** **"Ship Loader Creditor Claims"** means any and all Claims asserted by a third party or claimant (not including the Debtors or any assignee or successor of the Debtors) relating to damages or losses arising from the Ship Loader Fire.

**1.111** **"Silo Burn"** means the smoldering burn detected in Silo #2 at the Debtors' Storage Facility on the night of April 15 through 16, 2017, and related burning, fire, casualty, and damage, without limitation resulting in the Silo Collapse.

**1.112** **"Silo Burn Insurance Claims"** means all claims, Causes of Action, and rights of recovery of the Debtors or Reorganized Debtors relating to or arising from the Silo Burn and/or Silo Collapse, under and in connection with Insurance Policies, but not including any claims, Causes of Action, and rights of recovery under Liability Policies. Without limitation, the Silo Burn Insurance Claims include the claims, Causes of Action, and rights of recovery identified on Schedule 1.112.

**1.113** **"Silo Burn Creditor Claims"** means any and all Claims asserted by a third party or claimant (not including the Debtors or any assignee or successor of the Debtors) relating to damages or losses arising from the Silo Burn.

**1.114** **"Silo Collapse"** means the structural failure of Silo #2 at the Storage Facility, occurring on or about June 4, 2017, and related damage.

**1.115** **"Storage Facility"** means the Debtors' port and storage facility located at the Port of Port Arthur in Port Arthur, Texas, at 100 W Lakeshore Drive, Port Arthur, TX 77640.

**1.116** **"TPI"** means Debtor Texas Pellets, Inc.

**1.117** **"UCC"** means the Official Committee of Unsecured Creditors appointed in the Reorganization Case.

1.118  **"Unexpired Lease"** means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.119  **"Unsecured Claim"** means any claim that is not an Administrative Claim, Priority Claim, Secured Claim, or a Claim otherwise specifically classified in another class in this Plan.

## ARTICLE II
## INTRODUCTION

### 2.1    General Information Concerning Disclosure Statement and Plan

The Debtors submit this Disclosure Statement, as may be amended from time to time, under § 1125 of the Bankruptcy Code and Rule 3016 of the Bankruptcy Rules to all of the Debtors' known holders of Claims and Interests entitled to vote on the Debtors' Plan. The purpose of this Disclosure Statement is to provide adequate information to enable holders of Claims and Interests who are entitled to vote on the Plan to arrive at a reasonably informed decision in exercising their respective right to vote on the Plan.  A copy of the Plan is included with this Disclosure Statement.  All section references in this Disclosure Statement are to the Bankruptcy Code unless otherwise indicated.

The Debtors have proposed the Plan consistent with the provisions of the Bankruptcy Code.  The purpose of the Plan is to effectuate certain transactions to maximize recoveries for the Debtors' estates and creditors, including, as described in the Plan.

This Disclosure Statement is not intended to replace a careful review and analysis of the Plan, including the specific treatment of Claims and Interests under the Plan.  It is submitted as an aid and supplement to your review of the Plan and to explain the terms of the Plan.  Every effort has been made to fairly summarize the Plan and to inform holders of Claims and Interests how various aspects of the Plan affect their respective positions.  You are encouraged to consult with your own counsel.  Counsel for the Debtors are, and Counsel for the UCC may be, available to answer any questions that your counsel may have regarding the Plan and this Disclosure Statement.

### 2.2    Disclaimers

**NO SOLICITATION OF VOTES HAS BEEN OR MAY BE MADE EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND SECTION 1125 OF THE BANKRUPTCY CODE.  NO PERSON HAS BEEN AUTHORIZED TO USE ANY INFORMATION CONCERNING THE DEBTORS TO SOLICIT ACCEPTANCES OR REJECTIONS OF THE PLAN OTHER THAN THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.  HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT RELY ON ANY INFORMATION RELATING TO THE DEBTORS OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT, ANY ATTACHMENTS THERETO AND THE PLAN.**

**EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT, NO REPRESENTATION CONCERNING THE DEBTORS, THEIR ASSETS, THEIR**

LIABILITIES, PAST OR FUTURE OPERATIONS, OR CONCERNING THE PLAN ARE AUTHORIZED, NOR ARE ANY SUCH REPRESENTATIONS TO BE RELIED UPON IN ARRIVING AT A DECISION WITH RESPECT TO THE PLAN. ANY REPRESENTATIONS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD BE IMMEDIATELY REPORTED TO COUNSEL FOR THE DEBTORS.

UNLESS ANOTHER TIME IS SPECIFIED, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE OF THIS DISCLOSURE STATEMENT. NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE CONCERNING THE DISCLOSURE STATEMENT AND THE PLAN SHALL UNDER ANY CIRCUMSTANCES IMPLY THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE OF THE DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN PREPARATION OF THE DISCLOSURE STATEMENT WERE COMPILED.

THE INFORMATION PROVIDED HEREIN WAS OBTAINED FROM A VARIETY OF SOURCES AND IS BELIEVED TO BE RELIABLE. HOWEVER, THE DEBTORS HAVE NOT BEEN ABLE TO INDEPENDENTLY VERIFY EACH AND EVERY STATEMENT CONTAINED HEREIN. ACCORDINGLY, THE DEBTORS AND THEIR PROFESSIONALS CANNOT MAKE ANY REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

THE DEBTORS' BUSINESS AFFAIRS ARE COMPLEX. IT IS POSSIBLE THAT THE TRANSACTIONS CONTEMPLATED UNDER THE PLAN COULD HAVE NEGATIVE TAX AND OTHER ECONOMIC CONSEQUENCES. THE DEBTORS MAKE NO REPRESENTATIONS REGARDING THE TAX IMPLICATIONS OF ANY TRANSACTION CONTEMPLATED UNDER THE PLAN. IT IS NOT UNCOMMON FOR PARTIES TO RETAIN THEIR OWN TAX ADVISORS TO ANALYZE THE PLAN. THE DEBTORS ENCOURAGE ALL PERSONS THAT MIGHT BE AFFECTED TO SEEK INDEPENDENT ADVICE REGARDING THE TAX EFFECTS OF THE PLAN.

DISTRIBUTION OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS ANY REPRESENTATION OR WARRANTY AT ALL, EITHER EXPRESS OR IMPLIED, BY THE DEBTORS OR THEIR PROFESSIONALS THAT THE PLAN IS FREE FROM RISK, THAT THE ACCEPTANCE OF THE PLAN WILL RESULT IN A RISK-FREE LIQUIDATION OF THE DEBTORS' ASSETS OR THAT ALL POTENTIAL ADVERSE EVENTS HAVE BEEN ANTICIPATED.

THIS DISCLOSURE STATEMENT AND THE PLAN SHOULD BE READ IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN. FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND EQUITY INTERESTS, THE TERMS OF THE PLAN ARE SUMMARIZED IN THIS DISCLOSURE STATEMENT, BUT ALL SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY THE PLAN, WHICH CONTROLS IN CASE OF ANY INCONSISTENCY.

**2.3**      **Answers to Commonly Asked Questions**

As part of the Debtors' efforts to inform holders of Claims and Interests regarding the Plan and the Plan confirmation process, the following summary provides answers to questions which parties who receive a disclosure statement often ask.

**THE FOLLOWING SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN, WHICH CONTROLS IN CASE OF ANY INCONSISTENCY.**

### 2.3.1 Who are the Debtors?

The jointly-administered Chapter 11 Debtors, along with the last four digits of each Debtor's federal tax identification number, are Texas Pellets, Inc. (3478) and German Pellets Texas, LLC (9084).  The location of the Debtors' corporate headquarters and service address for the jointly-administered Debtors is: 164 CR 1040, Woodville, TX 75979.  The nature of the Debtors' business and the major events in this bankruptcy case are described below in Articles III through VI.

### 2.3.2 What is a Chapter 11 bankruptcy?

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code that allows financially distressed businesses to reorganize their debts or to liquidate their assets in a controlled fashion.  The commencement of a chapter 11 case creates an "estate" containing all of the legal and equitable interests of the debtor in property as of the date the bankruptcy case is filed.  During a chapter 11 bankruptcy case, the debtor remains in possession of its assets unless the Bankruptcy Court orders the appointment of a trustee which did not occur in this case.

### 2.3.3 If the Plan governs how my Claim or Interest is treated, what is the purpose of this Disclosure Statement?

The Bankruptcy Code requires that in order to solicit votes on a bankruptcy plan, the proponent of the plan must first prepare a disclosure statement that provides sufficient information to allow holders of Claims and Interests to make an informed decision about the plan.  Holders of Claims and Interests to make an informed judgment about the plan.  At that time, holders of Claims and Interests whose claims and interests are impaired under the Plan also receive a voting ballot and other materials.

### 2.3.4 Has this Disclosure Statement been approved by the Bankruptcy Court?

Section 1125(b) of the Bankruptcy Code requires that a Disclosure Statement be approved by the Bankruptcy Court as having "adequate information".  "Adequate information" means information of a kind, and in sufficient detail, as far as is practicable considering the nature and history of the Debtors, to enable a hypothetical investor typical of holders of claims or interests of the relevant classes to make an informed judgment whether to vote to accept or reject the Plan.

The Debtors have requested that the Bankruptcy Court consider the adequacy of the Disclosure Statement in a "combined hearing" along with confirmation of the Plan. The Bankruptcy Court will consider the adequacy of the Disclosure Statement at a hearing to be held on March 27, 2019, at 10:00 am in the First Floor Courtroom of the United States Bankruptcy Court, Jack Brooks Federal Building, 300 Willow Street, in Beaumont, Texas, which hearing may be adjourned or continued to a different date without further notice other than notice given in open court at such hearing.

### 2.3.5 How do I determine how my Claim or Interest is classified?

To determine the classification of your Claim or Interest, you must determine the nature of your Claim or Interest. Under the Plan, Claims and Interests are classified into a series of classes. The pertinent articles and sections of the Disclosure Statement and Plan disclose, among other things, the treatment that each class of Claims or Interests will receive if the Plan is confirmed.

### 2.3.6 Why is confirmation of the Plan important?

The Bankruptcy Court's confirmation of the Plan is a condition to the Debtors carrying out the treatment of holders of Claims and Interests under the Plan. Unless the Plan is confirmed, and any other conditions to confirmation or to the effectiveness of the Plan are satisfied, with some exceptions (including without limitation through the Sale Order) the Debtors are legally prohibited from satisfying Claims or Interests as provided in the Plan.

### 2.3.7 What is necessary to confirm the Plan?

Under applicable provisions of the Bankruptcy Code, confirmation of the Plan requires that, among other things, at least one class of impaired Claims or Interests vote to accept the Plan. Acceptance by a class of claims or interests means that at least two-thirds in the total dollar amount and more than one-half in number of the allowed Claims or Interests actually voting in the class vote in favor of the Plan, with all votes of insiders excluded from acceptance. Because only those claims or interests who vote on a plan will be counted for purposes of determining acceptance or rejection of a plan by an impaired class, a plan can be approved with the affirmative vote of members of an impaired class who own less than two-thirds in amount and one-half in number of the claims/interests. Besides acceptance of the Plan by a class of impaired creditors or interests, a bankruptcy court also must find that the Plan meets a number of statutory tests before it may confirm the Plan. These requirements and statutory tests generally are designed to protect the interests of holders of impaired claims or interests who do not vote to accept the Plan but who will nonetheless be bound by the Plan's provisions if the bankruptcy court confirms the Plan.

Because at least one of the classes under the Plan is deemed to reject the Plan (i.e., the holder of equity interests in the Debtors), the Debtors are requesting that the Bankruptcy Court confirm the Plan under § 1129(b) of the Bankruptcy Code. To confirm a plan not accepted by all classes, the plan proponent must demonstrate that the plan does not discriminate unfairly, and is fair and equitable with respect to each class of claims or interests that is impaired under, and that has not accepted, the plan. This method of confirming a plan is commonly called a "cramdown."

In addition to the statutory requirements imposed by the Bankruptcy Code, the Plan itself also provides for certain conditions that must be satisfied as conditions to confirmation.

### 2.3.8 Is there an Unsecured Creditors' Committee in this case?

Yes.    The Unsecured Creditors' Committee ("UCC") has three members: J.A.M. Distributing Company, Jasper Oil Company, and North American Procurement Company.  The role of the UCC is established by the Bankruptcy Code.  It acts as a participant in the case for the benefit of unsecured creditors as a group and has the right to appear and be heard.

Counsel for the UCC is Patrick Kelley, Esq., Patrick Kelley, PLLC, 112 E. Line Street, Suite 203, Tyler, Texas  75702.  Mr. Kelley can be reached by phone at: (903) 630-5151.

### 2.3.9 When is the deadline for returning my ballot and objecting to the Disclosure Statement and Plan?

**March 25, 2019 (the "Plan Ballot Deadline")** is fixed as the last day for filing written acceptances or rejections of the Debtors' proposed Plan which must be received by 4:00 p.m. (CDT) on that date at the offices of:

C. Davin Boldissar
Locke Lord LLP
601 Poydras Street, Suite 2660
New Orleans, Louisiana 70130-6036
Telephone: (504) 558-5100
Fax: (504) 681-5211
dboldissar@lockelord.com

If an objection is not timely filed, it may not be considered.

**IT IS IMPORTANT THAT ALL IMPAIRED HOLDERS OF CLAIMS AND INTERESTS VOTE ON THE PLAN.  THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST POSSIBLE RECOVERY TO HOLDERS OF CLAIMS AND INTERESTS.  THE DEBTORS THEREFORE BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTEREST OF HOLDERS OF CLAIMS AND INTERESTS AND RECOMMEND THAT ALL IMPAIRED HOLDERS OF CLAIMS AND INTERESTS VOTE TO ACCEPT THE PLAN.**

### ARTICLE III
### OVERVIEW OF PLAN

An overview of the Plan is set forth below.  This overview is qualified in its entirety by reference to the Plan.  If the Bankruptcy Court confirms the Plan and, in the absence of any applicable stay, all other conditions set forth in the Plan are satisfied, the Plan will take effect on the Effective Date.

The Plan provides for the following:

(a)      Sale of the Purchased Assets through the auction and sale process approved by the Bankruptcy Court, under the Sale Procedures Order, and following a final hearing before the Bankruptcy Court approving the Sale and issuance of the Sale Order;

(b)      Payment on the DIP Loans from Sale Proceeds under the Sale Order, plus co-assignment (together with the holder of the Bond Trustee Secured Claim, as co-assignee) of all Ship Loader Insurance Claims and Silo Burn Insurance Claims to the DIP Lender;

(c)      Treatment of Allowed Secured Ad Valorem Tax Claims and other Secured Claims through distribution of Sale Proceeds under the Sale Order and/or such other treatment as permitted under the Bankruptcy Code;

(d)      Treatment of the Bond Trustee Secured Claim through (i) distribution of any remaining Sale Proceeds under the Sale Order (after payment of any outstanding amounts under the DIP Loans, if any), (ii) distribution of any remaining Distribution Reserve Balance, and (iii) co-assignment (together with the Bond Trustee as DIP Lender, as co-assignee) of all Ship Loader Insurance Claims and Silo Burn Insurance Claims;

(e)      Satisfaction and payment of Allowed Administrative Claims from the Distribution Reserve;

(f)      Satisfaction and payment of Allowed Priority Tax Claims from the Distribution Reserve;

(g)      Satisfaction and payment of Allowed Professional Fee Claims from the Distribution Reserve;

(h)      Formation of the Liquidating Trust, which shall receive (i) the Avoidance Action Proceeds; and (ii) any remaining Sale Proceeds (if any) after all other required payments as set forth herein, and which shall pursue the Retained Causes of Action (including without limitation the Avoidance Actions and the D&O Action) and liquidate any other Excluded Assets on behalf of Unsecured Claims and Deficiency Claims; and,

(i)      The cancellation of Equity Interests.


## ARTICLE IV
## HISTORY AND STRUCTURE OF THE DEBTORS

### 4.1      History of the Debtors and Their Business

TPI and GPTX were members of the "German Pellets" family of companies, which is a family of related companies centered in Wismar, Germany, operating in the wood pellets

industry. TPI and GPTX have separate ownership, but their operations are closely coordinated, and their interests are extensively interdependent.

TPI is the owner and developer of a wood pellet manufacturing facility located in Woodville, Tyler County, Texas (the Manufacturing Facility), and a five-silo pellet storage facility located at Port Arthur, Texas (the Storage Facility). The Manufacturing Facility and Storage Facility manufacture and handle industrial wood pellets, which are used, among other things, as fuel in power plants, primarily in Europe.

Debtor GPTX is the operator of the Manufacturing Facility and Storage Facility and lease those facilities, pursuant to that certain Facilities License Agreement, dated July 25, 2012, by and between the Debtors.

The Manufacturing Facility and Storage Facility have been operational since 2013 (although operations were impacted by the Ship Loader Fire and Silo Burn in 2017, as discussed below). Under normal operations, pellets are produced at the Manufacturing Facility, are taken by truck to the Storage Facility, and are held at the Storage Facility until a vessel arrives to transport accumulated pellets by sea to the Debtors' customer.

The Debtors' primary offtake customer is Drax Power Limited, under the Agreement for the Sale and Purchase of Biomass (as amended), dated as of March 29, 2012, between Debtor TPI, and Drax Power, Limited.

### 4.2    The Debtors' Capital Structure

#### 4.2.1 Equity Holders

Debtor GPTX is 100% owned by German Pellets Holding USA, Inc. which is 100% owned by German Pellets GmbH. Debtor TPI is 100% owned by IPBG Pellets Beteiligungs GmbH.

#### 4.2.2 Prepetition Secured Bonds

TPI is indebted to the Bond Trustee under prepetition secured obligations relating to the Bonds (for the benefit of the beneficial holders of the Bonds). The obligations and further details are set forth in the DIP and Cash Collateral Order.

The total prepetition claim owed to the Bond Trustee is $184,675,000.00 in unpaid principal plus accrued and unpaid interest of $4,835,697.22 as of the Petition Date. The Bond Trustee holds first priority mortgages, pledges, liens and security interests in substantially all of the Debtors' real and personal property as security for these obligations, subject only to certain matters as set forth in the DIP and Cash Collateral Order.

#### 4.2.3 Other Claims and Indebtedness

As discussed in more detail below, based on the Schedules and a review of the claims registry in the Reorganization Case, the total estimated amount of Secured Claims asserted against Debtor GPTX is $81,383.24, and the total estimated amount of Unsecured Claims

asserted against Debtor TPI is $15,530.91, exclusive of the claims of the Bond Trustee and DIP Lender. Some Claims are or may be Disputed and the Debtors reserve rights to object to or assert that any and all of such Claims are Disputed.

Also based on the Schedules and a review of the claims registry in the Reorganization Case, the total estimated amount of Unsecured Claims asserted against Debtor GPTX is $7,889,346.51, and the total estimated amount of Unsecured Claims asserted against Debtor TPI is $22,948,100.71, exclusive of the claims of the Bond Trusteee relating to any Deficiency Claims. Some Claims are or may be Disputed and the Debtors reserve rights to object to or assert that any and all of such Claims are Disputed.

The Schedules, as amended, contain a detailed listing of Claims, together with the estimated amount of Claims, and holders of Claims and Interests are referred to the Debtors' Schedules for more information regarding the extent and nature of those Claims and Interests. In addition, a number of Proofs of Claims have been filed in the Debtors' Reorganization Case. Pursuant to Local Bankruptcy Rule 3003(a), the bar date for the Filing of Proofs of Claim was September 22, 2016, other than governmental claims which had a bar date of October 27, 2016.

## ARTICLE V
## EVENTS LEADING TO BANKRUPTCY

Prior to the Petition Date (i.e., April 30, 2016), the Debtors' Manufacturing Facility had operated as a pellet mill for approximately three years. While the Debtors' operations have continually improved since the inception of operations, the Debtors have faced certain operational difficulties, adverse weather events, and other difficulties as the Debtors have ramped up operations.

Prior to the Petition Date, the Debtors experienced an acute liquidity crisis by which they required sufficient funds in order to operate in the three weeks leading up to filing the Reorganization Case. The Debtors approached the Bond Trustee on behalf of the holders of the Bonds and requested an emergency loan sufficient to fund the acute liquidity needs of the Debtors in the three weeks prior to the Petition Date. The Bond Trustee agreed to provide an emergency loan in the aggregate amount of $1,507,275 to bridge the Debtors into an orderly commencement of the Reorganization Case. (The treatment of such bridge loan, which has been repaid in full as authorized under orders of the Bankruptcy Court, is set forth under the DIP and Cash Collateral Order.)

The Debtors' financial records reflect transfers in excess of $210 million from the Debtors' accounts to German Pellets GmbH and IPBG Pellets Beteiligungs GmbH between July 2012 and December 2015. The Debtors assert that such transfers depleted the Debtors' resources and paved the way for the acute liquidity crisis leading to the necessity for the bankruptcy filing.

In addition, the Debtors experienced limited damage to the wood pellet production facility from one or more tornados on Wednesday, April 27, 2016, which damaged a conveyor system and two of the pellet silos. This added to the liquidating issues facing the Debtors.

Based upon all of these factors (as well as the insolvency proceedings in Germany of German Pellets GmbH), the Debtors filed their bankruptcy petition on April 30, 2016.


**ARTICLE VI**
**EVENTS DURING THE REORGANIZATION CASE**

Reference is made herein to certain filings and events in the Reorganization Case, as reflected on the Docket and in Docket entries.  As referenced below, "Docket #_" refers to items as may be retrieved from the Docket of the Reorganization Case, and more information may be obtained from the Docket, which may be accessed at the Bankruptcy's Court's public website located at https://ecf.txeb.uscourts.gov/cgi-bin/login.pl, under Case No. 16-90126. (As set forth below, under an order entered on May 4, 2016, even though there is a bankruptcy case for each Debtor, all matters are docketed under Case No. 16-90126 as jointly administered, with a few exceptions as set forth in the May 4, 2016 order.)

The following is a summary only.  As of February 21, 2019, there are 1,048 Docket entries in the Reorganization Case, and the Debtors refer the reader to the Docket for full details.

### 6.1    Business Operations

#### 6.1.1 Pellet Manufacturing and Deliveries in 2016 Through Early 2017

After the Petition Date, the Debtors continued to operate the Manufacturing Facility and Storage Facility.  Using the proceeds from the DIP Loans (discussed below) and with the assistance of its professionals and advisors, the Debtors normalized and substantially improved the efficiency of their business operations during calendar year 2016.  During 2016 and early 2017 (before the occurrence of the Ship Loader Fire, Silo Burn, and Silo Collapse discussed below), the Debtors produced pellets and fully loaded eight large vessels bound for the Debtors' customer Drax Power, Ltd.

On September 20, 2016, the Debtors filed a *Motion for Entry of an Order Authorizing Debtors to Enter into Wood Pellet Sale and Supply Agreement* [Docket # 196], in which the Debtors requested authority to enter into a contract with Louisiana Pellets, Inc. and German Pellets Louisiana, LLC to purchase wood pellets from those entities, to be accumulated and sold. The Bankruptcy Court entered an order granting this motion on October 6, 2016 [Docket #222] The Debtors filed a motion to enter into a supplement to amend the terms of this agreement on November 2, 2016 [Docket #242], and such motion was granted by the Bankruptcy Court on November 28, 2016. [Docket #263]

#### 6.1.2 Ship Loader Fire, Silo Burn and Silo Collapse

As discussed below, the Debtors engaged an investment banker and solicited strategic offers for the Debtors' assets and business during 2016 and early 2017.  An auction was scheduled for the sale of substantially all of the Debtors' assets for March 1, 2017.  However, prior to the scheduled auction, Debtors experienced a fire loss at their storage facility in Port Arthur, Texas.  On February 27, 2017, a fire (defined herein and in the Plan as the Ship Loader Fire) occurred at the Storage Facility while a vessel was being loaded with wood pellets.  Among

other things, the Ship Loader Fire damaged beyond reasonable repair the Debtors' ship loader. As a result of the Ship Loader Fire, Debtors delayed the auction and immediately began efforts to replace the ship loader. (The ship loader was later replaced and other damaged equipment was repaired.)

While still addressing the Ship Loader Fire, on April 15, 2017, the Debtors detected smoldering in Silo #2 at the Storage Facility (referred to herein and in the Plan as the Silo Burn). Immediately after discovering the Silo Burn, the Debtors, together with their advisors and contractors, began taking various steps to extinguish the burn and to extract the wood pellets as expeditiously as possible. Among other contractors, the Debtors engaged Cotton Commercial USA Inc. as its disaster recovery contractor.

The Debtors' efforts to address the situation were undertaken under the direction of the Port Arthur Fire Department and its Deputy Chief as Incident Commander. (The Port Arthur Fire Department maintained a 24-hour presence and mobile command center at the site.) Shortly after discovering the Silo Burn, GPTX's disaster recovery contractors began taking steps to extinguish the Silo Burn, and to extract the wood pellets as expeditiously as possible. In collaboration with the Port Arthur Fire Department, extensive measures were taken to address the Silo Burn, including injection of inert gases (carbon dioxide, nitrogen and liquid nitrogen), and operations to extract impacted pellets.

Ultimately, despite the best efforts of the Debtors and their contractors to address the Silo Burn and extract all pellets, Silo #2 suffered a structural failure and collapsed on or about June 4, 2017. As discussed below, after this event occurred, the Debtors worked to remove debris, remaining pellets, and to clean up and rebuild the site as expeditiously as possible.

### 6.1.3 Rebuild

The Debtors have undertaken to rebuild and repair all systems impacted by the Ship Loader Fire, Silo Burn, and Silo Collapse. The Debtors have done so under a process agreed to with the Port Arthur Fire Marshal and the Port (respectively, and as discussed in more detail below under "6.10.4 Contested Matters With Port" and "6.10.5 State Court Action Filed by City of Port Arthur"). The Debtors retained Black & Veatch to perform construction management and other services, among other contractors, to manage the complex array of tasks necessary for the rebuild, including without limitation: construction and erection of new silo #2 (replacing the collapsed former silo), necessary repairs to silos #1 and #3, installation of a new overhead truss system, bucket elevator, and dust collector, repairs and installment of the new sections of the conveyor system, and electrical and controls installations and updates, among other items.

As of February 21, 2019, the rebuild and repair operations at the Storage Facility are substantially complete.

### 6.1.4 Idling and Restart of Manufacturing Facility

Due to the occurrence of the events described above, the Debtors' Manufacturing Facility has been in a "warm idle" state since the occurrence of the 2017 Silo Burn and Silo Collapse. While the rebuilding and repair work described above was ongoing and before its completion, the Storage Facility was not operational and was not able to receive, store, and ship wood pellets.

Notwithstanding the fact that the Storage Facility was not operational, on October 11, 2018, the Debtors filed a *Motion Under Bankruptcy Code §§ 105 and 363 Requesting Authorization for Debtors to Enter Into Wood Fiber and Wood Pellets Tolling Agreement* [Docket #929], in which the Debtors sought approval of an agreement (known as a "tolling" arrangement), under which the Debtors would produce wood pellets for direct delivery to Enviva, LP at the Manufacturing Facility (as opposed to the Storage Facility), allowing the Debtors to restart the Manufacturing Facility on an immediate basis and realize operating income while the Rebuild was still pending. The Bankruptcy Court entered an order granting the motion on October 19, 2018 [Docket #943], amended on October 22, 2018 [Docket #946] The Debtors filed a motion to approve an amendment to the agreement with Enviva, LP on December 27, 2018 [Docket #998]. The Bankruptcy Court entered an order approving the amendment on January 8, 2019 [Docket #1013]. Pursuant to this agreement, the Debtors restarted production at the Manufacturing Facility in October 2018.

### 6.2   Management of the Debtors

During the Reorganization Case, the Debtors have had in place a Chief Restructuring Officer, which initially was Bryan Gaston of Opportune, LLP. On May 9, 2016, the Debtors filed an application to retain Bryan Gaston as Chief Restructuring Officer and the firm of Opportune, LLP. [Docket #64] The application was granted on May 24, 2016 [Docket #87]

As of early May, 2017, in light of the challenges posed by the Ship Loader Fire and Silo Burn, the Debtors concluded that additional management resources and assistance were required to address the multitude of challenges created by these events. To address this need, the Debtors considered multiple options including additional personnel from the then current professionals, as well as third parties. The Debtors concluded that the most efficient and immediately available option was to engage professionals who already have significant experience and working knowledge of the Debtors' operations—Chip Cummins and RPA Advisors, who have worked on behalf of the Louisiana Pellets sister companies. The Debtors therefore filed, on May 4, 2017 an *Application Pursuant To Sections 327 and 328 of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure For Authorization to Retain RPA Advisors, LLC as Crisis Manager* [Docket #433]. The Bankruptcy Court entered an order granting the application on May 23, 2017 [Docket #451]. As approved by the Bankruptcy Court, the scope of services provided by Mr. Cummins and RPA included overall strategic planning and coordination; the strategic marketing and sale process; management of the Debtors' contractual relationships; oversight of budgeting and financing; and communications and coordination with stakeholders. [Docket# 433 and 451]

On October 27, 2017, the Debtors filed: (i) a *Motion to Approve Termination and Transition of Responsibilities of Opportune, LLP and Bryan M. Gaston as Chief Restructuring Officer Pursuant to Bankruptcy Code § 363(b)* [Docket #619] and (ii) M*otion to Modify Retention of RPA Advisors, LLC and to Appoint Chip Cummins as Chief Restructuring Officer of the Debtors Pursuant to Bankruptcy Code §§ 363* [Docket #620], effectively to confirm the transition of all matters previously handled by Mr. Gaston and Opportune LLP to Chip Cummins and RPA Advisors, LLC (who is referred to in this Disclosure Statement and Plan as the CRO). The Bankruptcy Court granted these motions through orders entered on November 27, 2017 [Docket #655] and January 10, 2018. [Docket #700]

Before the Petition Date, management services for the Debtors were provided by approximately 25 personnel of German Pellets GmbH, another company within the "German Pellets" family of companies. To preserve the status quo and continue normal business operations, the Debtors filed a motion on May 2, 2016 to continue certain services with German Pellets GmbH and logistical and support functions through German Pellets GmbH. [Docket #15] The Bankruptcy Court entered an interim order on May 4, 2016 granting authority to continue services through May 31, 2016. [Docket #42], and a second interim order on May 25, 2016 granting authority to continue services through July 15, 2016. [Docket #89]  A final order was entered on July 14, 2016, continuing a term for German Pellets GmbH to provide services through August 31, 2016 [Docket #147], later amended to run through September 30, 2016 through an order entered on September 6, 2016 [Docket #189]  On September 30, 2016, the Debtors filed a motion [Docket #214] to further amend the services agreement with German Pellets GmbH to reduce the compensation paid and reduce the scope of services and transfer certain services to Wailua Technology, Inc.  This motion was granted on October 24, 2016. [Docket #234]

The agreement with German Pellets GmbH terminated, but a dispute arose as to the date of termination.  The Debtors asserted that the agreement terminated as of September 10, 2017 [See Docket #746] while German Pellets GmbH asserted a later date of termination.  Ultimately, the matter was settled on a May 29, 2018 agreed order submitted concerning the motion of German Pellets GmbH for an Administrative Claim. [Docket #838]

### 6.3    The Bankruptcy Filing and First-Day Relief

On April 30, 2016 (the "Petition Date"), Debtors filed petitions pursuant to Chapter 11 of the United States Bankruptcy Code. [Docket #1]

The Bankruptcy Court held a "first-day" hearing to consider various emergency motions on May 4, 2016.  Relief granted at or in the month after the first-day hearing included the following orders entered by the Bankruptcy Court:

- Joint administration of the Debtors' bankruptcy cases (discussed in more detail below) [Docket #37]

- Authority to pay certain pre-petition wages of employees [Docket #39]

- Authority to continue certain pre-petition insurance practices [Docket #40]

- Authority to pay certain critical vendors [Docket #41]

- Authority to enter into a management services agreement with German Pellets GmbH [Docket #42];

- Authority to maintain existing bank accounts [Docket #88]; and

- Extending time to file schedules and statements of financial affairs. [Docket #22]

Page 24

The Debtors also filed the *Declaration of Bryan Davis in Support of Chapter 11 Petitions and First Day Pleadings* [Docket #16] which contained details concerning the Debtors, the events leading to bankruptcy, and the emergency motions pending before the Bankruptcy Court at the hearing held on May 4, 2016.

Under the Bankruptcy Court's May 4, 2016 *Order Granting Joint Administration of Bankruptcy Estates* [Docket #37], all matters from that point forward pertaining to the bankruptcy cases for both Debtors were to be docketed under Case No. 16-90126 (with certain exceptions as set forth in such order).

### 6.4    DIP Loans / DIP and Cash Collateral Order

As of the Petition Date, based upon the liquidating challenges noted above, Debtors required financing on a post-petition basis (the DIP Loans) to fund demonstrated operational, capital and administrative needs of the Debtors and their business.  Pursuant to the Debtors' motion the Bankruptcy Court approved the DIP Loans under the DIP and Cash Collateral Order as follows:

- Pursuant to the Debtors' motion [Docket #9], an interim order allowing Debtors to obtain post-petition financing and use of cash collateral during the case on May 5, 2016. [Docket #47]  Under that initial interim order, the Debtors were granted authority for an interim DIP Loans of up to $3,434,000.00 from the Bond Trustee as DIP Lender, in exchange for certain protections and provisions as set forth in the interim order. [Docket #47]  A second interim order dated May 27, 2016 was entering continuing the DIP Loans but not increasing the overall amount. [Docket #92]

- A final order dated June 14, 2016  [Docket #121] was entered continuing the DIP Loans in the amount up to $12,500,000, in addition to the amount of $3,144,218.87 previously advanced under the DIP Loans.

- After the entry of the June 14, 2016 order, the Debtors have sought authority to amend and extend the DIP Loans a total of twelve (12) separate times given the liquidity needs including to support the Rebuild process.  The Bankruptcy Court approved all requested amendments on the following dates: (1) January 26, 2017 [Docket #313]; (2) March 31, 2017 [Docket #398] ; (3) April 19, 2017 [Docket #418]; (4) May 5, 2017 [Docket #437]; (5) May 18, 2017 [Docket #448]; (6) June 15, 2017 [Docket #477]; (7) July 7, 2017 [Docket #489]; (8) September 15, 2017 [Docket #560]; (9) October 13, 2017 [Docket #599]; (10) November 15, 2017 [Docket #649]; (11) December 29, 2017 [Docket #692]; (12) September 22, 2018 [Docket #908] as modified by the order entered on October 22, 2018 [Docket #945]; and (13) November 28, 2018 [Docket #982].

As of November 28, 2018, the total post-petition borrowing authority was in the total post-petition amount of $84,338,648.07, and the total outstanding amount of the DIP Loans as of February 22, 2019 was $76,455,943.76.  These amounts are secured by a first priority lien against all of the Debtors' assets.

**6.5**      **Section 341 Meeting of Creditors and Formation of UCC**

The Office of the United States Trustee conducted a Section 341 Meeting of Creditors on June 24, 2016. [Docket #43]

The Office of the United States Trustee filed a notice of the appointment of the UCC on May 17, 2016. [Docket #73] and an amended notice of appointment on June 7, 2016. [Docket #108]  The UCC as appointed includes three members: J.A.M. Distributing Company, Jasper Oil Company, and NAPCO.

**6.6**      **Retention of Professionals and Payments to Professionals**

     **6.6.1 Legal Counsel**

The Debtors filed an application to retain Locke Lord LLP as their legal counsel on May 31, 2016. [Docket #103]  This application was approved on June 17, 2016. [Docket #124]

The Debtors also filed an application to retain Searcy & Searcy, P.C. as their local and conflicts counsel [Docket #46]  This application was approved on May 20, 2016. [Docket #77]

The UCC filed an application to retain Patrick Kelley, Esq., Ireland, Carroll & Kelly, P.C., 6101 S. Broadway, Suite 500, Tyler, Texas 75703 as counsel on June 8, 2016. [Docket #109].  This motion was approved on June 24, 2016. [Docket #131]  Effective January 1, 2019, Mr. Kelley's firm is Patrick Kelley, PLLC. [Docket #1019]

On May 16, 2016, the Debtors filed a *Motion for Administrative Order under Sections 105(a) and 331 of the Bankruptcy Code Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket #72], which was granted by the Bankruptcy Court through an order entered on June 10, 2016 [Docket #113]  This order established certain procedures for periodic payments to professionals for their services.

On September 12, 2016, the Debtors filed an *Application For Authority to Employ and Compensate (Nunc Pro Tunc) Certain Professionals Utilized in the Ordinary Course of The Debtors' Businesses and Request For Waiver of Local Rule 2014* [Docket #193], which was granted by the Bankruptcy Court on October 5, 2016. [Docket #220]  This application provides for the Debtors to employ certain "ordinary course" professionals without need for filing formal retention applications, and such professionals have been disclosed on the Docket.

Pursuant to the procedures entered by the Bankruptcy Court and under certain periodic applications filed by professionals for approval of fees and expenses, the Bankruptcy Court approved payments to professionals (counsel) in the following amounts: Searcy & Searcy, PC, Fees Awarded: $50350.00, Expenses Awarded: $832.63 (December 1, 2016, Docket #266); Ireland, Carroll & Kelley, PC, Fees Awarded: $57605.00, Expenses Awarded: $419.30 (December 1, 2016, Docket #267); Searcy & Searcy, PC. Fees Awarded: $48705.00, Expenses Awarded: $3960.73 (April 18, 2017, Docket #414); Ireland, Carroll & Kelley, PC. Fees Awarded: $39878.00, Expenses Awarded: $449.82 (April 18, 2017, Docket #415); Locke Lord, LLP. Fees Awarded: $483119.50, Expenses Awarded: $10598.44 (April 18, 2017, Docket #416);

Patrick Kelley,. Fees Awarded: $61932.50, Expenses Awarded: $751.18 (August 3, 2017, Docket #512); Searcy & Searcy, PC. Fees Awarded: $41070.00, Expenses Awarded: $1693.29 (August 3, 2017, Docket #514); Searcy & Searcy PC. Fees Awarded: $18842.50, Expenses Awarded: $443.77 (November 2, 2017, Docket #627); Patrick Kelley. Fees Awarded: $25888.25, Expenses Awarded: $554.33 (November 8, 2017, Docket #640); Locke Lord LLP. Fees Awarded: $905130.40, Expenses Awarded: $20085.19 (December 15, 2017, Docket #678); Searcy & Searcy, P.C., Local/Conflicts Co-Counsel Fees Awarded: $21000.00, Expenses Awarded: $514.02 (March 9, 2018, Docket 751); Patrick Kelley. Fees Awarded: $33251.25, Expenses Awarded: $869.92 (March 9, 2018, Docket #752); Locke Lord, LLP, Counsel For Debtors-In-Possession. Fees Awarded: $793378.75, Expenses Awarded: $43470.02 (March 28, 2018, Docket #767); Searcy & Searcy PC. Fees Awarded: $21,435.00, Expenses Awarded: $3,116.31 (July 9, 2018, Docket 856); Patrick Kelley. Fees Awarded: $16567.50, Expenses Awarded: $183.74 (July 10, 2018, Docket #858); Searcy & Searcy, P.C., Fees Awarded: $24262.50, Expenses Awarded: $3924.36 (October 31, 2018, Docket #960); Patrick Kelley. Fees Awarded: $28980.00, Expenses Awarded: $0.00 (November 28, 2018, Docket #980); Locke Lord LLP. Fees Awarded: $624454.50, Expenses Awarded: $23771.91 (December 21, 2018, Docket #994).

### 6.6.2 Other Professionals

The engagement of Bryan Gaston and Opportune, LLP, and Chip Cummins and RPA Advisors, LLC, is discussed above under "6.2 Management of the Debtors."

On July 28, 2017, the Debtors filed an *Application Pursuant to Sections 327 and 328 of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure For Authorization to Retain Navigant Consulting, Inc. as Insurance Consultants* [Docket #504], which was granted by the Bankruptcy Court on August 22, 2017. [Docket #525]  Navigant Consulting, Inc. was retained to assist the Debtors in pursuing their significant insurance claims and maximize recoveries which is further discussed below.  Due to the fact that the applicable personnel of Navigant Consulting, Inc. moved to BDO USA, LLP as of August 2018, the Debtors filed their Application Pursuant to Bankruptcy Code 327 and 328 and Rule 2014 of the Federal Rules of Bankruptcy Procedure For Authorization To Substitute and Retain BDO USA, LLP as Insurance Consultants on September 4, 2018. [Docket #885] which was granted by the Bankruptcy Court on September 25, 2018. [Docket #906]

Pursuant to the October 5, 2016 order entered by the Bankruptcy Court, certain "ordinary course" professionals filed applications for compensation and reimbursement, including Jensen Hughes (fire safety and investigation experts), and Whitley Penn LLP (accountants).

The engagement of investment bankers is addressed under "Marketing and Sale Process," below.

### 6.7   Schedules and Statements of Financial Affairs

On May 31, 2016, the Debtors filed their Schedules and Statements of Financial Affairs in each of their separate bankruptcy cases. [respectively, Docket #101 and 102 in Case No. 16-90126 and Docket #63 and 64 in Case No. 16-90127]

The Schedules, as amended, contain a detailed listing of Claims, together with the estimated amount of Claims.  Holders of Claims and Interests are referred to the Debtors' Schedules for more information regarding the extent and nature of those Claims and Interests.  In addition, a number of Proofs of Claims have been filed in the Debtors' Reorganization Case. Those Proofs of Claims are set forth on the Docket under the claims registry in Case No. 16-90126 and 16-90127, respectively.   The Statements of Financial Affairs contains various financial information including financial results, and payments and transfers from the Debtors.

Pursuant to Local Bankruptcy Rule 3003(a), the bar date for the Filing of Proofs of Claim was September 22, 2016, other than governmental claims which had a bar date of October 27, 2016.

**6.8**     **Marketing and Sale Process**

**6.8.1          2016-2017 Process**

The DIP and Cash Collateral Order established certain bankruptcy milestones, including that the Debtors would seek to engage an investment banker to solicit offers relating to the affiliation or acquisition of the Debtors' assets and business through a section 363 sale or as a plan sponsor under a plan of reorganization. The Debtors complied with this obligation by filing a motion seeking authorization to retain Guggenheim Securities, LLC [Docket #140] as investment banker which request was approved by the Bankruptcy Court by order dated July 28, 2016. [Docket #159]

Certain personnel of Guggenheim Securities, LLC left the employ of that firm and formed a new firm, Configure Partners, LLC.  As of September 26, 2017, the Debtors terminated the engagement of Guggenheim Securities and engaged Configure Partners, LLC as investment banker (referred to herein and in the Plan as the Investment Banker), under an application dated October 11, 2017 [Docket #594] and granted by the Bankruptcy Court on December 7, 2017. [Docket #670]

The DIP and Cash Collateral Order further provided that the parties would agree to a marketing and sale process with specific further milestone dates.  After various discussions and input from the Debtors' investment banker, the parties agreed to a timeline in 2016 for soliciting initial proposals relating to the Debtors' assets and business.  Guggenheim Securities, LLC as investment banker established a virtual on-line data room, prepared various marketing materials, and solicited offers.

Additional bankruptcy milestones were agreed to between the Debtors and the Bond Trustee in connection with the DIP and Cash Collateral Order [See, e.g., Docket # 284]. Pursuant to those milestones, on January 6, 2017, the Debtors filed a *Motion For Entry of Orders (I) Approving Bidding Procedures and Potentially Award Certain Protections and (II) Authorize (A) the Sale of Substantially All of the Debtors Assets, and (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* [Docket #287], which requested an order approving bidding procedures in the form attached to the motion.  Such bidding procedures included an auction process, in which bidders were invited to participate and submit bids for the

sale of the Debtors' business and assets. The January 6, 2017 motion also requested a second order, under Section 363 of the Bankruptcy Code, effectuating a sale "free and clear" of all claims and liabilities, in conjunction with the results of the proposed auction under the bidding procedures.

On January 20, 2017, the Bankruptcy Court entered an order setting a final hearing on the January 6, 2018 motion for March 10, 2017. [Docket #306]  Pursuant to a motion filed by the Bond Trustee [Docket #310], the Bankruptcy Court entered an order on January 26, 2017 rescheduling the final hearing for March 21, 2017. [Docket #315]

The Bankruptcy Court scheduled and held a hearing on February 6, 2017 on the January 6, 2017 motion.  After the hearing, the Bankruptcy Court granted the relief requested and entered an order approving the requested bidding procedures submitted by the Debtors and scheduling an auction for the sale of substantially all of the Debtors' assets for March 1, 2017. [Docket #330]

In light of the Ship Loader Fire, and pursuant to a motion filed on March 14, 2017 [Docket #377], the scheduled final hearing that was scheduled for March 21, 2017 was adjourned without date under an order entered on March 17, 2017. [Docket #383]  Also, under the Bankruptcy Court's February 7, 2017 order [Docket #330], the auction for the sale of substantially all of the Debtors' assets was originally scheduled for March 1, 2017.  On February 28, 2017 [Docket #362], the Debtors filed a notice postponing the scheduled March 1, 2017 auction, which was not rescheduled in 2017 given the Silo Burn and Silo Collapse.

### 6.8.2      2018-2019 Process

The Debtors have restarted the marketing and sale process with the assistance of the Investment Banker (Configure Partners).  The Investment Banker has re-established and updated the virtual on-line data room, prepared various updated and superseding marketing materials, and solicited offers.

Through this process, numerous parties have accessed the data room, conducted physical inspections of the Debtors' facilities, and provided general and initial indications of interests relating to possible acquisition.  Reviewing the available options, the Debtors have elected to put forward amended bidding procedures (in a motion filed on January 30, 2019), entitled *Motion for Entry of Orders: (I) Approving Amended and Superseding Bidding Procedures and Potentially Awarding Certain Protections and (II) Authorizing (A) the Sale of Substantially All of the Debtors' Assets, and (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* [Docket #1028] as a means to move forward the marketing and sale process, and achieve the best and highest possible recovery for the estates. The Debtors believe that the bidding procedures, approved through an order entered on February 21, 2019 [Docket #1048] (the Bidding Procedures Order) will result in a competitive bidding and auction process, thus likely enhancing the recovery to the Debtors' creditors and estates.  These bidding procedures are more fully described in the Bidding Procedures Order.  The bidding procedures and auction described therein will lead to the Sale that will provide the mechanism for certain recoveries under the Plan.

### 6.9      Lease/Contract Assumption and Rejection

On January 10, 2017, the Debtors filed a Motion *to Approve Assumption and Assignment Procedures for Certain Executory Contracts and Unexpired Leases.* [Docket #294]   The Bankruptcy Court entered an order on this motion on February 7, 2017 [Docket #328], setting certain procedures for assumption and assignment of Executory Contracts and Unexpired Leases. This order remains in full force and effect and governs assumption and assignment under the Plan, subject to applicable provisions of the Plan.

On April 27, 2017, the Debtors filed a *Motion to Assume Ground Lease and Easement Agreement Between the Debtors and Port of Arthur Navigation District of Jefferson County, Texas Under Bankruptcy Code § 365 and Fed. R. Bankr. P. 6006.* [Docket #426]   An order was entered granting the motion on September 26, 2018. [Docket #907]   On December 14, 2018, the Port filed additional Claims against the Debtors in connection with the Silo Burn and Ship Loader Fire, described as a "business interruption claim" [Docket #989] and a "property damage" claim. [Docket #990]   The Claims are pending and are Disputed [Docket #1009 and 1010] and a hearing has not yet been set.

On April 27, 2017, the Debtors filed a *Motion to Reject Port Arthur Facility Option Agreement With the Louisiana Debtors Under Bankruptcy Code 365 and Fed.R.Bankr.P.6006* [Docket #427] and a *Motion to Reject Storage and Handling Agreement With the Louisiana Debtors Under Bankruptcy Code 365 and Fed.R.Bankr.P.6006.* [Docket #428]   These motions were granted by the Bankruptcy Court on May 23, 2017 [Docket #452 and 453]

The Plan contains certain provisions governing assumption and assignment, and rejection, of Executory Contracts and Unexpired Leases. (*See* below under Article XI.)

### 6.10   Contested Matters / Adversary Proceedings / Other Litigation

The following is a description of significant post-petition contested matters, adversary proceedings, and other litigation involving the Debtors.

### 6.10.1        Contested Matter With Drax Power Limited

On October 3, 2017, the Debtors filed their *Motion Pursuant To Sections 105(A), 362 and 365 of the Bankruptcy Code to Compel Performance by Drax Power Limited Under an Executory Contract and to Enforce the Automatic Stay.* [Docket #577]   This motion concerned certain disputes between the Debtors and Drax Power, Limited under the offtake contract between the parties. Drax Power, Limited filed an objection on October 13, 2017 [Docket #601]; and the Debtors filed a reply on November 13, 2017 [Docket #647].

The Bankruptcy Court entered an order referring the matter to mediation on October 19, 2017. [Docket #611]   The parties attended mediation on November 20-21, 2017 and eventually reached a settlement, including a settlement agreement and contract amendment, pursuant to which the parties agreed to amended contractual terms which included an extension of the contract term and adjusted pricing, as set forth in the settlement agreement filed (in redacted form) in the Docket of the Reorganization Case on January 19, 2018, through a motion for Bankruptcy Court approval of the settlement. [Docket #706]   The Bankruptcy Court entered the requested order approving the settlement on February 7, 2018. [Docket #720] The Debtors filed a

motion to approve a further amendment to the offtake agreement with Drax Power Limited on December 27, 2018 [Docket #998] and the Bankruptcy Court entered an order approving the amendment on January 8, 2019 [Docket #1013]

### 6.10.2    Contested Matters and Adversary Proceeding with NAPCO

On May 19, 2016, NAPCO filed its *Motion to Allow and Compel Payment of Administrative Priority Expense Claim* [Docket #75], in which it claimed and asserted an Administrative Claim in the total amount of $1,382,673.87 under Section 503(b)(9) of the Bankruptcy Code.   On July 13, 2016, NAPCO filed its *Motion to Compel Assumption or Rejection of Executory Contract* regarding the contract between NAPCO and the Debtors [Docket #143], which was later withdrawn without prejudice on October 18, 2016. [Docket #233]  These motions are disputed and objections were filed by the Debtors on June 9, 2016, and August 3, 2016, respectively. [Docket #112 and 163]

On October 4, 2016, the Debtors filed a complaint against NAPCO under Section 547 of the Bankruptcy Code, seeking recovery of preferential transfers from the Debtors to NAPCO during the 90 days prior to the Petition Date, in the total amount of $3,510,049.80. [Docket #218]  This action remains pending and is referred to as the NAPCO Avoidance Claim under the Plan.

On November 1, 2016, an agreed motion was filed by the Debtors to consolidate the pending NAPCO Motion to Allow and Compel Payment of Administrative Priority Expense Claim with the complaint filed by the Debtors under Section 547 of the Bankruptcy Code. [Docket #241].  The Bankruptcy Court granted the motion on November 3, 2016, consolidating these matters under Adversary Case No. 16-09003 before the Bankruptcy Court. [Docket #246]

In addition, NAPCO commenced, on September 6, 2016, an adversary proceeding with the Bond Trustee as defendant, asserting claims for equitable subordination and fraud, in a case appearing under Adversary Case No. 16-09002 before the Bankruptcy Court.  The Debtors are not a party to this action, which remains pending.

### 6.10.3    Motions for Relief from Stay

On August 15, 2017, claimant Kurt Shelton filed his *Motion for Relief from Automatic Stay With Waiver of 30-Day Hearing Requirement As To Pending Negligence Claim in State Court* [Docket #521].  An objection was filed by the Debtors on August 29, 2017. [Docket #532]  An agreed order was entered on September 29, 2017 [Docket #569] granting in part and denying in part the request and allowing the claimant to file a state court action, which remains pending.  The claimant agreed to seek recovery only against insurance proceeds.

On August 25, 2017, VFS Leasing Co. filed its *Motion for Relief from Automatic Stay Without Waiver of 30-Day Hearing Requirement As To Leased Equipment Filed* [Docket #528]  An objection was filed by the Debtors on September 8, 2017. [Docket #554]  An agreed order was entered on October 2, 2017 [Docket #575]  Under this order, the claimant and lessor took possession of certain vehicles leased to the Debtors under leases that had expired by their own terms.

On March 29, 2018, claimant Thaddious Foster filed his *Unopposed Motion for Partial Lift of Automatic Stay With Waiver of 30-Day Hearing Requirement As To District Court Cause No. A-200611.* [Docket #768]  An agreed order was entered on April 18, 2018 [Docket #778] granting in part and denying in part the request and allowing the claimant to file a state court action, which remains pending.  The claimant agreed to seek recovery only against insurance proceeds.

On April 20, 2018, claimant Yhana Abdullah filed an action encaptioned *Yhana Abdullah v. German Pellets Texas, LLC et al.*, Case No. D-201493 (136th Judicial District Court of Jefferson County, Texas), naming GPTX as one of the defendants.  The matter is covered by insurance and any claims are Insured Claims.  The matter remains pending.

On November 18, 2018, claimant Linda Cooksey Walker filed an action encaptioned Linda Cooksey Walker v. German Pellets Texas, LLC et al., Case No. A-202951 (58th Judicial District Court of Jefferson County, Texas), naming GPTX as one of the defendants.  The matter is covered by insurance and any claims are Insured Claims.  The matter remains pending.

On December 21, 2018, claimant Travelers Property Casualty Company of America filed its *Motion for Relief from Automatic Stay With Waiver of 30-Day Hearing Requirement As To Debtor's Liability Insurance Policy Filed by Travelers Property Casualty Company of America* [Docket #995] An order was entered on January 14, 2019 [Docket #1018] allowing the claimant to file a state court action.  The claimant agreed to seek recovery only against insurance proceeds.

On January 8, 2019, claimant Ultrabulk A/S filed its *Motion for Relief from Automatic Stay With Waiver of 30-Day Hearing Requirement To File Texas State Court Lawsuit To Adjudicate Amount of Ultrabulk's Property Damages and Limiting Ultrabulk's Recovery To Only Debtors' Casualty, Property, and Liability Insurance Coverage Filed by Ultrabulk A/S.* [Docket #1015] An order was entered on January 23, 2019 [Docket #1022] allowing the claimant to file a state court action. The claimant agreed to seek recovery only against insurance proceeds.

### 6.10.4    Contested Matters with the Port

As the Rebuild was underway in early 2018, the Debtors were in regular communication with the Port and the Port's engineering consultants, U.S. Forensic, to coordinate construction activities.  In May 2018, a dispute arose between the Port and the Debtors concerning reviews and approvals concerning ongoing Rebuild work.  On May 10, 2018, the Port informed the Debtors that the Port was barring access to the Storage Facility site for the Debtors' contractors beginning on May 11, 2018, and therefore preventing further construction and repair work from moving forward as of that date.

In response, the Debtors filed their *Emergency Motion To Enforce Automatic Stay and Request for Damages for Willful Violation of Automatic Stay* early in the day on May 11, 2018. [Docket #814]  The Bankruptcy Court set the matter for hearing on May 14, 2018. [Docket #816] On May 14, 2018, the parties met and negotiated certain interim settlement terms to provide for the Rebuild activity to recommence at the start of the day on May 17, 2018.  These interim terms were reduced to written form and approved by the Port's governing board on May 16, 2018.

Page 32

In light of the interim terms being reached, the Bankruptcy Court continued, without date, the Debtors' May 11, 2018 motion, as well as the separate *Motion for Relief from Automatic Stay With Waiver of 30-Day Hearing Requirement As To Real Property Filed by Port of Port Arthur Navigation District of Jefferson County, Texas* filed on May 15, 2018 [Docket #824] regarding the same dispute. [Docket #828 and 829].

Subsequently, the Debtors and the Port executed a further agreement, replacing the interim terms, in a Memorandum of Agreement effective July 18, 2018, incorporating the Framework attached thereto, which resolved the pending disputes between the parties.

### 6.10.5        State Court Action Filed by City of Port Arthur

On June 30, 2017, City of Port Arthur commenced an injunction action in state court encaptioned *City of Port Arthur, Texas v. German Pellets Texas, LLC and Texas Pellets, Inc.,* Case No. E-200319 (172nd Judicial District Court of Jefferson County, Texas). Upon learning of the action, the Debtors immediately contacted the City of Port Arthur to enter a voluntary and consensual form of injunction order. On July 14, 2017, the parties met and agreed on a form of injunction order, which was entered that same day. With the agreement of the Debtors and the City of Port Arthur, the injunction order was extended several times, before expiring on October 1, 2018.

This action was filed in connection with the response to the Silo Burn and Silo Collapse. The Debtors were already voluntarily performing all of the items required under the agreed injunction order before the injunction order was even filed. Such items included: (a) cleanup and removal of pellets (underway and in progress since April 2017); (b) compliance with a "hazard analysis plan" agreed to with the City of Port Arthur Fire Marshal; (c) air monitoring and reporting (underway since April 2017); and (d) following guidance and direction from the Port Arthur Fire Department (ongoing since April 2017).

As of February 21, 2019, the Debtors have substantially completed rebuilding and repair work following the Silo Burn and Silo Collapse, in full compliance with requirements of the City of Port Arthur and Port Arthur Fire Marshal. The Debtors expect that no further action will take place in the suit commenced on June 30, 2017 and that the suit will be closed or dismissed.

### 6.10.6        Contested Administrative Claims

On July 19, 2017, J. Riley Enterprises, LLC d/b/a JB Industries filed a *Request for Allowance and Payment of Administrative Claim* [Docket #495] which was disputed by the Debtors [Docket #516]. A hearing was held on the matter on November 9, 2017 and the Bankruptcy Court issued an order on December 19, 2017 [Docket #682 and 683, setting an Allowed Administrative Claim in the amount of $665,287.38 of which $428,000.00 has been paid pursuant to the terms of the Bankruptcy Court's order. The remaining amounts will be treated as set forth in the Plan.

On September 26, 2017, the Kansas City Southern Railway Company filed a *Request for Allowance and Payment of Administrative Claim* [Docket #563, refiled at Docket #574] which was disputed by the Debtors. [Docket #614] The claimant filed a reply on November 9, 2017

[Docket #641]   An agreed order was entered by the Bankruptcy Court on January 8, 2018.
[Docket #696]

On July 19, 2017, German Pellets, GmbH filed a *Motion for Allowance and Payment of Administrative Expense Claim Under 11 U.S.C. Sec. 503(b)(1)* [Docket #724] which was disputed by the Debtors [Docket #746].   A reply was filed on April 13, 2018. [Docket #774]   A hearing was held on the matter on April 17, 2018.  The parties later settled the matter through an agreed order submitted to the Bankruptcy Court and entered on May 29, 2018 [Docket #838], and the claim has been paid and fully satisfied.

On December 27, 2017, NAPCO filed its *Motion to Establish Procedures to Reserve for and/or Pay Administrative Expense Claims*. [Docket #691]   The Bankruptcy Court held a hearing on the matter on February 28, 2018, and entered an order denying the motion on February 28, 2018. [Docket #744]

### 6.10.7      D&O Action

On April 30, 2018, the Debtors filed the action defined as the "D&O Action" under this Disclosure Statement and Plan and encaptioned *Texas Pellets, Inc. et al. v. German Pellets GmbH, et al*., Case No. 18-178 (United States District Court, Eastern District of Texas).  This action includes causes of action for breach of fiduciary duty, waste, negligence, gross negligence, fraudulent transfer, recovery under Bankruptcy Code Sections 550, 542, and 544, unjust enrichment, fraud, conspiracy, aiding and abetting, recovery of improper distributions, conversion, and repayment of advances, and objection to claims asserted against the Estates. Specifically and without limitation, the Debtors assert in excess of $210 million in avoidable transfers.  The action is pending before the federal district court and is addressed in the manner as set forth in the Plan.  Specifically, this action will be turned over to the Liquidating Trust to be litigated by the Liquidating Trustee for the benefit of creditors holding Allowed Claims.

### 6.10.8      *Kelley* Action

A group of individual plaintiffs filed the lawsuit encaptioned *Kelley, et al. v. German Pellets Texas LLC, et al*., Case No. B-0200859 (District Court of Jefferson County, Texas, 60th Judicial District Court), on October 25, 2017, naming the Debtors, along with Cotton Commercial USA, Inc., as defendants.  This lawsuit alleges damages to neighboring property owners and residents from the Silo Burn.  The Debtors contest any liability and are defending the action.  The matter is pending.

### 6.10.9      *Cuevas* Action

The action encaptioned *Cuevas, et al. v. German Pellets Texas, LLC*, et al, Case No. A-200862 (District Court of Jefferson County, Texas, 58th Judicial District Court),  was filed on October 25, 2017, naming the Debtors, along with GP Holding, as defendants.  The petition asserted causes of action against the defendants for negligence, gross negligence, wrongful death, and survival following a workplace fatality.  The parties conducted settlement discussions and reached a settlement, in which payment was made to the plaintiffs and plaintiffs waived and released any further claims against the Debtors.  The Bankruptcy Court approved this settlement

through an order entered on August 23, 2018 [Docket #876], and the settlement was later confirmed in the state court.  This matter is resolved.

### 6.10.10    Avoidance Actions

Between April 27, 2018 and April 30, 2018, the Debtors filed twenty-four (24) separate lawsuits (Avoidance Actions as defined under this Disclosure Statement and Plan) based on Section 547 and/or 548 of the Bankruptcy Code, to recover transfers made to the defendants as preferential and/or fraudulent transfers.  The actions and their current status as of February 21, 2019 is as follows:

| Defendant | Adversary Case Number | Demand Amount | Status |
| --- | --- | --- | --- |
| North American Procurement Company | 16-09003 | $2,660,365.11 | Pending |
| DKFM Switzerland AG | 18-09002 | $1,100,000.00 | Pending |
| Draeger Medical Systems | 18-09003 | $39,056.68 | Settled |
| United Rentals, Inc. F/k/a NES Rentals | 18-09004 | $33,671.68 | Settled |
| Health Care Service Corporation d/b/a BCBS | 18-09005 | $165,997.31 | Dismissed |
| The Guardian Life Insurance Company of America | 18-09006 | $21,035.44 | Dismissed |
| Wells Fargo Insurance, Inc., et al. | 18-09007 | $235,819.40 | Dismissed |
| Entergy Texas, Inc. | 18-09008 | $29,746.40 | Dismissed |
| East Coast Die Repair, Inc. | 18-09009 | $90,000.00 | Dismissed |
| Jasper Oil, Inc. | 18-09010 | $131,855.58 | Pending |
| Inspectorate & Bureau Veritas North America | 18-09011 | $80,463.76 | Settled |
| C & I Oil Company, Inc. | 18-09012 | $31,483.34 | Pending |
| Wessel GmbH | 18-09013 | $27,500.00 | Dismissed |
| North American Biomass | 18-09014 | $125,119.40 | Judgment Issued by Bankruptcy Court |

| Defendant | Adversary Case Number | Demand Amount | Status |
|---|---|---|---|
| Volvo Financial Services, LLC | 18-09015 | $104,173.53 | Settled |
| GreCon, Inc. | 18-09016 | $26,265.40 | Pending |
| Southern Tire Mart, LLC | 18-09017 | $24,486.44 | Pending |
| Motion Industries, Inc. | 18-09018 | $23,410.75 | Settled |
| Patterson Wood Products, Inc. | 18-09019 | $21,500.36 | Settled |
| Kluber Lubrication NA LP | 18-09020 | $17,892.00 | Dismissed |
| Ardent Mills, LLC | 18-09021 | $60,690.00 | Settled |
| KOBO | 18-09022 | $17,234.00 | Dismissed |
| City of Woodville | 18-09023 | $24,858.43 | Pending |
| Bates-Williamette | 18-09024 | $19,320.00 | Pending |

The actions above constitute "Avoidance Actions" as defined herein and in the Plan, and are treated as set forth in the Plan (to be transferred to the Liquidating Trust). The Debtors have realized certain recoveries from the matters set forth as "Settled" in the chart above, and such recoveries have yielded the "Avoidance Action Proceeds" (net of costs and attorneys' fees) as defined herein and in the Plan. Under the Plan, Avoidance Action Proceeds are to be transferred to, and will vest in, the Liquidating Trust free and clear of the liens of the Bond Trustee. Although the Bond Trustee has a lien against such proceeds, the Bond Trustee has agreed to waive such lien for the benefit of the estates.

In addition to the foregoing Avoidance Actions, nine additional Avoidance Actions are tolled pursuant to agreement with the counterparties, pursuant to tolling agreements. The Debtors continue to evaluate these actions.

### 6.10.11   Insurance Claims

The Debtors have asserted and made certain claims for payment and reimbursement from their property and casualty insurance carriers, in connection with the Ship Loader Fire, Silo Burn, Silo Collapse, and related circumstances. The Debtors have retained TRAHAN KORNEGAY PARTNERS LLP to assist as coverage counsel to pursue such claims. As of February 2019, the amount of outstanding and unpaid claims is approximately $34.5 million; however, additional claims and claim amounts remain to be asserted and addressed (above and beyond such amounts) Such claims are included within the definition of Ship Loader Fire

Insurance Claims and Silo Burn Insurance Claims, as defined herein and in the Plan, with the treatment as set forth in the Plan.

### 6.11    Filing of Plan and Disclosure Statement

#### 6.11.1    "Exclusive Period" to File Plan and Expiration of Exclusivity

Pursuant to Bankruptcy Code § 1121(a), the Debtors may file a plan of reorganization or liquidation at any time during the Reorganization Case. Section 1121(b) of the Bankruptcy Code further provides that only the Debtors have the right to file a plan during the first 120 days of the Reorganization Case, which is often referred to as the Debtors' "exclusivity period."

On August 4, 2016, the Debtors filed a motion to extend the "exclusive period" to file a plan. [Docket #167]   The Bankruptcy Court granted this motion on August 26, 2016 and extended the period to November 28, 2016. [Docket #181]  On November 28, 2016, the Debtors filed a motion to further extend the "exclusive period" to file a plan. [Docket #262]   The Bankruptcy Court granted this motion on December 20, 2016 and extended the period to January 27, 2017. [Docket #281]   On January 26, 2017, the Debtors filed a further motion to further extend the "exclusive period" to file a plan. [Docket #314]  The Bankruptcy Court granted this motion on May 5, 2017 and extended the period to June 30, 2017, provided that the Debtors amended their pending disclosure statement. [Docket #436]

As discussed below, the "exclusive period" expired on June 2, 2017.

#### 6.11.2    Original Plan and Disclosure Statement

On March 1, 2017, the Debtors filed their first plan and disclosure statement [Docket #364 and 365], which was withdrawn on June 2, 2017 [Docket #457] and is entirely superseded by, respectively, the Plan, and this Disclosure Statement.  The Debtors' "exclusive period" to file and confirm a plan therefore expired as of June 2, 2017, as confirmed by an order entered on June 7, 2017. [Docket #460]

#### 6.11.3    First Amended Plan and Disclosure Statement

On January 29, 2019, the Debtors filed a First Amended Plan [Docket #1025 and First Amended Disclosure Statement [Docket #1026], which have been updated as of February 22, 2019.

This Disclosure Statement (and attached Plan) contain minor updates from the versions filed on the Bankruptcy Court's Docket at Docket #1025 and 1026.  The Debtors refer the reader to these current versions of the Disclosure Statement and Plan which are the most current versions.

## ARTICLE VII
## CLASSIFICATION OF CLAIMS AND INTERESTS UNDER THE PLAN

The Claims against and Interests in the Debtors are designated and classified as set forth below.  The following is a designation of the classes under this Plan.  Administrative Claims and Priority Tax Claims have not been classified and are excluded from the following Classes in accordance with Section 1123(a)(1) of the Bankruptcy Code.   A Claim is classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and is classified in a different Class to the extent that any remainder of the claim qualifies within the description of such different Class.

### 7.1    Class 1 – Bond Trustee Secured Claim

**Estimated Amount:  $189,510,697.22**

Class 1 consists of the Bond Trustee Secured Claim, which is Allowed in the amount of $189,510,697.22 as of the Petition Date.  Based on the Debtors' review and information and in accordance with the DIP and Cash Collateral Order, the Bond Trustee Secured Claim is a first priority secured claim as to substantially all of the Debtors' assets, subject only to the liens and claims of the DIP Lender.

Class 1 is impaired under the Plan, and Class 1 is therefore entitled to vote on the Plan.

### 7.2    Classes 2(a), 2(b), 2(c) and 2(d) – Other Secured Claims

#### 7.2.1    Class 2(a) and Class 2(b) Secured Ad Valorem Tax Claims.

**Estimated Amount:  $81,383.24 for GPTX and $15,530.91 for TPI.**

Class 2(a) consists of any Secured Ad Valorem Tax Claim against TPI. Class 2(b) consists of any Secured Ad Valorem Tax Claim against GPTX. Under applicable non-bankruptcy law, Allowed Secured Ad Valorem Tax Claims would have priority over any other Secured Claims against the Debtors' property, including, without limitation, the Bond Trustee Secured Claim.  Based on the claims register and the Schedules, the estimated amount of Secured Ad Valorem Tax Claims in Class 2(a) that have been asserted against GPTX totals $81,383.24.  Based on the claims register and the Schedules, the estimated amount of Secured Claims in Class 2(b) that have been asserted against TPI totals $15,530.91. All of the known Secured Ad Valorem Tax Claims are Disputed, since the Debtors are current on all ad valorem taxes.

Classes 2(a) and 2(b) are impaired under the Plan, and are therefore entitled to vote on the Plan.

#### 7.2.2    Class 2(c) and Class 2(d) Secured Claims.

**Estimated Amount:  $0.00**

Class 2(c) consists of any Secured Claims against TPI other than the claims of the DIP Lender, the Bond Trustee Secured Claim and/or any Secured Ad Valorem Tax Claim. Class 2(d) consists of any Secured Claims against GPTX other than the Bond Trustee Secured Claim and/or any Secured Ad Valorem Tax Claim.  Based on the Debtors' review and information, any Class

2(c) and 2(d) Claims (if any exist) would be inferior in priority to the claims of the DIP Lender, the Bond Trustee Secured Claim and the Secured Ad Valorem Tax Claims. The Debtors are not aware of any such valid Secured Claims, and estimates such Claims as $0.00 in amount. (A single Proof of Claim was filed in the amount of $5,959.73, but the designation as a Secured Claim is believed to be in error and the Debtors intend to file an objection to such Claim as a Secured Claim.)  Any such Claims, if any, are classified under Classes 2(c) and 2(d) of the Plan.

Classes 2(c) and 2(d) are impaired under the Plan, and are therefore entitled to vote on the Plan.

### 7.3  Class 3 – Unsecured Claims

**Estimated Amount:  $8,068,419.25 for GPTX and $22,803,080.09 for TPI, plus the Allowed Deficiency Claim of the Bond Trustee**

Class 3(a) consists of Unsecured Claims (including without limitation Deficiency Claims) against TPI. Class 3(b) consists of Unsecured Claims (including without limitation Deficiency Claims) against GPTX. Based on the claims register and the Schedules, the estimated amount of Unsecured Claims in Class 3(a) that have been asserted against the Debtors totals $22,803,080.09.  Based on the claims register and the Schedules, the estimated amount of Unsecured Claims in Class 3(b) that have been asserted against the Debtors totals $8,068,419.25. These estimates include certain intercompany claims. These estimates do not include the Allowed Deficiency Claim of the Bond Trustee.  The Debtors expect that a number of unsecured Proofs of Claim will be subject to objection.

Classes 3(a) and 3(b) are impaired under the Plan, and are therefore entitled to vote on the Plan.

### 7.4  Class 4 – Interests

**Estimated Amount:  N/A**

Class 4 consists of equity Interests in the Debtors.  100% of the Interests in TPI are held by IPBG Pellets Beteiligungs GmbH.  100% of the Interests in GPLA are held by German Pellets Holding USA, Inc.

Class 4 is impaired under the Plan, are deemed to reject the Plan, and are not entitled to vote on the Plan.

THE RIGHT OF THE DEBTORS AND/OR THE LIQUIDATING TRUSTEE (WHETHER EXISTING OR FORMED UNDER THE PLAN) TO OBJECT TO ANY CLAIM FILED IN THIS CASE (NOT OTHERWISE ALLOWED) IS EXPRESSLY RESERVED.  THE INCLUSION OF A CLAIM OR CLAIMS WITHIN THIS DISCLOSURE STATEMENT IS NOT AN ADMISSION REGARDING THE VALIDITY OR ALLOWANCE OF ANY CLAIM. YOU SHOULD NOT ASSUME THAT A VOTE FOR OR AGAINST THE PLAN WILL HAVE ANY EFFECT OF THE STATUS OF YOUR CLAIM.

# ARTICLE VIII
## TREATMENT OF CLAIMS AND INTERESTS

**8.1    Class 1 – Bond Trustee Secured Claim**

**Estimated Recovery: Sale Proceeds, plus Distribution Reserve Balance, plus transfer of all other funds, cash, and proceeds of the Debtors other than the Avoidance Action Proceeds, plus co-assignment (together with DIP Lender) of all Ship Loader Insurance Claims and Silo Burn Insurance Claims**

The Bond Trustee Secured Claim shall be deemed Allowed in full.

The holder of the Bond Trustee Secured Claim shall receive the following, up to the amount of the Bond Trustee Secured Claim: (i) on or before the Effective Date, payment in Cash of all remaining Sale Proceeds (less the Distribution Reserve), if any, to the extent not already paid under the provisions of the Sale Order; (ii) payment of the Distribution Reserve Balance, on or before the date which is five (5) business days following the date on which all required payments from the Distribution Reserve are made under this Plan, and all Disputed Claims subject to payment from the Distribution Reserve are resolved by Final Order; (iii) on or before the Effective Date, payment and transfer of all other funds, cash, and proceeds of the Debtors' (other than the Avoidance Action Proceeds) which are subject to the Liens of the Bond Trustee after payment in full of the Claims of the DIP Lender; and  (iv) co-assignment (together with the Bond Trustee as DIP Lender, as co-assignee) of all Ship Loader Insurance Claims and Silo Burn Insurance Claims, which assignment shall be in the form and substance acceptable to the Bond Trustee and DIP Lender in each of their sole discretion.

The holder of the Bond Trustee Secured Claim shall have an Allowed Deficiency Claim in the amount of $189,510,697.22 less all payments received by the Bond Trustee.

**8.2    Classes 2(a), 2(b), 2(c) and 2(d) – Other Secured Claims**

**8.2.1        Class 2(a) and Class 2(b) Secured Ad Valorem Tax Claims.**

**Estimated Recovery: 100.0%**

The holders of Allowed Secured Ad Valorem Tax Claims shall receive the following, up to the amount of such Allowed Secured Ad Valorem Tax Claims: (i) the proceeds of any collateral (including, if applicable, Sale Proceeds) securing such Allowed Secured Ad Valorem Tax Claim, up to the amount of such Allowed Secured Ad Valorem Tax Claim, with such payment to be paid from the Distribution Reserve, or (ii) the collateral securing such Allowed Secured Ad Valorem Tax Claim. Allowed Secured Ad Valorem Tax Claims are subject to Reserved Distributions.

The recovery on Class 2(a) and Class 2(b) Claims is estimated at 100% because Allowed Secured Ad Valorem Tax Claims are automatically perfected by operation of law and enjoy priority over all other Secured Claims with Liens against property of the Debtors and their Estates. If the Sale of the Purchased Assets closes, the Debtors expected all Allowed Secured Ad Valorem Tax Claims to be paid in full.

### 8.2.2        Class 2(c) and Class 2(d) Secured Claims.

**Estimated Recovery: $0.00 (Approximately 100.0%)**

The holders of an Allowed Secured Claim in Class 2(c) or Class 2(d) shall receive either (i) the collateral securing such Allowed Secured Claim; or (ii) the proceeds of any collateral (including, if applicable, Sale Proceeds) securing such Allowed Secured Claim, up to the amount of such Allowed Secured Claim, after satisfaction of all superior Liens including without limitation the Bond Trustee Secured Claim and any Allowed Secured Ad Valorem Tax Claim. Any remaining claim of the holder of an Allowed Secured Claim in Class 2(c) or Class 2(d) after receipt of collateral or the proceeds from the sale of collateral shall be a Deficiency Claim.

The recovery is estimated at 100% because the Debtors are not aware of any valid Class 2(c) or Class 2(d) Claims.

### 8.3        Classes 3(a) and 3(b) – Unsecured Claims

**Estimated Recovery: Avoidance Action Proceeds plus Additional Recoveries from Retained Causes of Action**

Under the Plan, Class 3(a) and 3(b) Claims shall receive the following treatment:

    a.    Distribution of Any Remaining Sale Proceeds

After all required payments of Sale Proceeds are made under the Sale Order and under the terms of this Plan, in the following order of priority, to (i) for deposit in the Distribution Reserve, (ii) to the DIP Lender for any amounts outstanding under the DIP Loans, (iii) to the Bond Trustee on account of the Bond Trustee Secured Claim; (iv) to holders of any Allowed Secured Claims; and (v) to the Bond Trustee from the Distribution Reserve Balance up to the full amount of the Bond Trustee Secured Claim; the following sums, shall be paid to the Liquidating Trust for the benefit of holders of Allowed Class 3(a) and Allowed Class 3(b) Claims: (w) any remaining balance from Sale Proceeds (if any), (x) any remaining Distribution Reserve Balance (if any), (y) any proceeds from the sale of Excluded Assets to the extent such Excluded Assets are not subject to the Liens of the Bond Trustee or another holder of an Allowed Secured Claim; and (z) Avoidance Action Proceeds. Any such payment to the Liquidating Trust, if made, shall be applied and held by the Liquidating Trustee in an allocation between the respective Estates of TPI and GPTX as determined by the Liquidating Trustee, subject to approval of the Bankruptcy Court. Allowed Class 3(a) Claims shall receive a pro rata distribution from the amount allocated for the Estate of TPI and Allowed Class 3(b) Claims shall receive a pro rata distribution from the amount allocated for the Estate of GPTX.

Pursuant to the terms of the Liquidating Trust Agreement, the Liquidating Trustee may reserve all or part of any payment received from Sale Proceeds (if any) or otherwise, to fund the Liquidating Trust.

The Liquidating Trustee shall distribute Available Cash, if any, pro rata to holders of Allowed Claims in Class 3(a) and Class 3(b) under the terms of the Liquidating Trust Agreement on one or more Interim Distribution Date(s).

        b.      <u>Liquidating Trust</u>

The Liquidating Trustee shall distribute Available Cash, if any, pro rata to holders of Allowed Claims in Class 3(a) and Class 3(b) under the terms of the Liquidating Trust Agreement on one or more Interim Distribution Date(s).  Such distributions shall be made to, respectively, (i) Class 3(a) Claims from recoveries solely attributable to the Estate of TPI and (ii) to Class 3(b) Claims from recoveries solely attributable to the Estate of GPTX.  To the extent recoveries are not solely attributable to either the Estate of TPI or the Estate of GPTX, they shall be distributed pro rata to all holders of both Class 3(a) and Class 3(b) Claims.  In the event that Class 3(a) Claims or Class 3(b) Claims are paid in full and there exists remaining Available Cash as to the respective Debtor, holders of Allowed Claims in such class shall receive interest at the Plan Rate.

The Liquidating Trust shall liquidate Retained Causes of Action for the benefit of Unsecured Claims.  Any recovery is speculative, but will be in addition to any Sale Proceeds received, and the Avoidance Action Proceeds.

**8.4**      **<u>Class 4 – Interests</u>**

**Estimated Recovery: $0.00**

Under the Plan, Class 4 Interests shall be cancelled by the Plan, and holders of Interests shall receive nothing under the Plan.

**ARTICLE IX**
**<u>TREATMENT OF ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS</u>**

**9.1**      **<u>Administrative Claims</u>**

        **9.1.1 DIP Loans**

**Estimated Recovery: 100%**

The DIP Lender shall receive the following on account of the DIP Loans, up to the full amount outstanding under the DIP Loans:

(i)      under and in conjunction with the Sale Order, payment of Sale Proceeds as set forth in the Sale Order;

(ii)     payment, on or before the Effective Date, of any remaining Sale Proceeds after funding of the Distribution Reserve;

(iii)    payment, on or before the Effective Date, of any other proceeds of the Estates, to the extent not distributed under this Plan;

(iv)    co-assignment (together with the holder of the Class 1 Bond Trustee Secured Claim, as co-assignee) of all Ship Loader Insurance Claims and Silo Burn Insurance Claims.

The assignment of the Ship Loader Insurance Claims and Silo Burn Insurance Claims, and allocation of proceeds between the holder of the Bond Trustee Secured Claim and the Claims of the DIP Lender shall be consistent with the terms of the DIP and Cash Collateral Order.

Upon such payment of the DIP Loans being made in full, the DIP Loans shall be considered discharged and satisfied and all Liens, superpriority claims, and other protections under the DIP Loans shall be released. Notwithstanding the foregoing, the Liens, superpriority claims, and other protections granted to the Bond Trustee and the DIP Lender (i) in the Bond Documents and (ii) pursuant to the DIP and Cash Collateral Order (to the extent such Liens, superpriority claims, and other protections relate to use of the Bond Trustee's Cash Collateral (as defined in such DIP and Cash Collateral Order)), are not released.

## 9.1.2 Other Administrative Claims

**Estimated Recovery: 100%**

Except to the extent that the holder of an Allowed Administrative Claim agrees to different treatment, each holder of an Allowed Administrative Claim (except for Insured Claims, addressed below) against the Debtors shall be paid the full Allowed amount of such Claim, to be paid on the latest of: (a) the Effective Date, (b) five (5) Business Days after the date on which such Administrative Claim becomes an Allowed Administrative Claim, or (c) on such date or dates as provided in the documents (if any) governing the Debtors' obligation to the holder of such Allowed Administrative Claim. Notwithstanding the foregoing, any and all Allowed Administrative Claims as may be outstanding and are Allowed as of the Effective Date, shall be paid on or before the Effective Date, from the Distribution Reserve.  To the extent that any Administrative Claim is an Insured Claim, any recovery or distribution on such Claim shall be limited to recovery or distribution under the applicable Liability Policy.  Holders of Insured Claims shall receive no distributions under the Plan.  These provisions apply (without limitation) to Ship Loader Creditor Claims and Silo Burn Creditor Claims.

Requests for payment of Administrative Claims arising on or before the Effective Date must be Filed no later than the earlier of: (i) any bar date or deadline set by the Bankruptcy Court for some or all Administrative Claims in the Reorganization Case; or (ii) for all other Administrative Claims, the date that is thirty (30) calendar days after the Effective Date, which date shall be termed the "Administrative Claims Bar Date." Holders of Administrative Claims (including, without limitation, (i) any governmental units asserting claims for federal, state, or local taxes; and (ii) any holders of Ship Loader Creditor Claims or Silo Burn Creditor Claims) that do not File such requests by the Administrative Claims Bar Date shall be forever barred from asserting such claims against the Debtors, Reorganized Debtors, the Liquidating Trust, or

any other person or entity, or any of their respective property. Holders of Allowed Administrative Claims shall not be entitled to interest on their Administrative Claims.

### 9.1.3 Statutory Fees

**Estimated Recovery: 100%**

On or before the Effective Date, all outstanding fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid from the Distribution Reserve.

### 9.1.4 Pre-Effective Date Professional Fee Claims

**Estimated Recovery: 100%**

All professionals seeking payment of Professional Fee Claims shall (i) file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred in the Reorganization Case by the date that is thirty (30) calendar days after the Effective Date (the "Professional Fee Claim Bar Date"), and (ii) be paid from the Distribution Reserve the full unpaid amount as is Allowed by the Bankruptcy Court within five (5) Business Days after the date that such Claim is Allowed by Final Order of the Bankruptcy Court, except to the extent that the holder of an Allowed Professional Fee Claim agrees to a different treatment. Notwithstanding the foregoing, in no event shall amounts paid to the holder of a Professional Fee Claim exceed the aggregate amounts provided for such professional in the budgets, as amended and modified, attached to the DIP and Cash Collateral Order, or as further agreed to in any wind down budget agreed to with the Bond Trustee.

### 9.2     Allowed Priority Tax Claims

**Estimated Recovery: 100%**

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, on or before the Effective Date, each holder of such Claim shall be paid in full and in Cash the full amount of such Claim from the Distribution Reserve. Holders of Priority Tax Claims shall not be entitled to receive any payment on account of penalties except as Unsecured Claims. Priority Tax Claims are subject to Reserved Distributions.

### ARTICLE X
### ACCEPTANCE OR REJECTION OF THE PLAN

### 10.1     Voting Classes

Each holder of a Claim in Classes 1, 2(a), 2(b), 2(c), 2(d), 3(a), and 3(b) shall be entitled to vote to accept or reject the Plan.  The holders of Class 4 claims are deemed to have rejected the Plan and may not vote.

### 10.2     Voting Rights of Holders of Disputed Claims and Disputed Interests

Pursuant to Bankruptcy Rule 3018(a), a Claim that is Disputed will not be counted for purposes of voting on the Plan to the extent it is disputed, unless the Bankruptcy Court enters an order temporarily allowing the Claim for voting purposes under Bankruptcy Rule 3018(a). Such disallowance for voting purposes is without prejudice to the right of the holder of that Claim to seek to have its Claim allowed for purposes of distribution under the Plan.

### 10.3    Acceptance by Impaired Classes

An impaired class of Claims shall have accepted the Plan if (a) the holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar amount of the Claims actually voting in such class have voted to accept the Plan, and (b) more than one-half in number of the holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of such Claims actually voting in such class have voted to accept the Plan.

### 10.4    Nonconsensual Confirmation

In the event that any Class of Claims fails to accept the Plan in accordance with section 1129(a)(8) of the Bankruptcy Code, the Debtors request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code.

## ARTICLE XI
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 11.1    Assumption, Assignment and Rejection

On the Effective Date, and with certain exceptions as set forth in the Plan, all Executory Contracts or Unexpired Leases of the Debtors are deemed rejected under sections 365 and 1123 of the Bankruptcy Code, other than those assumed under the Sale Order or listed as assumed within the Plan Supplement, which are assumed and assigned to the Purchaser. The Plan Supplement also contains a list of rejected Executory Contracts or Unexpired Leases (without limitation).  The Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases or the Schedule of Rejected Executory Contracts and Unexpired Leases within the Plan Supplement at any time through and including 45 days after the Effective Date.

### 11.2    Rejection Claims

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed within thirty (30) calendar days after the later of the Effective Date or the effective date of rejection.  All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as Class 3(a) or Class 3(b) Unsecured Claims against the applicable Debtor and shall be treated in accordance with the Plan, unless a different security or priority is otherwise asserted in such Proof of Claim and Allowed under the Plan.

### 11.3    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any monetary defaults under each Supplemental Assumed Executory Contract or Supplemental Assumed Unexpired Lease shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash by Purchaser on or before the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Assumed Executory Contracts or Assumed Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or the Purchaser to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Supplemental Assumed Executory Contract or Supplemental Assumed Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made by the Purchaser following the entry of a Final Order resolving the dispute and approving the assumption.

No later than seven (7) days before the objection deadline for filing objections to the Plan, or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, the Debtors will provide for the Plan Supplement (which shall contain notices of proposed assumption and proposed cure amounts) to be sent to applicable third parties and counterparties to each Assumed Executory Contract or Assumed Unexpired Lease.

Any objections to assumption and/or assignments of Assumed Executory Contracts and Assumed Unexpired Leases are governed by the Bankruptcy Court's February 7, 2017 *Order Granting Motion to Approve Assumption and Assignment Procedures for Certain Executory Contracts And Unexpired Leases.* [Docket #328]

Assumption of any Supplemental Assumed Executory Contract or Supplemental Assumed Unexpired Lease shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Supplemental Assumed Executory Contract or Supplemental Assumed Unexpired Lease at any time before the effective date of assumption. Any Proofs of Claim Filed with respect to a Supplemental Assumed Executory Contract or Supplemental Assumed Unexpired Lease shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

### ARTICLE XII
### MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN

### 12.1    Date Of Effective Date / Effective Date Conditions

The "Effective Date" of the Plan shall be the day mutually agreed upon between the Debtors and the Bond Trustee, which shall be no later than three (3) Business Days after all of the following conditions have been either satisfied or waived by the Debtors and the Bond Trustee:

- The Sale pursuant to the Sale Order shall have Closed;
- The Sale Proceeds shall have been tendered and paid by Purchaser in full;
- The Distribution Reserve shall have been funded from Sale Proceeds as of the Effective Date; and,
- The Confirmation Order, in form and substance satisfactory to the Debtors and the Bond Trustee, shall have become a Final Order.

## 12.2    Vesting of Assets

The property of the Debtors' Estates not transferred pursuant to the Sale Order or under the transactions otherwise contemplated by the Plan (including without limitation, the Excluded Assets), shall vest in the Liquidating Trust on the Effective Date, subject to existing Liens, Claims, charges, or other encumbrances, and subject to required disbursements of funds under the terms of this Plan.

Without limitation, the following assets are vested in and assigned to the Liquidating Trust on the Effective Date: the Excluded Assets, the Avoidance Actions, the Retained Causes of Action, the D&O Action, and the Avoidance Action Proceeds.

## 12.3    Objections to Claims or Interests; Prosecution of Disputed Claims or Disputed Interests

Except for the Claims of the DIP Lender, the Bond Trustee Secured Claim and the Bond Trustee's Deficiency Claim which are each an Allowed Claim and not subject to objection, setoff, surcharge, or reduction of any kind, the Debtors (before the Effective Date) and the Liquidating Trustee (after the Effective Date), shall have the exclusive right to object to the allowance, amount or classification of Claims or Interests asserted in the Reorganization Case, and such objections may be litigated to Final Order by the Liquidating Trustee (to the extent such creditor does not assert an administrative claim or a claim for substantial contribution) who shall succeed to the rights and defenses to such claims possessed by Debtors or Reorganized Debtors; provided that after the Effective Date, the Bond Trustee may also object to Administrative Claims and Priority Tax Claims. Unless otherwise provided herein or ordered by the Bankruptcy Court, all objections to Claims or Interests shall be filed no later than one hundred and twenty (120) days after the Effective Date, subject to any extensions granted pursuant to a further order of the Bankruptcy Court. Such extensions may be obtained by the Liquidating Trustee upon *ex parte* motion.

## 12.4    No Substantive Consolidation

Although the Plan is presented as a joint plan of reorganization, the Plan does not provide for substantive consolidation of Debtors' Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for any reason. Allowed Claims against one Debtor will be satisfied solely from the cash and recoveries of the Liquidating Trust attributable to that Estate. Under the terms of the Liquidating Trust Agreement, each holder of an Allowed Unsecured Claim shall receive distributions from the Liquidating Trust assets that are attributable to the Estate against which such Allowed Unsecured Claim is asserted, on a pro rata basis.

Except as specifically set forth herein, nothing in this Plan shall constitute or be deemed to constitute an admission that any one or all the Debtors is subject to or liable for any Claims against any other Debtors. A Claim against multiple Debtors will be treated as a separate Claim against each Debtor's Estate for all purposes including, but not limited to, voting and distribution; provided however, that no Unsecured Claim will receive value in excess of 100% of the Allowed amount of such Claim.

### 12.5    Creation of Liquidating Trust

On the Effective Date, the Liquidating Trust shall be created. The Liquidating Trust shall be governed by the Liquidating Trust Agreement, the Plan, and the Confirmation Order. The terms of the employment of the Liquidating Trustee shall be set forth in the Liquidating Trust Agreement and the Confirmation Order. On the Effective Date, the Debtors and Reorganized Debtors shall transfer to the Liquidating Trust the Excluded Assets (including without limitation the Retained Causes of Action). All transfers to the Liquidating Trust shall be subject to all Liens, claims, interests and encumbrances, including but not limited to the Liens of the DIP Lender and the Bond Trustee. Except as specifically set forth herein, holders of Allowed Unsecured Claims shall look solely to the Liquidating Trust for the satisfaction of their Claims. For federal income tax purposes, the transfer of the identified assets to the Liquidating Trust will be deemed to be a transfer to the holders of Allowed Claims (who are the Liquidating Trust beneficiaries), followed by a deemed transfer by such beneficiaries to the Liquidating Trust.

The powers, obligations, and limitations of the Liquidating Trust, as well as other considerations, are set forth in Articles 9.11 through 9.15 of the Plan.

### 12.6    Retention of Jurisdiction

After Confirmation of the Plan and occurrence of the Effective Date, in addition to jurisdiction which exists in any other court, the Bankruptcy Court will retain such jurisdiction as is legally permissible including for the purposes set forth in the Plan, and as set forth in Article 9.18 of the Plan.

### 12.7    Discharges. Releases and Waivers

**The discharges, waivers, releases, and exculpation provisions of Articles 9.21 through 9.25 of the Plan shall be effective on the Effective Date.**  Upon the occurrence of the Effective Date, 11 U.S.C. § 1141 and this Plan shall control the rights of holders of Claims and Interests against the Debtors.  The discharge and release, and exculpation provisions as set forth in the Plan shall be fully effective as of the Effective Date.

## ARTICLE XIII
## COMPROMISES AND SETTLEMENTS

### 13.1    Compromises and Settlements

Pursuant to § 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distribution and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies resolved pursuant to the Plan, including, without limitation, all Claims arising prior to the Effective Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, arising out of, relating to or in connection with the business or affairs of, or transactions with, the Debtors. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estates, Creditors and other parties in interest, and are fair, equitable and within the range of reasonableness.

## ARTICLE XIV
## MISCELLANEOUS PROVISIONS

### 14.1    Withdrawal of Plan

Upon failure to consummate the transactions contemplated by the Asset Purchase Agreement, the Debtors reserve the right to withdraw this Plan at any time prior to the Confirmation Date. If the Debtors withdraw this Plan prior to the Confirmation Date, or if the Confirmation Date or the Effective Date does not occur, then this Plan shall be deemed null and void. In such event, nothing contained herein shall be deemed to constitute an admission, waiver or release of any Claims by or against the Debtors, the Estates or any other person, or to prejudice in any manner the rights of the Debtors, the Estates or any person in any further legal proceedings involving the Debtors.

### 14.2    Substantial Consummation

On the Effective Date, the Plan shall be deemed to be substantially consummated under Bankruptcy Code §§ 1101 and 1127(b).

### 14.3    Conflict

Except as set forth in the Plan and as set forth below, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any agreement or order (other than the Confirmation Order or the Sale Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control; provided, however, with respect to any conflict or inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall govern.

### 14.4    Dissolution of UCC

On the Effective Date, the UCC shall dissolve automatically, and its members shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Reorganization Case.

## ARTICLE XV
## CONFIRMATION OF THE PLAN

### 15.1    Confirmation Hearing

Section 1128(a) requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan ("Confirmation Hearing").   The Confirmation Hearing has been scheduled before the Honorable Bill Parker, United States Bankruptcy Judge, on March 27, 2019, at 10:00 am (Central Time) in the First Floor Courtroom of the United States Bankruptcy Court, Jack Brooks Federal Building, 300 Willow Street, in Beaumont, Texas.

The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except an announcement made at the Confirmation Hearing or any adjournment thereof.

Section 1128(b) provides that any party in interest may object to confirmation of the Plan.  However, an impaired Creditor, who votes to accept the Plan, may not have standing to object to the Plan.  Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014 and any applicable Local Rules of the Bankruptcy Court.  **The deadline for filing objections to confirmation of the Plan is <u>March 25, 2019</u>**.  Objections to confirmation must be filed with the Clerk of Court.

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY FILED AND SERVED, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### 15.2    Statutory Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Bankruptcy Code's requirements for confirmation of the Plan have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan. As set forth in § 1129 of the Bankruptcy Code, these requirements are as follows:

1.    The Plan complies with the applicable provisions of the Bankruptcy Code.

2.    The proponent of the Plan complies with the applicable provisions of the Bankruptcy Code.

3.    The Plan has been proposed in good faith and not by any means forbidden by law.

4.    Any payment made or to be made by the Plan proponent, or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in, or in connection with the Reorganization Case, or in connection with

the Plan and incident to the Reorganization Case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

5.     The proponent of the Plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of each Debtor, an affiliate of each Debtor participating in a joint Plan with such Debtor, or a successor to each Debtor under the Plan; and the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and with public policy; and the proponent of the Plan has disclosed the identity of any insider that will be employed or retained by that Debtor, and the nature of any compensation for such insider.

6.     Any governmental regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the Debtors, has approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval.

7.     With respect to each Class of impaired Claims or equity Interests:

(a)     each holder of a Claim or Interest of such class:

(i)     has accepted the Plan; or

(ii)    will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date; or

(b)     if § 1111(b)(2) of the Bankruptcy Code applies to the Claims of such Class, the holder of a Claim of such Class will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the value of such holder's interest in the Estate's interest in the property that secured such Claims.

8.     With respect to each Class of Claims or Interests:

(a)     such Class has accepted the Plan; or

(b)     such Class is not impaired under the Plan;

9.     Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that:

(a)     with respect to a Claim of a kind specified in § 507(a)(1) or § 507(a)(2) of the Bankruptcy Code, on the effective date of the Plan, the holder of such Claim will receive on account of such Claim Cash equal to the Allowed amount of such Claim;

(b) with respect to a class of Claims of a kind specified in §§ 507(a)(3), 507(a)(4), 507(a)(5) or 507(a)(6) of the Bankruptcy Code, each holder of a Claim of such Class will receive:

  (i) if such Class has accepted the Plan, deferred Cash payments of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claim; or

  (ii) if such Class has not accepted the Plan, Cash on the Effective Date of the Plan equal to the Allowed amount of such Claim; and

(c) with respect to a Claim of a kind specified in § 507(a)(8) of the Bankruptcy Code, the holder of a Claim will receive on account of such claim deferred Cash payments, over a period not exceeding six years after the date of assessment of such Claim, of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claim.

10. If a class is Impaired under the Plan, at least one class of Claims that is Impaired has accepted the Plan, determined without including any acceptance of the Plan by any insider.

11. Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the plan proponent or any successor to the plan proponent under the Plan, unless such liquidation or reorganization is proposed in the Plan.

The Debtors believe that the Plan satisfies all the statutory requirements of Chapter 11 of the Bankruptcy Code, that the Debtors have complied or will have complied with all of the requirements of Chapter 11, and that the proposal of the Plan is made in good faith.

The Debtors further believe that the holders of all Claims Impaired under the Plan will receive payments or distributions under the Plan having a present value as of the Effective Date in amounts not less than the amounts likely to be received by such holders if the Debtors were liquidated in a case under Chapter 7 of the Bankruptcy Code.

**The Debtors have conducted the liquidation analysis attached as Exhibit "1" hereto, which shows that under a hypothetical Chapter 7 liquidation, holders of Allowed Unsecured Claims would not receive any recovery. By comparison, under the Plan, the holders of the DIP Loan Claim and Allowed Administrative Claims are satisfied, and the Bond Trustee and Unsecured Creditors share in certain recoveries as set forth herein.**

Finally, the Debtors do not believe that the confirmation of the Plan will likely be followed by the need for further financial reorganization of the Debtors. The Plan will effectuate a liquidation of the remaining assets of the Debtors and no further reorganization is likely.

**15.3**   **Cramdown**

**Class 4 Interest holders will be treated as a cramdown Class under §1129(b)(2)(C). In the event that any Impaired class of Claims or Interests (including Class 4 and if applicable, other Classes) does not accept the Plan, the Bankruptcy Court may still confirm the Plan if, as to each impaired Class which has not accepted the Plan, the Plan does not discriminate unfairly and is "fair and equitable." A Plan does not discriminate unfairly within the meaning of the Bankruptcy Code if no Class receives more than it is legally entitled to receive for its Claims or equity Interests.**

"Fair and equitable" has different meanings with respect to the treatment of secured and unsecured claims. As set forth in § 1129(b)(2) of the Bankruptcy Code, those meanings are as follows:

1.      With respect to a Class of Secured Claims, the Plan provides:

(a)      (i) that the holders of such Claims retain the Liens securing such Claims, whether the property subject to such Liens is retained by the Plan Proponent or transferred to another entity, to the extent of the allowed amount of such Claims; and

(ii) that each holder of a Claim of such Class receive on account of such Claim deferred Cash payments totaling at least the allowed amount of such Claim, of a value, as of the Effective Date of the Plan, of at least the value of such holder's interest in the estate's interest in such property;

(b)      for the sale, subject to § 363(k) of the Bankruptcy Code, of any property that is subject to the Liens securing such Claims, free and clear of such liens, with such Liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (a) and (b) of this subparagraph; or

(c)      for the realization by such holders of the indubitable equivalent of such Claims.

2.      With respect to a Class of unsecured Claims, the Plan provides:

(a)      that each holder of a Claim of such Class receive or retain on account of such Claim property of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claim; or

(b)      the holder of any Claim or Interest that is junior to the Claims of such Class will not receive or retain under the Plan on account of such junior Claim or Interest any property.

3.      With respect to a Class of Interests, the Plan provides:

(a)      that each holder of an Interest of such Class receive or retain on account of such interest property of a value, as of the Effective Date of the Plan, equal to the greatest

of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such Interest; or

> (b)     the holder of any Interest that is junior to the interests of such Class will not receive or retain under the Plan on account of such junior interest any property.

The Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable with respect to, and does not discriminate unfairly against, any rejecting Impaired Class of Claims and the cramdown class of equity interests.  The Debtors believe that the Bankruptcy Court will find these requirements satisfactory and will confirm the Plan.

### 15.4    Annulment of Plan if Conditions Not Waived or Satisfied

The Debtors reserve the right to waive any of the conditions precedent to the Effective Date.  If any of the conditions precedent are not waived, and are not satisfied within the specified time periods or can no longer occur, the Confirmation Order will be annulled and the Debtors and all parties in interest will return to the *status quo ante* immediately before the entry of the Confirmation Order.

## ARTICLE XVI
## OTHER CONSIDERATIONS AND
## ALTERNATIVES TO CONFIRMATION OF THE PLAN

### 16.1    Confirmation Hearing

The Plan affords holders of Claims the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such holders.  If the Plan is not confirmed, however, the theoretical alternatives include: (a) alternative plans of reorganization/liquidation; (b) liquidation of the Debtors under Chapter 7 of the Bankruptcy Code; and (c) dismissal of the Reorganization Case.

### 16.1.1        Alternative Plans of Liquidation

The Debtors assert that, if the Plan is not confirmed, the Debtors or another party in interest in the Reorganization Case could attempt to formulate and propose a different plan or plans.  Such plans might, theoretically, involve some other form of reorganization or liquidation of the Debtors' operations and assets.  Any alternative plans, however, would likely result in additional administrative expenses to the estate and would result in a lesser recovery for creditors – in particular, the Debtors believe that any alternate plan of liquidation or reorganization would result in a zero recovery for Unsecured Claims.

The Plan proposed by the Debtors is straightforward, meets the requirements of § 1129 and provides the best outcome for Creditors. The Plan is the outcome of the Debtors' comprehensive marketing process in which the Debtors identified the transaction alternative with the highest value for creditors (the transaction proposed under the Plan).

### 16.1.2        Liquidation under Chapter 7

The Debtors believe that creditors' interests have been best served by the filing of this Reorganization Case.  Had the Debtors instead filed for liquidation under Chapter 7 of the Bankruptcy Code rather than under Chapter 11, all going-concern value of the Debtors' businesses and assets would have been lost.  This would have had a detrimental effect on the value of the Debtors' assets.  The marketing process conducted by the Debtors and the Investment Bankers indicated that the value that could be realized from entities interested in simply liquidating the Debtors' assets were significantly lower than offers submitted by entities interested in acquiring the Debtors' assets as part of a going concern.

**The Debtors have conducted the liquidation analysis attached as Exhibit "1" hereto, which shows that under a hypothetical Chapter 7 liquidation, holders of Allowed Unsecured Claims would not receive any recovery. By comparison, under the Plan, the holders of the DIP Loan Claim, Allowed Secured Ad Valorem Tax Claims, and Allowed Administrative Claims are satisfied, and the Claims of the Bond Trustee and Unsecured Creditors share in certain recoveries as set forth herein.**

### 16.1.3        Dismissal of the Reorganization Case

If the Reorganization Case were to be dismissed, it is a near certainty that the Claims of the DIP Lender, the Bond Trustee would exercise its remedy under the Bonds and commence foreclosure on the Debtors' assets.  This would likely result in the entirety of Debtors' assets going toward the Bond Trustee Secured Claim and Secured Ad Valorem Tax Claims with no assets available for any recovery of Unsecured Claims, payment of Administrative Claims, or payment of Priority Tax Claims, all of which would face a zero recovery.

### 16.2    Risk Factors

There are certain risks inherent in the liquidation and administration process under the Bankruptcy Code.  If certain standards set forth in the Bankruptcy Code are not met, the Bankruptcy Court will not confirm the Plan even if holders of Claims and Interests accept the Plan. Although the Debtors believe that the Plan meets such standards, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  If the Bankruptcy Court were to determine that such requirements were not met, it could require the Debtors to re-solicit acceptances, which could delay and/or jeopardize confirmation of the Plan.  The Debtors believe that the solicitation of votes on the Plan will comply with § 1126(b) and that the Bankruptcy Court will confirm the Plan.  The Debtors cannot, however, provide assurance that modifications of the Plan will not be required to obtain confirmation of the Plan, or that such modifications will not require a re-solicitation of acceptances.

### 16.3    Tax Considerations

### 16.3.1        Introduction

The following discussion summarizes certain federal income tax consequences of the transactions described herein and in the Plan.  This discussion is for informational purposes only

and does not constitute tax advice.  This summary is based upon the Internal Revenue Code and the Treasury Regulations promulgated thereunder, including judicial authority and current administrative rulings and practice as of the date of this Disclosure Statement and will not be updated for subsequent tax or factual developments.  Neither the impact on foreign holders of claims and equity interests nor the tax consequences of these transactions under state and local law is discussed.  Also, special tax considerations not discussed herein may be applicable to certain classes of taxpayers, such as financial institutions, broker-dealers, insurance companies, mutual funds, regulated investment companies, real estate investment trusts, trusts, S corporations, dealers and traders in securities and currencies, partnerships and other entities classified as partnerships for federal tax purposes and tax-exempt organizations.  Furthermore, due to the complexity of the transactions contemplated in the Plan, and the unsettled status of many of the tax issues involved, the tax consequences described below are subject to significant uncertainties including subsequent legislative and other tax changes.  No opinion of counsel has been obtained and no ruling has been requested from the Internal Revenue Service ("IRS") on these or any other tax issues.  There can be no assurance that the IRS will not challenge any or all of the tax consequences of the Plan, or that such a challenge, if asserted, would not be sustained.  **HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS ARE THEREFORE URGED TO CONSULT WITH THEIR TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.**

### 16.3.2          Tax Consequences to the Debtors and Holders of Interests

The Debtors will realize cancellation of indebtedness ("COI") income in respect of each Claim generally in an amount equal to the excess, if any, of (i) the portion of the Claim (including accrued and previously deducted but unpaid interest) from which the Debtor is (or is deemed to be) discharged; and (ii) the sum of any cash or the "issue price," under the Internal Revenue Code of 1986 (the "Internal Revenue Code") §§ 1273(b) and 1274, of any debt obligations distributed under the Plan in discharge of such Claims.  The exact amount of COI income realized upon consummation of the Plan has not been finally determined. Under the Internal Revenue Code, a taxpayer is generally required to include COI income in gross income. COI income is not includable in gross income, however, if it occurs in a case under the Bankruptcy Code, provided the taxpayer is under the jurisdiction of a court in such case and the cancellation of indebtedness is granted by the court or is pursuant to a plan approved by the court.   The Debtors' COI income, if any, resulting from the Plan should satisfy these requirements, and, therefore, should not result in recognition of gross income to the Debtors. COI income that is excluded from gross income will reduce certain tax attributes of the taxpayer, including net operating loss suspended under Internal Revenue Code Section 1361(d) (hereinafter "NOLs") carryovers, capital loss carryovers and the tax basis of assets, in a specified order of priority beginning with the NOLs and NOL carryovers, unless the taxpayer elects to have the reduction applied first to the tax basis of depreciable assets.  The reduction of tax basis is limited to the excess of (i) the aggregate of the tax bases of the taxpayer's property (determined immediately after the discharge); and (ii) the aggregate liabilities of the taxpayer (determined immediately after the discharge).   The exclusion for COI is deemed to occur immediately following the end of the Debtors' tax year, and not during the tax year.

The Debtors will recognize gain or loss on the sale of assets to third parties equal to the sales price of such assets less the Debtors' adjusted tax basis in such properties. The sales price includes all indebtedness assumed by a buyer as well as all other consideration received by the Debtors. The amount and tax character of such gain and loss will depend on the applicable facts and circumstances.

It is anticipated that cancellation of equity interests will result in a loss each such Equity Interest Holder in the amount of such Equity Interest Holder's U.S. federal income tax basis in their Debtor shares redeemed or deemed redeemed in connection with such distribution. Such loss will as a general matter likely constitute a capital loss, and individual holders of Interests of Debtors who have held their shares in Debtors to which such distributions relate for in excess of one (1) year may be entitled to reduced long-term capital gain rates.

### 16.3.3        Tax Consequences to Creditors

**In General**. The federal income tax consequences of the implementation of the Plan to a holder of a Claim will depend, among other things, on: (a) whether its Claim constitutes a debt or security for federal income tax purposes, (b) whether the Claimant receives consideration in more than one tax year, (c) whether the Claimant is a resident of the United States, (d) whether all the consideration by the Claimant is deemed to be received by that Claimant as part of an integrated transaction, (e) whether the Claimant utilizes the accrual or cash method of accounting for tax purposes, and (f) whether the holder has previously taken a bad debt deduction or worthless security deduction with respect to the Claim.

**Gain or Loss on Exchange**. Generally, a holder of an Allowed Claim will realize a gain or loss on the exchange under the Plan of his Allowed Claim for cash and other property in an amount equal to the difference between (i) the sum of the amount of any cash and the fair market value on the date of the exchange of any other property received by the holder (other than any consideration attributable to accrued but unpaid interest on the Allowed Claim), and (ii) the adjusted basis of the Allowed Claim exchanged therefore (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income). Any gain recognized generally will be a capital gain (except to the extent the gain is attributable to accrued but unpaid interest or accrued market discount, as described below) if the Claim was a capital asset in the hand of an exchanging holder, and such gain would be a long-term capital gain if the holder's holding period for the Claim surrendered exceeded one (1) year at the time of the exchange.

The tax treatment of an Allowed Claim for accrued unpaid interest will depend on the Claimant's tax basis in such Claim, which primarily depends on whether the Claimant has previously recognized income for the accrual of such interest and/or recognized a loss with respect to same. Any such holders should consult with their tax advisors regarding the tax treatment of any such accrued unpaid interest.

Any loss recognized by a holder of an Allowed Claim will be a capital loss if the Claim constitutes a "security" for federal income tax purposes or is otherwise held as a capital asset. For this purpose, a "security" is a debt instrument with interest coupons or in registered form.

### 16.3.4        Information Reporting and Backup Withholding

Under the backup withholding rules of the Internal Revenue Code, holders of Claims and Interests may be subject to backup withholding with respect to payments made pursuant to the Plan unless such holder (i) is a corporation or comes within certain other exempt categories and, when required, demonstrates this fact, or (ii) provides a correct taxpayer identification number and certifies under penalties of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividends and interest income.  Any amount withheld under these rules will be credited against the holder's federal income tax liability.  Holders of Claims and Equity Interests may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

### 16.3.5        Importance of Obtaining Professional Assistance

**THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE FEDERAL, STATE, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY AREAS, UNCERTAIN.  TO COMPLY WITH TREASURY DEPARTMENT CIRCULAR 230, YOU ARE HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT, THE PLAN OR ANY RELATED MATERIALS, IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED BY YOU, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON YOU UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED; AND (B) ANY SUCH DISCUSSIONS ARE BEING USED ONLY IN CONNECTION WITH SATISFYING THE REQUIREMENTS IMPOSED UNDER THE BANKRUPTCY CODE FOR DISCLOSURE STATEMENTS, AND (C) YOU SHOULD SEEK ADVICE FROM AN INDEPENDENT TAX ADVISOR WITH RESPECT TO YOUR FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES BASED ON YOUR PARTICULAR CIRCUMSTANCES.**

### ARTICLE XVII
### CAUSES OF ACTION

### 17.1    Retention of Claims and Causes of Action

Pursuant to Article 9.28 of the Plan, the Debtors and Reorganized Debtors expressly reserve, and do not waive, all Causes of Action and Retained Causes of Action (other than any Released Claims).

**Without limitation, (i) the Causes of Action set forth in Exhibit "2" hereto, and (ii) the Ship Loader Insurance Claims and Silo Burn Insurance Claims set forth in Exhibit "3" hereto, are expressly reserved, and any entities listed in Exhibit "2" and/or Exhibit "3" (but not limited solely to those entities) are hereby advised that they may be sued, subject to suit, or subject to such claims as set forth in Exhibit "2" and/or Exhibit "3" whether or not they vote to accept the Plan.**  All Retained Causes of Action are reserved to be asserted by the

Liquidating Trust, while all other Causes of Action of the Debtors are reserved for exclusive use by the Reorganized Debtors.

Without limitation, Ship Loader Insurance Claims and Silo Burn Insurance Claims are fully reserved, are not waived, and are addressed as set forth in the Plan.

### 17.2   Preferences and Fraudulent Transfers

Under the Bankruptcy Code, the Debtors may recover certain preferential transfers of property, including cash, made while insolvent during the 90 days immediately prior to the filing of the bankruptcy petition with respect to pre-existing debts, to the extent the transferee received more than it would have in respect of the pre-existing debt had the Debtors been liquidated under Chapter 7 of the Bankruptcy Code.  In the case of "insiders," the Bankruptcy Code provides for a one-year preference period.  There are certain defenses to such recoveries.  Transfers made in the ordinary course of the Debtors' and transferee's business according to the ordinary business terms in respect of debts less than 90 days before the filing of a bankruptcy are not recoverable. Additionally, if the transferee extended credit subsequent to the transfer (and prior to the commencement of the bankruptcy case), such extension of credit may constitute a defense to recovery, to the extent of any new value, against an otherwise recoverable transfer of property. If a transfer is recovered by the Liquidating Trustee, the transferee has a Unsecured Claim to the extent of the recovery.  The rights to bring preferential transfer claims identified on the attached **Exhibit "2",** as well as any other preferential transfer causes of action as may be Avoidance Actions or Retained Causes of Action, are fully reserved and assigned to the Liquidating Trust under the terms of the Plan.

**Holders of Claims and Interests and parties-in-interest are advised that if they received a voidable transfer, they may be sued whether or not they vote to accept the Plan**. All avoidance actions and rights pursuant to §§ 506(c), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b), 553 and 724 of the Bankruptcy Code and all causes of action under state, federal or other applicable law which constitute Causes of Action shall be retained and may be prosecuted or settled by the Liquidating Trust (if Retained Causes of Action) or the Reorganized Debtors (if not Retained Causes of Action).

### 17.3   Other Causes of Action

As set forth in the Plan, the Debtors believe that certain Retained Causes of Action exist that will be evaluated, pursued and resolved by the Liquidating Trust, including but not limited to those identified on **Exhibit "2"** hereto.

### ARTICLE XVIII
### VOTING PROCEDURES AND REQUIREMENTS

### 18.1   Ballots and Voting Deadline

A ballot to be used to vote to accept or reject the Plan is enclosed with this Disclosure Statement.   A holder of Claims who is voting must (1) carefully review the ballot and

instructions thereon, (2) complete and execute the ballot indicating the Creditor's vote to either accept or reject the Plan, and (3) return the executed ballot to the address indicated thereon by the deadline specified by the Bankruptcy Court.

**The Bankruptcy Court has directed that, to be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be received by the Debtors no later than March 25, 2019, at 4:00 p.m. (Central Time)**

If you hold an impaired Claim against the Debtor, return your ballot to:

Locke Lord LLP
c/o C. Davin Boldissar
601 Poydras St., Suite 2660
New Orleans, LA 70130

**TO BE COUNTED, YOUR BALLOT MUST BE <u>RECEIVED</u>
NO LATER THAN MARCH 25, 2019, AT 4:00 P.M. (CENTRAL TIME).**

### 18.2    <u>Creditors Entitled to Vote</u>

Any holder of a Claim whose Claim is Impaired under the Plan is entitled to vote, if either (i) the Debtors have scheduled its Claim on its Statement of Liabilities and such Claim is not scheduled as disputed, contingent or unliquidated, (ii) such holder has filed a Proof of Claim on or before the last date set by the Bankruptcy Court for filing Proofs of Claim and no objection has been filed to such Claim, or (iii) such holder is a beneficial owner of the Bonds.

Holders of Disputed Claims are not entitled to vote on the Plan.  Any Claim to which an objection has been filed and remains pending, is not entitled to vote unless the Bankruptcy Court, upon motion by the holder of a Disputed Claim, temporarily allows the Claim in an amount that it deems proper for accepting or rejecting the Plan by the filing of a motion.  Any such motion must be heard and determined by the Bankruptcy Court before the date established by the Bankruptcy Court as the final date to vote on the Plan pursuant to Bankruptcy rule 3018.  In addition, a vote may be disregarded if the Bankruptcy Court determines that the acceptance or rejection of the Plan by the holder of the Claim was not solicited or obtained in good faith or according to the provisions of the Bankruptcy Code.

Classes of Claims that are not Impaired are deemed to have accepted a Plan pursuant to § 1126(f) and, therefore, are not entitled to vote on the Plan.  Pursuant to § 1126, only classes of claims or interests that are "impaired" are entitled to vote on a plan.  Generally, a Claim is impaired if the Plan alters the legal, equitable, or contractual rights to which the holder of such claim is otherwise entitled.

### 18.3    <u>Voting Procedures</u>

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, revocation, or withdrawal of Ballots will be determined by the Bankruptcy Court.  The Debtors also reserve the right to oppose any Ballot

(subject to final determination by the Bankruptcy Court) that is not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, be unlawful. The Debtors further reserve the right to ask the Bankruptcy Court to waive any defects or irregularities or conditions or delivery as to any particular Ballot. The interpretation by the Bankruptcy Court of the provisions of this Disclosure Statement and the Ballots will be final and binding. Unless waived, any defects or irregularities concerning deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine. Unless otherwise directed by the Bankruptcy Court, delivery of Ballots will not be deemed to have been made and will be invalidated unless or until all defects and irregularities have been timely cured or waived.

### 18.4   **Vote Required for Class Acceptance**

The Bankruptcy Code defines acceptance of a chapter 11 plan by a class of Claims as the acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half in number of the allowed Claims of the class actually voting to accept or reject the proposed plan.

The Bankruptcy Code defines acceptance of a chapter 11 plan by a class of Interests as the acceptance by holders of at least two-thirds (2/3) in amount of the allowed Interests in the class actually voting to accept or reject the proposed plan.

### 18.5   **Cramdown**

If the Plan is not accepted by holders of all classes of Impaired Claims, the Debtors reserve the right to withdraw the Plan. If the Plan is accepted by one or more holders of all classes of Impaired Claims, the Debtors will request the Bankruptcy Court to approve the Plan under 11 U.S.C. § 1129(b), including the cramdown of equity Interest holders.

**THE DEBTORS STRONGLY URGE ALL IMPAIRED CREDITORS TO VOTE TO ACCEPT THE PLAN.**

*Remainder of Page is Intentionally Left Blank*

**Date: February 22, 2019**

**DEBTORS:**

**Texas Pellets, Inc.**

By:
Name: Chip Cummins
Title:   Chief Restructuring Officer

**German Pellets Texas, LLC**

By:
Name: Chip Cummins
Title:   Chief Restructuring Officer

70689015v.1

**SCHEDULE 1.10[1]**

| Defendant | Adversary Case Number | Demand Amount | Status |
|---|---|---|---|
| North American Procurement Company | 16-09003 | $2,660,365.11 | Pending |
| DKFM Switzerland AG | 18-09002 | $1,100,000.00 | Pending |
| Draeger Medical Systems | 18-09003 | $39,056.68 | Settled |
| United Rentals, Inc. F/k/a NES Rentals | 18-09004 | $33,671.68 | Settled |
| Health Care Service Corporation d/b/a BCBS | 18-09005 | $165,997.31 | Dismissed |
| The Guardian Life Insurance Company of America | 18-09006 | $21,035.44 | Dismissed |
| Wells Fargo Insurance, Inc., et al. | 18-09007 | $235,819.40 | Dismissed |
| Entergy Texas, Inc. | 18-09008 | $29,746.40 | Dismissed |
| East Coast Die Repair, Inc. | 18-09009 | $90,000.00 | Dismissed |
| Jasper Oil, Inc. | 18-09010 | $131,855.58 | Pending |
| Inspectorate & Bureau Veritas North America | 18-09011 | $80,463.76 | Settled |
| C & I Oil Company, Inc. | 18-09012 | $31,483.34 | Pending |
| Wessel GmbH | 18-09013 | $27,500.00 | Dismissed |
| North American Biomass | 18-09014 | $125,119.40 | Judgment Issued by Bankruptcy Court |
| Volvo Financial Services, LLC | 18-09015 | $104,173.53 | Settled |
| GreCon, Inc. | 18-09016 | $26,265.40 | Pending |

---

[1] For actions with an Adversary case number, these are filed before the Bankruptcy Court and are pending actions with the listed case number.

| Defendant | Adversary Case Number | Demand Amount | Status |
|---|---|---|---|
| Southern Tire Mart, LLC | 18-09017 | $24,486.44 | Pending |
| Motion Industries, Inc. | 18-09018 | $23,410.75 | Settled |
| Patterson Wood Products, Inc. | 18-09019 | $21,500.36 | Settled |
| Kluber Lubrication NA LP | 18-09020 | $17,892.00 | Dismissed |
| Ardent Mills, LLC | 18-09021 | $60,690.00 | Settled |
| KOBO | 18-09022 | $17,234.00 | Dismissed |
| City of Woodville | 18-09023 | $24,858.43 | Pending |
| Bates-Williamette, LLC | 18-09024 | $19,320.00 | Pending |

In addition to the foregoing, all of the Debtors' and Estates' rights and claims for recovery and/or avoidance of preferential and/or fraudulent transfers subject to avoidance under sections 547, 548, and/or 550 of the Bankruptcy Code, 11 U.S.C. §§ 547, 548, and 550 against the following parties: SSA Gulf, Inc. / SSA Marine; Smart's Truck & Trailer Equipment, Inc.; The Goodyear Tire and Rubber Company; RAB of Louisiana, LLC / RAB of Louisiana, Inc.; Lakeway Tire & Service; Louisiana Workers' Compensation Corporation; California Pellet Mill / CPM Europe B.V.; Kice Industries, Inc.; and German Pellets Holding USA, Inc.

## **SCHEDULE 1.65**

## COMMERCIAL GENERAL LIABILITY

| PERIOD | NUMBER | LIMITS | INSURER | TYPE (OCC/CM) |
|---|---|---|---|---|
| 01-01-2018/19 | G28202222-002 $1M/occ; $4M/agg | | Westchester Surplus Lines Ins. Co. | OCC |
| 01-01-2017/18 | G28202222-001 $1M/occ; $4M/agg | | Westchester Surplus Lines Ins. Co. | OCC |
| 01-01-2016/17 | 263-82-65 $1M/occ; $2M/agg | | Illinois National Ins. Co. (AIG) | OCC |
| 01-01-2015/16 | 600-81-59 $1M/occ; $2M/agg | | Illinois National Ins. Co. (AIG) | OCC |
| 07-01-2013 to 01-01-15 | 459-41-48 $1M/occ; $2M/agg | | Illinois National Ins. Co. (AIG) | OCC |
| 11-21-11 to 10-1-13 | AR5361023 $1M/occ; $2M/agg | | Colony Ins. Co. | OCC |
| 11-21-11 to 11-21-12 | 1200700247 $1M/occ; $2M/agg | | Catlin Specialty Ins. Co. | OCC - Woodville only |
| 11-21-12 to 11-21-13 | 1200700433 $1M/occ; $2M/agg | | Catlin Specialty Ins. Co. | OCC - Woodville only |

## UMBRELLA / EXCESS

| PERIOD | NUMBER | LIMITS | INSURER | TYPE (OCC/CM) |
|---|---|---|---|---|
| 03-31-2018/19 | EXC2274783 $10M xs $15M | | Great Am. Assurance Co. | OCC |
| 03-31-2018/19 | 23627403 $15M xs CGL, Auto, EL | | Lexington Ins. Co. | OCC |
| 01-01-2017 to 03-31-2018 | ZUP-41M70858-17-NF $25M xs CGL, Auto, EL, EBL | | The Travelers Indem. Co. | OCC |
| 5-11-2012 to 10-1-2013 | G24279911001 $10M xs $10M | | Illinois Union Ins. Co. (ACE) | OCC |
| 11-21-2011 to 9-1-2013 | AR5461118 $10M xs CGL | | Colony Insuarnce Co. | OCC |

## POLLUTION

| PERIOD | NUMBER | LIMITS | INSURER | TYPE (OCC/CM) |
|---|---|---|---|---|
| 05-11-2018/2019 | PRE E317258 00 | $5,000,000 | Great Am. E&S Ins. Co. | Claims-Made |
| 05-11-2015/2018 | PLS18947808 | $5,000,000 | AIG Specialty Ins. Co. | |

## DIRECTORS & OFFICERS

| PERIOD | NUMBER | LIMITS | INSURER | TYPE (OCC/CM) |
|---|---|---|---|---|
| 1-1-2017 to 7-1-2019 | DOP10010503300 | $5,000,000 | Endurance Am. Ins. Co. | Claims-Made |

## EMPLOYMENT PRACTICES LIABILITY

| PERIOD | NUMBER | LIMITS | INSURER | TYPE (OCC/CM) |
|---|---|---|---|---|
| 12-16-2018/19 | 8224-9115 | $1,000,000 | Federal Insurance Co. | Claims-Made |
| 12-16-2017/18 | 8224-9115 | $1,000,000 | Federal Insurance Co. | Claims-Made |
| 12-16-2016/17 | 8224-9115 | $1,000,000 | Federal Insurance Co. | Claims-Made |
| 12-16-2015/16 | 8224-9115 | $1,000,000 | Federal Insurance Co. | Claims-Made |

## INLAND MARINE (CONTRACTORS EQUIPMENT)

| PERIOD | NUMBER | LIMITS | INSURER | TYPE (OCC/CM) |
|---|---|---|---|---|
| 07-01-2018/19 | 22 MS NL2070 | $2,461,178 | Hartford Fire Ins. Co. | OCC |
| 07-01-2017/18 | 22 MS NL2070 | $2,461,178 | Hartford Fire Ins. Co. | OCC |
| 07-01-2016/17 | 22 MS NL2070 | $2,191,285 | Hartford Fire Ins. Co. | OCC |

## BUSINESS AUTO (INCLUDING LIABILITY)

| PERIOD | NUMBER | LIMITS | INSURER | TYPE (OCC/CM) |
|---|---|---|---|---|
| 01-05-2018/19 | 01 APM 015655-01 | $1,000,000 | Redwood Fire and Cas. Ins. Co. | OCC |
| 08-19-2017/18 | 02 TRM 024963-01 | $1,000,000 | Berkshire Hathaway Homestate Ins. C | OCC |
| 08-19-2016/17 | 02 APM 010445-01 | $1,000,000 | Berkshire Hathaway Homestate Ins. C | OCC |

* TYPE (OCC/CM) - "OCC" is an occurrence-based policy, which is usually triggered by events occurring during the policy period.  "CM" is a claims-made policy, which is triggered by claims that are made during the policy period for events that occurred in the past.

## SCHEDULE 1.98

(1) All Avoidance Actions, including without limitation those set forth on Schedule 1.10

(2) The D&O Action

(3) The following Causes of Action:

| | **Name of Entity/Potential Defendant** | **Causes of Action (Including Retained Causes of Action) Held by the Debtors Against the Entity/Potential Defendant** |
|---|---|---|
| **1.** | German Pellets GmbH | Causes of Action under §§ 542, 544, 545, 547, 548, 550, 551, 553, or other sections of the Bankruptcy Code, and/or under other similar federal or state statute, case and/or common law (including, e.g., and without limitation, constructive and intentional fraud and fraudulent transfer) |
| **2.** | German Pellets Holding USA, Inc. | Causes of Action under §§ 542, 544, 545, 547, 548, 550, 551, 553, or other sections of the Bankruptcy Code, and/or under other similar federal or state statute, case and/or common law (including, e.g., and without limitation, constructive and intentional fraud and fraudulent transfer) |
| **3.** | German Pellets Louisiana, LLC | Causes of Action under §§ 542, 544, 545, 547, 548, 550, 551, 553, or other sections of the Bankruptcy Code, and/or under other similar federal or state statute, case and/or common law (including, e.g., and without limitation, constructive and intentional fraud and fraudulent transfer) |
| **4.** | German Pellets Texas, LLC | Causes of Action under §§ 542, 544, 545, 547, 548, 550, 551, 553, or other sections of the Bankruptcy Code, and/or under other similar federal or state statute, case and/or common law (including, e.g., and without limitation, constructive and intentional fraud and fraudulent transfer) |
| **5.** | GP Lumber, LLC | Causes of Action under §§ 542, 544, 545, 547, 548, 550, 551, 553, or other sections of the Bankruptcy Code, and/or under other similar federal or state statute, case and/or common law (including, e.g., and without limitation, constructive and intentional fraud and fraudulent transfer) |
| **6.** | IPBG Pellets Beteiligungs GmbH | Causes of Action under §§ 542, 544, 545, 547, 548, 550, 551, 553, or other sections of the Bankruptcy Code, and/or under other similar federal or state statute, case and/or common law (including, e.g., and without limitation, |

| | **Name of Entity/Potential Defendant** | **Causes of Action (Including Retained Causes of Action) Held by the Debtors Against the Entity/Potential Defendant** |
|---|---|---|
| | | constructive and intentional fraud and fraudulent transfer) |
| **7.** | Louisiana Pellets, Inc. | Causes of Action under §§ 542, 544, 545, 547, 548, 550, 551, 553, or other sections of the Bankruptcy Code, and/or under other similar federal or state statute, case and/or common law (including, e.g., and without limitation, constructive and intentional fraud and fraudulent transfer) |
| **8.** | Texas Pellets, Inc. | Causes of Action under §§ 542, 544, 545, 547, 548, 550, 551, 553, or other sections of the Bankruptcy Code, and/or under other similar federal or state statute, case and/or common law (including, e.g., and without limitation, constructive and intentional fraud and fraudulent transfer) |
| **9.** | Woodville Lumber II, LLC | Causes of Action under §§ 542, 544, 545, 547, 548, 550, 551, 553, or other sections of the Bankruptcy Code, and/or under other similar federal or state statute, case and/or common law (including, e.g., and without limitation, constructive and intentional fraud and fraudulent transfer) |
| **10.** | Woodville Lumber, Inc. | Causes of Action under §§ 542, 544, 545, 547, 548, 550, 551, 553, or other sections of the Bankruptcy Code, and/or under other similar federal or state statute, case and/or common law (including, e.g., and without limitation, constructive and intentional fraud and fraudulent transfer) |
| **11.** | All officers, directors, and or managers of GPTX between 2012 and the Petition Date, including without limitation Peter Leibold, Anne Leibold and/or Michael Leibold | All Causes of Action of the Debtors, including without limitation the following: (1) willful misconduct, (2) theft, (3) constructive and intentional fraud or fraudulent transfer (including without limitation under Bankruptcy Code §§ 544 and 548 and other similar federal or state statutes, cases or common law), (4) gross negligence, (5) ordinary negligence, (6) conversion, (7) tortious interference with existing contract(s), (8) tortious interference with prospective relations, (9) money had and received, (10) bad-faith acts, (11) self-dealing, (12) breach of fiduciary duty, (13) *ultra vires* acts, (14) breach of contract, (15) quantum meruit, (16) promissory estoppel, (17) offset/recoupment, (18) declaratory judgement, (19) all Causes of Action arising under Bankruptcy Code §§ 542, 544, 545, 547, 548, 550, 551, and 553, as well as other similar federal or state statute, cases and/or common law, (20) misappropriation of trade secrets, (21) aiding |

| **Name of Entity/Potential Defendant** | **Causes of Action (Including Retained Causes of Action) Held by the Debtors Against the Entity/Potential Defendant** |
|---|---|
| | and abetting, (22) civil conspiracy, (23) claims for attorneys' fees, costs, and pre- and post-judgment interest, and (24) any and all Causes of Action asserted under the D&O Action. |
| **12.** All officers, directors, and or managers of TPI between 2012 and the Petition Date, including without limitation Peter Leibold, Anne Leibold and/or Michael Leibold | All Causes of Action of the Debtors, including without limitation the following: (1) willful misconduct, (2) theft, (3) constructive and intentional fraud or fraudulent transfer (including without limitation under Bankruptcy Code §§ 544 and 548 and other similar federal or state statutes, cases or common law), (4) gross negligence, (5) ordinary negligence, (6) conversion, (7) tortious interference with existing contract(s), (8) tortious interference with prospective relations, (9) money had and received, (10) bad-faith acts, (11) self-dealing, (12) breach of fiduciary duty, (13) *ultra vires* acts, (14) breach of contract, (15) quantum meruit, (16) promissory estoppel, (17) offset/recoupment, (18) declaratory judgement, (19) all Causes of Action arising under Bankruptcy Code §§ 542, 544, 545, 547, 548, 550, 551, and 553, as well as other similar federal or state statute, cases and/or common law, (20) misappropriation of trade secrets, (21) aiding and abetting, (22) civil conspiracy, (23) claims for attorneys' fees, costs, and pre- and post-judgment interest, and (24) any and all Causes of Action asserted under the D&O Action. |
| **13.** Port of Port Arthur Navigation District of Jefferson County, Texas | All claims, causes of action, and/or rights of action accruing or existing against as of the Effective Date, including without limitation: any and all claims, causes of action, rights of action, avoidance actions, lawsuits, and actions relating to damages incurred by the sellers in connection with the failure to maintain the vessel berth and channel during the period February 25, 2016 through March 3, 2016, resulting in the inability of sellers to complete vessel loading operations at the Storage Facility. |
| **14.** North American Procurement Company | All claims, causes of action, rights of action, avoidance actions, lawsuits, and actions accruing or existing against North American Procurement Company as of the Effective Date, including, but not limited to, claims asserted in Adversary No. 16-09003, pending before the United States Bankruptcy Court for the Eastern District of |

| | **Name of Entity/Potential Defendant** | **Causes of Action (Including Retained Causes of Action) Held by the Debtors Against the Entity/Potential Defendant** |
|---|---|---|
| | | Texas |
| **15.** | [To the extent that such parties are counterparties to Rejected Executory Contracts and/or Rejected Unexpired Leases]:<br>AIG Specialty Insurance Company<br>Aspen Specialty Insurance Company<br>AT&T<br>B&W Mechanical Handling Ltd. n/k/a SAMSON Materials Handling Ltd.<br>Berkshire Hathaway Homestate Ins. Co.<br>Clifton Larson Allen<br>Cummings Westlake LLC<br>Drax Power Limited<br>Drax Power Limited<br>Endurance American Insurance Company<br>Evanston Insurance Company<br>Federal Insurance Company<br>German Pellets Louisiana, LLC<br>German Pellets Louisiana, LLC/Louisiana Pellets Inc.<br>GP Lumber, LLC<br>GreCon, Inc.<br>Harford Fire Insurance Co.<br>Inspectorate (Bureau Veritas)<br>Ironshore Specialty Insurance Company<br>IUQ Institut fur Umweltschutz and Qualitatssicherung, Dr. Krengel GmbH<br>James L. Davis Construction, LLC<br>James River Insurance Company | All claims, causes of action, rights of action, avoidance actions, lawsuits, and actions accruing or existing under Rejected Executory Contracts and Rejected Unexpired Leases, as of the Effective Date. |

| **Name of Entity/Potential Defendant** | **Causes of Action (Including Retained Causes of Action) Held by the Debtors Against the Entity/Potential Defendant** |
|---|---|
| Jim Pate<br>KC Electric, Inc.<br>Louisiana Pellets, Inc<br>Louisiana Pellets, Inc. and German Pellets Louisiana, LLC<br>Luminate LLC<br>Maxum Indemnity Company<br>Mid-South Fire Solutions, Inc.<br>Moak, Casey & Associates<br>North American Procurement Company<br>North American Procurement Company<br>PartnerRe Ireland Insurance Limited<br>PEFC - SFI (Bureau Veritas)<br>Pelletaire LLC<br>POPA Navigation District of Jefferson County<br>Red Ball Oxygen Co., Inc.<br>Smart's Truck Leasing LLC<br>SSA Gulf, Inc.<br>STIS<br>Steadfast Insurance Company<br>Texas Mutual Insurance Company<br>Travelers Excess and Surplus Lines Company<br>Travelers Property Casualty Insurance Co.<br>TSI Responsible Innovation a/k/a Teal Sales, Incorporated<br>VecoPlan AG<br>Volvo Financial Services<br>Westchester Surplus Lines Insurance Company<br>Westport Insurance Corporation<br>Williams Scotsman, Inc.<br>Woodville Lumber, Inc. | |

| | **Name of Entity/Potential Defendant** | **Causes of Action (Including Retained Causes of Action) Held by the Debtors Against the Entity/Potential Defendant** |
|---|---|---|
| | | |

## <u>SCHEDULE 1.109</u>

All claims, Causes of Action, and rights of recovery under insurance policies issued by the insurance carriers listed below, for policy periods in effect as of February 2017, relating to or arising from the Ship Loader Fire:

Evanston Insurance Co.

Steadfast Insurance Co.

Aspen Specialty Co.

James River Insurance Co.

Partner Re Insurance Co.

Swiss Re Insurance Co

Ironshore Insurance Co.

Lloyds Syndicates Insurance

## **SCHEDULE 1.112**

All claims, Causes of Action, and rights of recovery under insurance policies issued by the insurance carriers listed below, for policy periods in effect as of April 2017, relating to or arising from the Silo Burn and/or Silo Collapse:

Evanston Insurance Co.

Steadfast Insurance Co.

Aspen Insurance Co.

Scottsdale Insurance Co.

Hallmark Insurance Co.

Everest Insurance Co. Lloyds Novae Syndicate

Ironshore Insurance Co.

Maxum Insurance Co.

Lloyds Syndicates

**German Pellets Texas, LLC and Texas Pellets Inc.**

Liquidation Analysis

**Overview:**

Presented on the following page is a summary level liquidation analysis of German Pellets Texas, LLC and Texas Pellets Inc. ("GPTX" or "TPI") based on balance sheet assets and liabilities.  We have not performed a review of a detailed trial balance in its analysis, and such a review would not likely result in material changes to the analysis and conclusions.  We have made a number of important assumptions in its liquidation analysis. The liquidation analysis has been done on a consolidated basis, and the recovery for creditors would not change if it was done otherwise. Certain key assumptions of the analysis are included below and on the following pages.

High level assumptions related to the scenario and analysis performed include the following:

**Balance Sheet Date** - Asset and liability values are generally presented as of December 31, 2018

**Plant Idle/Filing Date** -  Assumes the Plant is idle and enters chapter 7 bankruptcy protection on January 1, 2019

**Trustee -** Assumes a Trustee is appointed to oversee the liquidation of the assets and manages distributions to creditors.  The Trustee is assumed to be compensated at a rate of $53,250 for the first $1 million in recovered proceeds and 3% of recovered proceeds thereafter

**Process Timeline -** Assumes the bankruptcy filing and final resolution process takes three months

**Deductions -** Certain deductions from recoveries are assumed to account for costs to carry the Plant and potential priority and administrative claims that would be required to be paid (i.e. Professional Fees)

**German Pellets Texas, LLC and Texas Pellets Inc.**

Liquidation Analysis

*($ in '000s)*

| Balance Sheet Assets | | Balance as of Dec-18 | Recovery Estimate % | | | Recovery Estimate $ | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Low | Mid | High | Low (5 months) | Mid (4.5 months) | High (3 months) | |
| Cash and Equivalents - Unrestricted | $ | 338.9 | 100% | 100% | 100% | $ 338.9 | $ 338.9 | $ 338.9 | |
| Cash and Equivalents - Restricted | | 99.7 | 50% | 50% | 50% | 49.8 | 49.8 | 49.8 | |
| Accounts Receivable - Post Petition | | 1,470.1 | 85% | 90% | 95% | 1,249.6 | 1,323.1 | 1,396.6 | |
| Accounts Receivable - Prepetition | | 434.7 | 0% | 0% | 0% | - | - | - | |
| Inventory - Fuel | | 164.7 | 65% | 70% | 75% | 107.0 | 115.3 | 123.5 | |
| Inventory - Pellets Produced | | 119.5 | 50% | 60% | 70% | 59.7 | 71.7 | 83.6 | |
| Inventory - Raw Materials | | - | 60% | 65% | 70% | - | - | - | |
| Inventory - Spare Parts, Tools | | 422.5 | 15% | 20% | 25% | 63.4 | 84.5 | 105.6 | |
| Inventory - Supplies | | 242.1 | 15% | 20% | 25% | 36.3 | 48.4 | 60.5 | |
| Prepaid Expenses | | 910.3 | 85% | 90% | 95% | 773.8 | 819.3 | 864.8 | |
| Fixed Assets (Net) - Buildings / Machinery / Land etc. | | 171,464.3 | 3% | 5% | 7% | 5,143.9 | 8,573.2 | 12,002.5 | |
| Other Assets: Security Deposits | | 632.0 | 100% | 100% | 100% | 632.0 | 632.0 | 632.0 | |
| Other Assets: Deferred Finance Expenses | | 13,091.4 | 0% | 0% | 0% | - | - | - | |
| Total Assets | $ | 189,390.2 | | | | $ 8,454.5 | $ 12,056.2 | $ 15,657.9 | |
| Outstanding Insurance Claims | | 71,930.1 | 50% | 75% | 100% | 35,965.1 | 53,947.6 | 71,930.1 | |
| Grand Total | $ | 261,320.3 | | | | $ 44,419.5 | $ 66,003.8 | $ 87,588.0 | A |
| *Realizable Value* | | | | | | *17%* | *25%* | *34%* | |
| **Deductions:** | | | | | | | | | |
| Chapter 7 expenses (Carrying Cost) (1) | | | | | | $ 1,300.0 | $ 975.0 | $ 650.0 | |
| Trustee Fees | | | | | | 1,355.8 | 2,003.4 | 2,650.9 | |
| Chapter 11 Administrative Claims (accrued unpaid professional fees) | | | | | | 2,268.0 | 2,268.0 | 2,268.0 | |
| Chapter 11 Post- Petition Debtor in Possession Financing | | | | | | 76,455.9 | 76,455.9 | 76,455.9 | |
| Class 2 Claims (Ad Valorem Tax Claims) | | | | | | 93.9 | 93.9 | 93.9 | |
| Class 1 (Bond Trustee Secured Claim) | | | | | | 184,675.0 | 184,675.0 | 184,675.0 | |
| Subtotal: Total Administrative, Secured and Priority Claims | | | | | | $ 266,148.7 | $ 266,471.2 | $ 266,793.7 | |
| Subtotal: Total Distributable to Administrative, Secured and Priority Claims | | | | | | $ 44,419.5 | $ 66,003.8 | $ 87,588.0 | B |
| Total Unsecured Class 3 Claims | | | | | | $ 30,871.5 | $ 30,871.5 | $ 30,871.5 | |
| Cash Distribution to Unsecured Creditors | | | | | | - | - | - | =A-B |
| *Unsecured Creditor Payments as a % of Total Claims* | | | | | | *0%* | *0%* | *0%* | |

**Notes to Liquidation Analysis:**

(1) Assumes monthly carrying costs of approximately $217k per month

**EXHIBIT "2"**

(1) The following Avoidance Actions:

| Defendant | Adversary Case Number[1] | Demand Amount | Status |
|---|---|---|---|
| North American Procurement Company | 16-09003 | $2,660,365.11 | Pending |
| DKFM Switzerland AG | 18-09002 | $1,100,000.00 | Pending |
| Draeger Medical Systems | 18-09003 | $39,056.68 | Settled |
| United Rentals, Inc. F/k/a NES Rentals | 18-09004 | $33,671.68 | Settled |
| Health Care Service Corporation d/b/a BCBS | 18-09005 | $165,997.31 | Dismissed |
| The Guardian Life Insurance Company of America | 18-09006 | $21,035.44 | Dismissed |
| Wells Fargo Insurance, Inc., et al. | 18-09007 | $235,819.40 | Dismissed |
| Entergy Texas, Inc. | 18-09008 | $29,746.40 | Dismissed |
| East Coast Die Repair, Inc. | 18-09009 | $90,000.00 | Dismissed |
| Jasper Oil, Inc. | 18-09010 | $131,855.58 | Pending |
| Inspectorate & Bureau Veritas North America | 18-09011 | $80,463.76 | Settled |
| C & I Oil Company, Inc. | 18-09012 | $31,483.34 | Pending |
| Wessel GmbH | 18-09013 | $27,500.00 | Dismissed |
| North American Biomass | 18-09014 | $125,119.40 | Judgment Issued by Bankruptcy Court |
| Volvo Financial Services, LLC | 18-09015 | $104,173.53 | Settled |
| GreCon, Inc. | 18-09016 | $26,265.40 | Pending |

---

[1] For actions with an Adversary case number, these are filed before the Bankruptcy Court and are pending actions with the listed case number.

| Defendant | Adversary Case Number[1] | Demand Amount | Status |
|---|---|---|---|
| Southern Tire Mart, LLC | 18-09017 | $24,486.44 | Pending |
| Motion Industries, Inc. | 18-09018 | $23,410.75 | Settled |
| Patterson Wood Products, Inc. | 18-09019 | $21,500.36 | Settled |
| Kluber Lubrication NA LP | 18-09020 | $17,892.00 | Dismissed |
| Ardent Mills, LLC | 18-09021 | $60,690.00 | Settled |
| KOBO | 18-09022 | $17,234.00 | Dismissed |
| City of Woodville | 18-09023 | $24,858.43 | Pending |
| Bates-Williamette, LLC | 18-09024 | $19,320.00 | Pending |

In addition to the foregoing, all of the Debtors' and Estates' rights and claims for recovery and/or avoidance of preferential and/or fraudulent transfers subject to avoidance under sections 547, 548, and/or 550 of the Bankruptcy Code, 11 U.S.C. §§ 547, 548, and 550 against the following parties: SSA Gulf, Inc. / SSA Marine; Smart's Truck & Trailer Equipment, Inc.; The Goodyear Tire and Rubber Company; RAB of Louisiana, LLC / RAB of Louisiana, Inc.; Lakeway Tire & Service; Louisiana Workers' Compensation Corporation; California Pellet Mill / CPM Europe B.V.; Kice Industries, Inc.; and German Pellets Holding USA, Inc.

(2) All of the Debtors' and the Estates' rights and claims as asserted in the D&O Action, which is (i) the action filed and asserted by the Debtors as encaptioned *Texas Pellets, Inc., et al. v. German Pellets GmbH, et al.*, Case No. 2:18-cv-00178-JRG-RSP (United States District Court, Eastern District of Texas); and (ii) all of the Debtors' and the Estates' rights and claims as may be asserted against any Insurance Policy (including any runoff or tail policy, but not including any property or casualty Insurance Policy) that has been issued at any time to and provides coverage to any of the Debtors for current or former directors', officers', managers', and/or members' liability for actions or inactions taken by such individuals in such capacities.

Without limitation, such actions include actions against the following defendants:

GERMAN PELLETS GMBH
IPBG PELLETS BETEILIGUNGS GMBH
PETER LEIBOLD
ANNE LEIBOLD
MICHAEL LEIBOLD

(3) The following Causes of Action:

| | Name of Entity/Potential Defendant | Causes of Action (Including Retained Causes of Action) Held by the Debtors Against the Entity/Potential Defendant |
|---|---|---|
| 1. | German Pellets GmbH | Causes of Action under §§ 542, 544, 545, 547, 548, 550, 551, 553, or other sections of the Bankruptcy Code, and/or under other similar federal or state statute, case and/or common law (including, e.g., and without limitation, constructive and intentional fraud and fraudulent transfer) |
| 2. | German Pellets Holding USA, Inc. | Causes of Action under §§ 542, 544, 545, 547, 548, 550, 551, 553, or other sections of the Bankruptcy Code, and/or under other similar federal or state statute, case and/or common law (including, e.g., and without limitation, constructive and intentional fraud and fraudulent transfer) |
| 3. | German Pellets Louisiana, LLC | Causes of Action under §§ 542, 544, 545, 547, 548, 550, 551, 553, or other sections of the Bankruptcy Code, and/or under other similar federal or state statute, case and/or common law (including, e.g., and without limitation, constructive and intentional fraud and fraudulent transfer) |
| 4. | German Pellets Texas, LLC | Causes of Action under §§ 542, 544, 545, 547, 548, 550, 551, 553, or other sections of the Bankruptcy Code, and/or under other similar federal or state statute, case and/or common law (including, e.g., and without limitation, constructive and intentional fraud and fraudulent transfer) |
| 5. | GP Lumber, LLC | Causes of Action under §§ 542, 544, 545, 547, 548, 550, 551, 553, or other sections of the Bankruptcy Code, and/or under other similar federal or state statute, case and/or common law (including, e.g., and without limitation, constructive and intentional fraud and fraudulent transfer) |
| 6. | IPBG Pellets Beteiligungs GmbH | Causes of Action under §§ 542, 544, 545, 547, 548, 550, 551, 553, or other sections of the Bankruptcy Code, and/or under other similar federal or state statute, case and/or common law (including, e.g., and without limitation, constructive and intentional fraud and fraudulent transfer) |
| 7. | Louisiana Pellets, Inc. | Causes of Action under §§ 542, 544, 545, 547, 548, 550, 551, 553, or other sections of the Bankruptcy Code, and/or |

4

| | **Name of Entity/Potential Defendant** | **Causes of Action (Including Retained Causes of Action) Held by the Debtors Against the Entity/Potential Defendant** |
|---|---|---|
| | | under other similar federal or state statute, case and/or common law (including, e.g., and without limitation, constructive and intentional fraud and fraudulent transfer) |
| **8.** | Texas Pellets, Inc. | Causes of Action under §§ 542, 544, 545, 547, 548, 550, 551, 553, or other sections of the Bankruptcy Code, and/or under other similar federal or state statute, case and/or common law (including, e.g., and without limitation, constructive and intentional fraud and fraudulent transfer) |
| **9.** | Woodville Lumber II, LLC | Causes of Action under §§ 542, 544, 545, 547, 548, 550, 551, 553, or other sections of the Bankruptcy Code, and/or under other similar federal or state statute, case and/or common law (including, e.g., and without limitation, constructive and intentional fraud and fraudulent transfer) |
| **10.** | Woodville Lumber, Inc. | Causes of Action under §§ 542, 544, 545, 547, 548, 550, 551, 553, or other sections of the Bankruptcy Code, and/or under other similar federal or state statute, case and/or common law (including, e.g., and without limitation, constructive and intentional fraud and fraudulent transfer) |
| **11.** | All officers, directors, and or managers of GPTX between 2012 and the Petition Date, including without limitation Peter Leibold, Anne Leibold and/or Michael Leibold | All Causes of Action of the Debtors, including without limitation the following: (1) willful misconduct, (2) theft, (3) constructive and intentional fraud or fraudulent transfer (including without limitation under Bankruptcy Code §§ 544 and 548 and other similar federal or state statutes, cases or common law), (4) gross negligence, (5) ordinary negligence, (6) conversion, (7) tortious interference with existing contract(s), (8) tortious interference with prospective relations, (9) money had and received, (10) bad-faith acts, (11) self-dealing, (12) breach of fiduciary duty, (13) *ultra vires* acts, (14) breach of contract, (15) quantum meruit, (16) promissory estoppel, (17) offset/recoupment, (18) declaratory judgement, (19) all Causes of Action arising under Bankruptcy Code §§ 542, 544, 545, 547, 548, 550, 551, and 553, as well as other similar federal or state statute, cases and/or common law, (20) misappropriation of trade secrets, (21) aiding and abetting, (22) civil conspiracy, (23) claims for attorneys' fees, costs, and pre- and post-judgment interest, and (24) any and all Causes of Action asserted under the |

| **Name of Entity/Potential Defendant** | **Causes of Action (Including Retained Causes of Action) Held by the Debtors Against the Entity/Potential Defendant** |
|---|---|
| | D&O Action. |
| **12.** | All officers, directors, and or managers of TPI between 2012 and the Petition Date, including without limitation Peter Leibold, Anne Leibold and/or Michael Leibold | All Causes of Action of the Debtors, including without limitation the following: (1) willful misconduct, (2) theft, (3) constructive and intentional fraud or fraudulent transfer (including without limitation under Bankruptcy Code §§ 544 and 548 and other similar federal or state statutes, cases or common law), (4) gross negligence, (5) ordinary negligence, (6) conversion, (7) tortious interference with existing contract(s), (8) tortious interference with prospective relations, (9) money had and received, (10) bad-faith acts, (11) self-dealing, (12) breach of fiduciary duty, (13) *ultra vires* acts, (14) breach of contract, (15) quantum meruit, (16) promissory estoppel, (17) offset/recoupment, (18) declaratory judgement, (19) all Causes of Action arising under Bankruptcy Code §§ 542, 544, 545, 547, 548, 550, 551, and 553, as well as other similar federal or state statute, cases and/or common law, (20) misappropriation of trade secrets, (21) aiding and abetting, (22) civil conspiracy, (23) claims for attorneys' fees, costs, and pre- and post-judgment interest, and (24) any and all Causes of Action asserted under the D&O Action. |
| **13.** | Port of Port Arthur Navigation District of Jefferson County, Texas | All claims, causes of action, and/or rights of action accruing or existing against as of the Effective Date, including without limitation: any and all claims, causes of action, rights of action, avoidance actions, lawsuits, and actions relating to damages incurred by the sellers in connection with the failure to maintain the vessel berth and channel during the period February 25, 2016 through March 3, 2016, resulting in the inability of sellers to complete vessel loading operations at the Storage Facility. |
| **14.** | North American Procurement Company | All claims, causes of action, rights of action, avoidance actions, lawsuits, and actions accruing or existing against North American Procurement Company as of the Effective Date, including, but not limited to, claims asserted in Adversary No. 16-09003, pending before the United States Bankruptcy Court for the Eastern District of Texas |
| **15.** | [To the extent that such | All claims, causes of action, rights of action, avoidance |

| **Name of Entity/Potential Defendant** | **Causes of Action (Including Retained Causes of Action) Held by the Debtors Against the Entity/Potential Defendant** |
|---|---|
| parties are counterparties to Rejected Executory Contracts and/or Rejected Unexpired Leases]:<br>AIG Specialty Insurance Company<br>Aspen Specialty Insurance Company<br>AT&T<br>B&W Mechanical Handling Ltd. n/k/a SAMSON Materials Handling Ltd.<br>Berkshire Hathaway Homestate Ins. Co.<br>Clifton Larson Allen<br>Cummings Westlake LLC<br>Drax Power Limited<br>Drax Power Limited<br>Endurance American Insurance Company<br>Evanston Insurance Company<br>Federal Insurance Company<br>German Pellets Louisiana, LLC<br>German Pellets Louisiana, LLC/Louisiana Pellets Inc.<br>GP Lumber, LLC<br>GreCon, Inc.<br>Harford Fire Insurance Co.<br>Inspectorate (Bureau Veritas)<br>Ironshore Specialty Insurance Company<br>IUQ Institut fur Umweltschutz and Qualitatssicherung, Dr. Krengel GmbH<br>James L. Davis Construction, LLC<br>James River Insurance Company<br>Jim Pate<br>KC Electric, Inc. | actions, lawsuits, and actions accruing or existing under Rejected Executory Contracts and Rejected Unexpired Leases, as of the Effective Date. |

| | **Name of Entity/Potential Defendant** | **Causes of Action (Including Retained Causes of Action) Held by the Debtors Against the Entity/Potential Defendant** |
|---|---|---|
| | Louisiana Pellets, Inc<br>Louisiana Pellets, Inc. and German Pellets Louisiana, LLC<br>Luminate LLC<br>Maxum Indemnity Company<br>Mid-South Fire Solutions, Inc.<br>Moak, Casey & Associates<br>North American Procurement Company<br>North American Procurement Company<br>PartnerRe Ireland Insurance Limited<br>PEFC - SFI (Bureau Veritas)<br>Pelletaire LLC<br>POPA Navigation District of Jefferson County<br>Red Ball Oxygen Co., Inc.<br>Smart's Truck Leasing LLC<br>SSA Gulf, Inc.<br>STIS<br>Steadfast Insurance Company<br>Texas Mutual Insurance Company<br>Travelers Excess and Surplus Lines Company<br>Travelers Property Casualty Insurance Co.<br>TSI Responsible Innovation a/k/a Teal Sales, Incorporated<br>VecoPlan AG<br>Volvo Financial Services<br>Westchester Surplus Lines Insurance Company<br>Westport Insurance Corporation<br>Williams Scotsman, Inc.<br>Woodville Lumber, Inc. | |

## EXHIBIT "3"

(1)     All claims, Causes of Action, and rights of recovery under insurance policies issued by the insurance carriers listed below, for policy periods in effect as of February 2017, relating to or arising from the Ship Loader Fire:

Evanston Insurance Co.

Steadfast Insurance Co.

Aspen Specialty Co.

James River Insurance Co.

Partner Re Insurance Co.

Swiss Re Insurance Co

Ironshore Insurance Co.

Lloyds Syndicates Insurance

(2)     All claims, Causes of Action, and rights of recovery under insurance policies issued by the insurance carriers listed below, for policy periods in effect as of April 2017, relating to or arising from the Silo Burn and/or Silo Collapse:

Evanston Insurance Co.

Steadfast Insurance Co.

Aspen Insurance Co.

Scottsdale Insurance Co.

Hallmark Insurance Co.

Everest Insurance Co. Lloyds Novae Syndicate

Ironshore Insurance Co.

Maxum Insurance Co.

Lloyds Syndicates