UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
(LUFKIN DIVISION)

| | |
|---|---|
| In re: ) | |
| ) | **JOINTLY ADMINISTERED** |
| TEXAS PELLETS, INC.[1] ) | under Case No. 16-90126 |
| ) | |
| Debtors. ) | Chapter 11 |
| ) | |

| | |
|---|---|
| ALLISON BYMAN, APPEARING IN ) | |
| HER CAPACITY AS TRUSTEE OF THE ) | |
| LIQUIDATING TRUST OF TEXAS ) | |
| PELLETS, INC. AND GERMAN ) | |
| PELLETS TEXAS, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **Adversary Proceeding No.** _____ |
| ) | |
| PORT OF PORT ARTHUR ) | |
| NAVIGATION DISTRICT OF ) | |
| JEFFERSON COUNTY, TEXAS, ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT

Plaintiff, Allison Byman, appearing in her capacity as the Trustee of the LIQUIDATING TRUST OF TEXAS PELLETS, INC. AND GERMAN PELLETS TEXAS, LLC (the "Liquidating Trustee" or "Plaintiff") files this *Complaint* (the "Complaint") against PORT OF PORT ARTHUR NAVIGATION DISTRICT OF JEFFERSON COUNTY, TEXAS (the "Port") and hereby alleges as follows:

---

[1] The jointly-administered Chapter 11 Debtors, along with the last four digits of each such Debtor's federal tax identification number, are Texas Pellets, Inc. (3478) and German Pellets Texas, LLC (9084). The corporate headquarters and service address for the jointly-administered is: 164 CR 1040, Woodville, TX 75979.

**PAGE 1**

1503532v.1

## I. SUMMARY OF ACTION

1. Plaintiff asserts claims for damages against the Port under the Lease (defined below) between Texas Pellets, Inc. and German Pellets Texas, LLC (collectively the "Debtors") and the Port and arising from the Port's failure to maintain the vessel berth and to dredge adequately the navigation channel immediately adjacent to TPI's facility. As a result of the Port's failure to adequately maintain and dredge navigation channel and vessel berth, Plaintiff incurred damages in excess of $2,079,404.41.

## II. PARTIES

2. The Plaintiff is the Liquidating Trustee of the LIQUIDATING TRUST OF TEXAS PELLETS, INC. AND GERMAN PELLETS TEXAS, LLC which is a trust established pursuant to this Court's *Order Confirming Joint Chapter 11 Plan of Texas Pellets, Inc., and German Pellets Texas, LLC, Granting Final Approval of Debtors' First Amended Disclosure Statement, and Entry of Findings of Fact and Conclusions of Law Pertaining Thereto* [Docket #1257] (the "Confirmation Order"), confirming the *First Amended Joint Chapter 11 Plan for Texas Pellets, Inc. and German Pellets Texas, LLC (Solicitation Version, with Immaterial Modifications as of August 30, 2019)* [Docket #1257-1] (the "Plan"). Pursuant to Sections 9.4.1 and 1.92 of the below-defined Plan, the Liquidating Trust is vested with (and has the sole right to assert) the causes of action asserted herein under Counts 1 and 3, which is defined under the Plan as the "Port Dredging Action."

3. PORT OF PORT ARTHUR NAVIGATION DISTRICT OF JEFFERSON COUNTY, TEXAS is a local government entity[2] domiciled in Texas, with its principal place of

---

[2] On information and belief, the Port is a navigation district created pursuant to Acts of the 58th Legislative, Regular Session, 1964, Chapter 197, as amended.

business in the State of Texas. The Port may be served with process in compliance with Rule 7004(b)(6) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules" or "FRBP") by mailing a copy of this Complaint and accompanying summons via regular United States mail, postage prepaid, to the Port's registered agent in Texas for service of process: Floyd Gaspard, Registered Agent, 221 Houston Ave, Port Arthur, Texas 77640-6415; Matthews Smith, Registered Agent, 2419 Evergreen Drive, Port Arthur, Texas 77642-2244. A copy of the Complaint and accompanying summons will also be mailed via regular United States mail, postage prepaid, to the Port's counsel of record James W. King, Offerman & King, LLP, 6420 Beaumont, TX 77706. A copy will also be mailed to the notice address under the Lease (defined below), to (1) the Port of Port Arthur Navigation District of Jefferson County, Texas., P.O. 1428 / 221 Houston Ave., Port Arthur, TX 77641, Attn: Larry Kelley; and (2) Scot Sheldon, Esq., at Moore Landrey LLP, 905 Orleans Street, Beaumont, TX 77701.

### III.    JURISDICTION AND VENUE

4.    This Court has jurisdiction over this adversary proceeding (the "Lawsuit") under 28 U.S.C. §§ 157 and 1334.

5.    This Lawsuit is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (C), (F), (H) and (O). Plaintiff hereby consents to the entry of final orders or a final judgment by this Court in this Lawsuit if it is determined that this Court, absent consent of the parties to this Lawsuit, cannot enter final orders or a final judgment consistent with Article III of the United States Constitution. Moreover, to the extent that this Lawsuit is determined to be a non-core proceeding, then Plaintiff likewise also consents to the entry of final orders or a judgment by this Court.

6.    Venue is proper in this Court under 28 U.S.C. § 1409.

7.    The Port has appeared in the above Chapter 11 case, and counsel has enrolled in

the Chapter 11 case. The Port has multiple hearings, and has requested affirmative relief from this Court. [*See* Docket # 447, 823, 989, 990, 1054, 1139 in main bankruptcy case]. The Port has also filed a Proof of Claim and designated as Claim # 6 filed in Case No. 16-90126.

### IV. BACKGROUND FACTS

#### A. Relationship Between the Debtors and the Port

8. Until the Debtors sold their operating assets to Woodville Pellets, LLC (the "Purchaser") pursuant to an Order of this Court dated May 16, 2019 [Docket #1163] (the "Sale Order"), Texas Pellets, Inc. ("TPI") was the owner and developer of a wood biomass pellet manufacturing facility located in Woodville, Tyler County, Texas (the "Manufacturing Facility"), and a five-silo pellet storage facility located at Port Arthur, Texas (the "Storage Facility"). German Pellets Texas, LLC ("GPTX") operated and leased the Manufacturing and Storage Facility, pursuant to that certain *Facilities License Agreement*, dated July 25, 2012 (the "Facility Lease"), by and between TPI and GPTX. Under the Facility Lease, wood biomass pellets were manufactured and sold as part of one operational project (the "Project").

9. On or about February 28, 2012, the Port and TPI entered into that certain *Ground Lease* (as amended, the "Lease"). The Lease is dated February 28, 2012 (as amended and supplemented) by and between The Port, as lessor, and TPI as lessee. A copy of the Lease is attached hereto as Exhibit "1". There is also an associated *Easement Agreement* (as amended, the "Easement") between the same parties. Under the Lease, TPI leased from the Port certain real estate and personal property located at the Port of Port Arthur, Texas (the "Port Arthur Property"). The Storage Facility is constructed on the Port Arthur Property.

10. The Lease and Easement were assumed under Section 365 of the Bankruptcy Code by TPI under the Court's Order dated September 26, 2018 [Docket #907], and assigned to the

Purchaser through the Sale Order. However, under the Sale Order and Asset Purchase Agreement (as defined in the Sale Order), all of the Debtors' claims and causes of action against the Port accruing before June 18, 2019 (including without limitation claims and causes of action under the Lease) were retained by the Debtors.

11. The Debtors stored all their manufactured pellets for eventual loading on to vessels at the storage facility of the Port Arthur Property ("Storage Facility"), for transport to international customers. The Storage Facility consists of a five-silo wood pellet storage facility and shipping terminal. At the Storage Facility, the Debtors gathered their product (wood pellets), shipped via trucks from the Manufacturing Facility and other sources. The product was then loaded onto ocean going shipping vessels docked at the shipping terminal.

12. In order to dock at the Storage Facility's shipping terminal, and utilize the docking features of the Storage Facility, it is necessary for the vessels to utilize the vessel berth ("Vessel Berth") and navigation channel immediately adjacent to the Storage Facility ("Navigation Channel"). The Vessel Berth utilized at the Storage Facility is also known as "Berth 4" at the Port's facilities.

13. The Port's contractual obligations concerning the Vessel Berth and Navigation Channel are detailed in the Lease. Exhibit D, Special Stipulation No. 5 of the Lease (*See* Exhibit "1" hereto) provides as follows:

> Exhibit D
> (Special Stipulations)
> The following Special Stipulations are hereby incorporated into the Lease and made a part thereof, and in the event they conflict with any of the provisions set forth in the Lease, the following Special Stipulations shall control:
>
> […]
>
> 5. Vessel Berths. Lessor warrants to and covenants with Lessee that Lessor will maintain or cause to be maintained the Navigation Channels within Lessor's jurisdiction and the berths immediately adjacent to the Closest Dock Area (the

"Wood Pellet Berths") with such skill and diligence that all vessels operated in the service of Lessee or its customers shall be able at all times safely to reach and lie always afloat within the Wood Pellet Berths, provided that the vessel is no greater than: 160 foot beam, no greater than 738 foot length, draft not to exceed 40 feet brackish conditions, fender width less than 3 feet. Notwithstanding anything contained in Lessor's tariffs or otherwise, Lessee shall have absolute priority regarding the use of the Wood Pellet Berths and shall have access to the same 24 hours a day, seven days a week.

Each dredge cycle (which shall be no less frequently than 18 months or if deemed necessary by the Lessor at a time sooner), the Lessor will contract to dredge in front of the docks to at least a minus 42-43 feet in an effort to maintain a 40 feet depth alongside a berth. Siltation build up is a normal occurrence between dredge cycles, but Lessor will ensure that the hard bottom remains at least minus 42 feet. Vessel owner shall at all times make the sole determination as to safe berth and depth alongside.

14. Paragraph 9 of the Lease (*See* Exhibit "1" hereto) states as follows:

9. Indemnification of [TPI]. To the extent allowed by law, [the Port] shall indemnify and save harmless [TPI] against and from all liabilities, obligations, damages, penalties, claims, costs, charges and expenses, including reasonable attorney's fees, which may be imposed upon or incurred by or asserted against [TPI] by reason of any of the following occurring during the Term:
(a) any work done in, on, or about any Adjoining Property or any part thereof by or on behalf of [the Port];
(b) any use, possession, occupation, condition, operation, maintenance or management of any Adjoining Property or any part thereof by or on behalf of [the Port] or any party claiming by, through or under [the Port]; and
(c) any accident, injury or damage to any person or property occurring in or on any Adjoining Property or any part thereof that is owned or controlled by [the Port], which occurs as a result of any act, or failure to act, on the part of [the Port] or any of its agents, contractors, servants, employees, licensees, invitees or designees…

15. Under the above referenced Special Stipulation No. 5 and Paragraph 9, the Port committed and agreed to maintain the Vessel Berth and dredge the Navigation Channel and allow Vessels to fully utilize, at all times, the Storage Facility. Further, the Port agreed to indemnify the Debtors for charges and expenses incurred by the Debtors as a result of the Port's construction activities and its operations at the Port property.

16. In 2016, the Port failed to honor its obligations under the above-referenced Special

Stipulation No. 5 and Paragraph 9 of the Lease, causing damages to the Plaintiff as set forth herein.

### B.  The Port's Breach of the Lease

17. On or about February 19, 2016, the M/V Sentinel ("Sentinel") arrived in the vicinity of the Storage Facility under charter with the Debtors' customer, to load wood pellets from the Storage Facility. The total amount to be loaded was 49,500 metric tons.

18. Between February 19 and 25, 2016, the Sentinel underwent preparations to receive its cargo from the Storage Facility,

19. On or about February 25, 2016, the Sentinel was brought into the Navigational Channel and was moored and docked at the Storage Facility.

20. On February 25, 2016, loading of cargo commenced on the Sentinel. Loading of the Sentinel continued through March 1, 2016.

21. On March 1, 2016, during loading operations, the Sentinel was shifted alongside the berth to fill the last hold of the vessel. During this operation the Master of the Sentinel suspended loading operations, because it was determined that there was insufficient draft to bring the vessel alongside the loading berth again. Indeed, due to insufficient draft within the Navigation Channel (in violation of the terms of the Lease), the bottom of the Sentinel made contact with the water bottom during this operation. As a safety measure, the Captain of the Sentinel immediately suspended further loading of cargo.

22. To investigate further, the Master of the Sentinel appointed a third party surveyor to conduct a sounding at the loading berth which confirmed that the berth did not provide sufficient draft of 40 feet. The draft was in some areas as low as approximately 35.9 feet (10.95 meters) which was well below the requirements of Special Stipulation No. 5.

23. On March 1, 2016, in order to attempt to address the insufficient draft within the Navigation Channel, the Port attempted repairs and remedial work within the Navigation Channel. That work was not successful, and did not result in restoring the Navigation Channel to the draft required under the Lease. The Debtors considered several alternative potential remedial measures to allow completion of loading of the cargo. None proved to be feasible.

24. On March 2, 2016, the Captain of the Sentinel ordered the vessel to be removed from the Navigation Channel, and the vessel traveled to an anchorage known as the Sunoco Anchorage near Nederland, Texas ("Sunoco Anchorage").

25. While the vessel was anchored at the Sunoco Anchorage, a crane was employed to shift the load aboard the Sentinel to stabilize the cargo.

26. It was determined that significant dredging would be required to restore the Navigation Channel to the draft required under the Lease. After such determination was made and the cargo was stabilized, the Sentinel departed the area on or about March 3, 2016 and commenced its voyage to its ultimate destination.

27. Because the Sentinel was interrupted in its loading operations due to insufficient draft within the Navigation Channel, the full cargo could not be, and was not loaded. Approximately 21% of the full cargo was unable to be loaded.

28. As a result of these events, TPI and GPTX incurred significant damages, in the approximate amount of at least $2,079,404.41. Those damages are itemized in Exhibit "2" hereto, and include without limitation lost revenue, deadfreight, demurrage, and other charges, losses and damages as set forth in Exhibit "2." [3]

---

[3] In an abundance of caution, certain details concerning the exact amount of cargo, the calculation of damages categories, and other specific information relating to the Debtors' cargo and customer is not set forth herein due to the concern that the Debtors' customer may assert that some such

29. Without limitation, the damages and losses asserted under Exhibit "2" include lost revenue in the estimated amount of $1,722,864.41 from the Debtors' customer, since the vessel Sentinel was not loaded to capacity.

30. Without limitation, the damages and losses asserted under Exhibit "2" also include "deadfreight" charges from the vessel operator due to the reduced amount of cargo. Those deadfreight charges were in turn assessed on the Debtors, and paid by them, in the approximate amount of $242,132.30, since the vessel Sentinel was not loaded to capacity.

31. Without limitation, the damages and losses asserted under Exhibit "2" also include increased "demurrage" charges from the vessel operator, which are charges for the vessel being in the area and essentially on standby awaiting loading. As discussed above, the circumstances necessitated that Sentinel suspend loading operations, which increased demurrage charges of approximately $29,093.75. That charge was in turn assessed on the Debtors, and paid by them.

32. In addition and without limitation, the vessel and customer of the Debtors incurred various additional costs as set forth on Exhibit "2," in connection with the circumstances above and the necessary moving of the Sentinel and interruption of the loading process. Those additional charges (in the approximate aggregate amount of $85,313.95) were incurred and passed on by the customer of the Debtors, and paid by them.

33. The Debtors notified the Port of the costs and damages sustained by them and tendered several demands, including without limitation correspondence dated April 19, 2016 and August 10, 2016. While the Port did acknowledge the correspondence and appeared through counsel (Kenneth Bullock of Munsch Hart), the Port never substantively responded and has not

---

information may be confidential under the parties' sale agreement. Plaintiff shall request that such information be submitted in this case under seal.

paid any of the damages or amounts owed to the Debtors.

34.   Under the Plan and Confirmation Order (including without limitation Sections 9.4.1 and 1.92 of the Plan), the Liquidating Trust is vested with (and has the sole right to assert) all causes of action and claims for recovery of damages resulting from the 2016 Events described in Paragraphs 18 through 34 above, and as further described in Counts 1 and 3 below.

C.   Attorney's Fees

35.   Paragraph 33 of the Lease provides:

33. Attorney's Fees. In the event either party hereto is compelled to file suit to enforce the terms of this Lease, the party prevailing in such litigation, in addition to all other relief granted by the Court, shall be entitled to the payment by the losing party of all damages, expenses, court costs and reasonable attorneys' fees actually suffered or incurred by the prevailing party in such litigation.

## V. COUNT ONE
### *Breach of Obligations Under Lease (2016 Events)*

36. Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 35 as if fully set forth herein.

37. The Lease is an enforceable contract between TPI and the Port.

38. TPI and the Port were and are parties with the capacity to contract.

39. When entering into the Lease, TPI and the Port both freely gave their consent to entering into it. The Lease has the object and lawful purpose as set forth therein.

40. TPI performed all of its obligations under the Lease.

41. The Port breached its obligations under the Lease.

42. The Port is liable to the Liquidating Trustee for breaches of the Lease, under the assumption and assignment of the Lease under the Sale Order and Asset Purchase Agreement (as defined in the Sale Order). Pursuant to Sections 9.4.1 and 1.92 of the Plan, the Liquidating Trust is vested with the causes of action as asserted in this Count 1 (and Count 3 below) and for the breaches and damages, costs and attorney's fees based on the 2016 Events.

43. Specifically and without limitation, the Port breached the Lease by failing to properly maintain and dredge the Navigation Channel and Vessel Berth in accordance with Special Stipulation No. 5 and Paragraph 9 therein, in connection with the 2016 Events.

44. The Sentinel met the requirements for beam, length, draft, and fender width size as set forth in Special Stipulation No. 5 to the Lease.

45. The breaches described above have directly caused damages as described herein, in excess of $2,079,404.41.

46. The Liquidating Trustee additionally seeks an award of expenses, court costs, and reasonable attorney's fees incurred, pursuant to Paragraph 33 of the Lease.

## VI.    COUNT TWO
### *Attorney's Fees Under Tex. Bus. & Com. Code Ann. § 24.013 and 11 U.S.C. § 105*

47. Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 46 as if fully set forth herein.

48. In addition to all other relief requested in this Lawsuit, the Liquidating Trustee also requests an award of a reasonable attorney's fees and costs pursuant to TEX. BUS. & COM. CODE ANN. § 24.013 and Bankruptcy Code § 105.

49. The Liquidating Trustee additionally seeks an award of expenses, court costs, and reasonable attorney's fees incurred, pursuant to Paragraph 33 of the Lease.

**WHEREFORE** ALLISON BYMAN, IN HER CAPACITY AS TRUSTEE OF THE LIQUIDATING TRUST OF TEXAS PELLETS, INC. AND GERMAN PELLETS TEXAS, LLC as Plaintiff, respectfully prays that this Court enter a judgment in their favor as follows:

   i. awarding judgment against the Port in the amount of Plaintiff's damages, in the amounts set forth above and as to be proven at trial;

   ii. awarding pre- and post-judgment interest on any judgment until such judgment is paid in full;

   iii. awarding expenses, court costs and reasonable attorney's fees in an amount to be proven at trial; and

   iv. granting the Plaintiff such other and further relief as is just and equitable.

Dated: January 21, 2020                    Respectfully submitted,

                                            /s/ *Catherine E. Lasky*
                                           Catherine E. Lasky (La. Bar 28652)
                                              (*admitted pro hac vice*)
                                           LASKY MURPHY LLC
                                           715 Girod Street, Suite 250
                                           New Orleans LA 70130
                                           Telephone: (504) 603-1500
                                           Facsimile: (504) 603-1503
                                           Email: klasky@laskymurphy.com

Jason W. Burge (La. Bar 30420)
Brent B. Barriere (La. Bar 2818)
Alysson L. Mills (La. Bar 32904)
Rebekka C. Veith (La. Bar 36062)
FISHMAN HAYGOOD, LLP
201 St. Charles Avenue, 46th Floor
New Orleans, LA  70170
Telephone: (504) 586-5252
Facsimile: (504) 586-5250
Email: bbarriere@fishmanhaygood.com
          jburge@fishmanhaygood.com
          amills@fishmanhaygood.com
          rveith@fishmanhaygood.com

**COUNSEL FOR ALLISON BYMAN, LIQUIDATING TRUSTEE FOR TEXAS PELLETS, INC. AND GERMAN PELLETS TEXAS, LLC**